U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

AUG 2 6 2019

CLERK, U.S. DISTRICT COURT
By_____
　　　　Deputy

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:18-CV-00902-A** |
| | § | |
| **KINGDOM DOWNHOLE TOOLS, LLC,** | § | |
| **TREA BAKER, and** | § | |
| **JUSTICE BAKER,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |

## FIRST AMENDED COMPLAINT

TO THE HONORABLE COURT:

Now comes, Diamondback Industries, Inc. ("Plaintiff" or "Diamondback") and files this First Amended Complaint against Kingdom Downhole Tools, LLC ("Kingdom"), Trea Baker ("T. Baker"), and Justice Baker ("J. Baker"), (collectively, "Defendants"), and would show the Court as follows:

### I.    Parties

1.    Diamondback is a Texas corporation with its headquarters and principal place of business located at 3824 Williamson Road, Crowley, TX 76036.

2.    Defendant Kingdom Downhole Tools LLC is a Texas limited liability company with a principal place of business at 3136 Meandering Way, Granbury, Hood County, Texas 76049.

3.      Defendant Trea H. Baker is an individual residing in Granbury, Johnson County, Texas.

4.      Defendant Justice Baker is an individual residing in Granbury, Johnson County, Texas.

5.      All Defendants have been served with process.

## II.    Jurisdiction and Venue

6.      This is an action for trade secret misappropriation arising under Title 18 of the United States Code, declaratory judgment of non-infringement of a patent under 35 U.S.C. § 1, *et seq.*, and 28 U.S.C., § 2201, violation of the Digital Millennium Copyright Act ("DMCA") under 17 U.S.C. §§ 1202-1203, patent infringement under 35 U.S.C. .§ 271, *et seq.*, as well as various claims under the laws of the State of Texas.

7.      This Court has original jurisdiction by federal question under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's claims under Texas law, pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b).  On information and belief, Defendants conduct business in this District, and a substantial portion of the acts and omissions alleged in this First Amended Complaint occurred in this District, including misappropriation of trade secrets under both Federal and Texas law, patent infringement, violation of section 1202 of the DMCA, and violations of the Computer Fraud and Abuse Act.

## III.    Summary of the Complaint

9.      Diamondback is suing Defendants for misappropriation of trade secrets, violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), conspiracy, patent infringement, and violation of the DMCA (17 U.S.C. § 1202).

10.     Defendants conspired to raid Diamondback's intellectual property, but specifically its ingenious invention, the disposable short-setting tool, as well as Diamondback's proprietary and secret power charge formula.   Defendants T. Baker and Justice Baker are former Diamondback employees.   Defendants used the information they stole from Diamondback to infringe Diamondback's patents, jump-start their own manufacture of products using Diamondback's trade secrets, and to attempt to unfairly compete or facilitate others' competition with Diamondback's power charge business.

### IV.   Timeline of Relevant Events

**Diamondback and the '035 Patent**

11.     Diamondback, owned by Derrek Drury ("Drury"), was founded on July 12, 1999. Diamondback develops, manufactures, and sells setting tools, power charges, and igniters for use in completing oil and gas wells. Diamondback patented the "Disposable Setting Tool," (U.S. Patent No. 9,810,035 (the "'035 Patent")), on November 7, 2017. Drury and T. Baker were two of the three inventors of the Disposable Setting Tool. The third, Jim Carr, also then a Diamondback employee, is deceased. In addition to the Disposable Setting Tool, Diamondback manufactures power charges for use in both its patented tool, as well as other setting tools manufactured by other companies, such as Baker Hughes.

12.     The '035 Patent discloses and claims a setting tool designed to be attached to a

wireline used for downhole tools. The setting tool is designed so that when a power charge is ignited

in a power charge chamber of the tool, the resulting gasses from the burning of the charge increase

the pressure to force a barrel piston over a mandrel toward the downhole end of the mandrel, where

a frac plug is attached. The barrel piston engages a setting sleeve, which in turn engages the frac

plug attached to the end of the mandrel to deploy the frac plug in a wellbore. Representative Claim

1 of the '035 Patent is reproduced below:

What is claimed is:
1. A gas operated setting tool for use in wells, comprising:
a mandrel having a first section, an intermediate section and a second section, said first section of being defined for securing to a firing head thereto, said intermediate section having an interior bore extending from said first section to a blind end of said interior bore and defining a power charge chamber, wherein one or more flow ports extend radially outward from said power charge chamber through said mandrel to an exterior of said intermediate section of said mandrel, said intermediate section defining an intermediate exterior of a first uniform circumference, and said second section having a lower exterior of a second uniform circumference, wherein said lower exterior is in fluid communication with said interior bore;
a barrel piston having a tubular body with an enclosed end, said tubular body having a central portion with a uniform interior circumference for slidably receiving said intermediate section and said second section of said mandrel, with an annular-shaped space defined to extend between said central portion of said tubular body of said barrel piston and said second section of said mandrel, said enclosed end of said tubular body having a bore for slidably receiving said second section of said mandrel;

a first seal extending between said tubular body of said barrel piston and said intermediate section of said mandrel for sealing a first portion of said annular-shaped space;
a second seal extending between said bore and said enclosed end of said barrel piston and said second section of said mandrel for sealing a second portion of said annular-shaped space;
said mandrel further having an upper end with a seal section for securing to the firing head, and wherein said mandrel and said barrel piston have lowermost ends adapted for securing to respective ones of a setting sleeve and a packer mandrel; and
wherein a power charge is disposed in said power charge chamber and ignited to generate pressurized gas, pass said pressurized gas through said one or more ports and stroke said barrel piston over said second section of said mandrel, moving the setting sleeve relative to the packer mandrel and setting a well tool secured thereto.

The '035 Patent 7:11 – 55 (Dkt. 1-1, Appx. 18).

13.     In June of 2017, T. Baker approached Drury regarding obtaining an ownership

interest in Diamondback. Drury declined to offer T. Baker ownership in Diamondback. Upon

information and belief, from this point in June 2017, T. Baker became disgruntled and began looking

for opportunities elsewhere, including to compete directly against Diamondback.

14.    Trea Baker inserted himself into another relationship of Diamondback involving Repeat Precision, LLC and others which relationship ended in a dispute which is currently in litigation in the United States District Court for the Western District of Texas in Waco. Reference is made to that dispute only in connection with the actions taken by the Defendants herein relating to the parties in that other case. It appears from information available to Diamondback that the Defendants engaged in certain wrongful conduct in connection with the other parties in the Waco litigation described more fully below.

### The Inside Job

15.    On March 28, 2018, Drury sent an email to the leadership of Diamondback, reminding them that it was unlawful to take any proprietary materials from Diamondback. Justice Baker was copied on that email.

16.    As noted earlier, Trea Baker who had been Vice President of Operations at Diamondback had become disgruntled with Diamondback and set about to steal trade secrets and highly-confidential information which included technical specifications for Diamondback's setting tool technology. And he began an effort to compete directly against Diamondback. He began his efforts likely a good deal earlier but certainly by March of 2018.

17.    While Trea Baker was an employee at Diamondback, his access to Diamondback information included access to the technical specifications for setting tools as well as the power charge formula for the power charges which Diamondback manufactures for use with the disposable setting tools.

18.    When it became apparent that Trea Baker was engaging in misconduct at Diamondback, he was terminated as an employee. Before his termination, he had access to Diamondback's confidential and trade secret information which was to be used solely for purpose

of performing his duties for Diamondback. Drury informed the Repeat Precision parties that Trea

Baker had been terminated as of March 26, 2018, via a text message.

19.     Trea Baker, after his termination, then began efforts to work with his son, Justice

Baker, to obtain further trade secrets and technical specifications of Diamondback's tools and

products. Particularly, on April 12, 2018, there was an email which Drury reviewed wherein Justice

Baker had mistakenly sent Diamondback confidential information to Trea Baker's Diamondback

email account, presumably instead of Trea Baker's personal email account. Diamondback was

monitoring Trea Baker's email account after his termination. In that email, Justice Baker had

attempted to send Trea Baker further detailed technical specifications of Diamondback tools and

products. Upon learning this, Drury also immediately terminated Justice Baker from Diamondback.

20.     At the time he was terminated as an employee, Justice Baker admitted to

Diamondback that he had stolen Diamondback's designs and admitted that he had engaged in this

wrongdoing. However, the Bakers began to make use of the confidential information and intellectual

property of Diamondback. Specifically, less than two weeks after Justice Baker had been terminated,

Diamondback received an executive summary which had been created on April 22, 2018 for a

company called "Kingdom Downhole Tools, L.L.C." That executive summary purports to contain

what is called "confidential, trade-secret information," and states that Kingdom has "expertise in

automation of Power Charge manufacturing and perfecting the one-run tool design." It is now

known that both Justice Baker and Trea Baker are managing members of Kingdom Downhole Tools,

L.L.C., which was formed on or about June 18, 2018. The products offered by Kingdom Downhole

Tools are in fact essentially the products of Diamondback.

21.     Gary Martin later admitted to Diamondback that Repeat Precision paid Trea Baker

and provided him with health insurance over a period of approximately six weeks following Trea

Baker's termination for violation of Diamondback's policies. Gary Martin lied and said that he hired Trea Baker for "consulting." However, upon information and belief, Gary Martin hired Trea Baker to provide information confidential to Diamondback, including the details and secrets surrounding Diamondback's power charge formula(e) and methods of manufacture, both of which are kept in secrecy by Diamondback.

22.    In his deposition in this case, T. Baker testified that between his termination on March 22, 2018, and April 1, 2018, he did some "consulting" work for Gary Martin. According to Trea Baker, the consulting work Gary Martin asked him to perform was "to research the market for the market share in the power charges in the oil and gas market, and…to give [T. Baker's] idea of the best machine tools that are on the market." T. Baker further testified that for this "consulting," Gary Martin paid him $10,000 in two $5,000 checks in consecutive weeks immediately after his termination from Diamondback. It appears, however, that he shared Diamondback confidential information with Martin.

23.    After his "consulting" work for Gary Martin, T. Baker then began to think for himself about "designing a new tool to compete with Diamondback." T. Baker named the tool the "K20."

## The Rip-Off

24.    After T. Baker's termination from Diamondback on March 22, 2018, and his son, J. Baker's subsequent termination from Diamondback on April 12, 2018, the two formed Kingdom Downhole Tools, LLC, ostensibly to compete directly with Diamondback in the disposable setting tool market.

25.    One of the original members of Kingdom, Matt Pond, also the then President of Frontier Oil Tools, LLC, was involved in trying to obtain manufacturing for the setting tools

Kingdom blatantly stole from Diamondback. Matt Pond was also an investor in Kingdom, in an amount of approximately $70,000.00 according to J. Baker in his deposition.

26.     According to T. Baker, T. Baker and J. Baker met with Matt Pond to discuss their ideas for competing against Diamondback around mid-April 2018.

27.     On May 16, 2018, Matt Pond, a founding member of Kingdom, forwarded an email from T. Baker to Hector Herrera of Frontier Oil Tools, LLC ("Frontier"). This email included scanned engineering drawings that T. Baker and J. Baker had made from confidential and trade secret engineering drawings that they stole from Diamondback.

28.     Despite asking for these documents through the discovery process, Diamondback only obtained these documents by sending a subpoena directly to Frontier, not from the Bakers.

29.     At least three of the drawings, Bates labeled FOT00212, FOT00213, and FOT00216, are simply copies of Diamondback engineering drawings with all information identifying the author, owner, and copyright ownership largely removed (on FOT00213 and FOT00216, a sliver of the word "DIAMONDBACK" is still visible). The copied Diamondback drawings that correspond to Frontier's FOT00212, FOT00213, and FOT00216 are Diamondback's DI-NDTex-044949, -044951, and -0044952, respectively.

30.     The information removed (which is "copyright management information", is shown by this excerpt from DI-NDTex-044949 (with selected information redacted):



31.     In addition to the Diamondback-specific authorship, ownership and copyright notices, Kingdom and the Bakers also altered information on the drawing that would show the origin and the substance of the copyright management of the documents.  In reality, the drawings provided by Kingdom to Frontier shown at FOT00212, 213, and 216 are simply copies of Diamondback's drawings with the source-identifying, and copyright information, removed.

32.     When asked where he obtained the drawings that he sent to Frontier, T. Baker lied, stating either "I don't know where they came from," or alternatively, "Probably from a website…like somebody that already makes it like Owen Oil Tools or Hunting Titan. I'm not sure where I got it."

33.     It is readily apparent that T. Baker not only knew precisely where the drawings were from (Diamondback), but he also removed the copyright management information relating to ownership, authorship and related information from each of these drawings.  He intentionally tried to hide the source of the documents to avoid being caught.

### The Infringement

34.     Regardless of the source of the drawings used to manufacture Kingdom's competing setting tool, the "K20," the K20 literally infringes the '035 Patent, and alternatively under the doctrine of equivalents.

35.     Alternatively, the K20 infringes the '035 Patent indirectly, both through contributory infringement and through Kingdom's inducement of others to infringe.

36.     At a minimum, the K20 infringes claims **1**, 5, 6, 7, 9, **10**, 14, 15, 17, **18**, & 19 (independent claims in **bold**).  A claim chart detailing the literal infringement of exemplary claim 1 of the '035 Patent is shown below:

| Claim 1 – '035 Patent | Accused System |
|---|---|
| **1.** A gas operated setting tool for use in wells, comprising: | Kingdom Downhole Tools, LLC K20 Setting Tool:<br><br>Shown below is an assembled Kingdom tool with a portion of the barrel piston cut away:<br> |
| a. a mandrel having a first section, an intermediate section and a second section, | Below is a picture of the mandrel of the Kingdom Tool.<br> |
| b. said first section of being defined for securing to a firing head thereto,; | The "first section" of the Kingdom tool includes a portion with a diameter sized to fit into a coupling for securing the mandrel to a firing head.<br> |

| Claim 1 – '035 Patent | Accused System |
|---|---|
| c. said intermediate section having an interior bore extending from said first section to a blind end of said interior bore and defining a power charge chamber, wherein one or more flow ports extend radially outward from said power charge chamber through said mandrel to an exterior of said intermediate section of said mandrel, | The intermediate section has an interior bore from the first section to a blind end of the interior bore defining a power charge chamber, wherein one or more flow ports (in this case two) radially outward from the power charge chamber through the mandrel:<br><br><br><br>*Interior bore*<br>*First section*<br>*Blind end*<br>*Ports*<br><br>The ports extend radially outward from the power charge chamber of the interior bore, shown below with an Allen wrench inserted from the exterior of the mandrel into the interior bore defining the power charge chamber:<br><br><br><br>*Allen wrench*<br>*Ports extend radially outward from the power charge chamber through the mandrel to the exterior of the mandrel*<br>*Port extends radially outward* |

| Claim 1 – '035 Patent | Accused System |
|---|---|
| d. said intermediate section defining an intermediate exterior of a first uniform circumference, and said second section having a lower exterior of a second uniform circumference, wherein said lower exterior is in fluid communication with said interior bore | <br><br>*Second section has a lower exterior of a second uniform circumference*<br><br>*Lower exterior is in fluid communication with the interior bore due to the ports that extend from the interior bore to the outside of the second section (shown by the Allen wrench inserted through the port)*<br><br>*Intermediate section exterior having a first uniform circumference* |
| e. a barrel piston having a tubular body with an enclosed end, said tubular body having a central portion with a uniform interior circumference for slidably receiving said intermediate section and said second section of said mandrel, with an annular-shaped space defined to extend between said central portion of said tubular body of said barrel piston and said second section of said mandrel, said enclosed end of said tubular body having a bore for slidably receiving said second section of said mandrel; | <br>*Barrel Piston with Tubular Body*<br><br>The enclosed end and annular shaped space are best shown in the cutaway picture of the tool, below. When the tool is in operation, the annular-shaped space increases in size as the barrel piston slides down over the second section of the mandrel. The Kingdom tool uses two pieces fixed together by a threaded portion to create the barrel piston. Once secured, the lower portion of the barrel piston comprises the enclosed end, the face of which opposes the intermediate section of the mandrel that includes the ports from the power charge chamber.<br><br><br>*Enclosed end having a bore for the second section of the mandrel*<br><br>*Central Portion with uniform interior circumference*<br><br>The exterior port holes from the intermediate section of the mandrel are disposed in the annular space in close proximity to the enclosed end of the barrel. When the tool is assembled, there is an offset between the |

| Claim 1 – '035 Patent | Accused System |
|---|---|
|  | closed end of the barrel piston and the port openings. This offset defines the annular space between the bore of the barrel piston and the exterior of the second section of the mandrel. When the tool is actuated, gasses from the combustion of the power charge flow through the port, pushing against the enclosed end of the barrel piston to slide it over the second section of the mandrel. As this happens, the annular-shaped space expands.<br><br><br><br>Alternatively, under the Doctrine of Equivalents, during the tool's operation, as the barrel is forced down the mandrel, an annular-shaped space exists and expands as the enclosed end of the barrel moves away from the ported face of the intermediate section of the mandrel. In such a configuration, the tool operates to perform substantially the same function, in substantially the same way, to achieve the same result as the claimed invention. |
| f.  a first seal extending between said tubular body of said barrel piston and said intermediate section of said mandrel for sealing a first portion of said annular-shaped space; | <br><br>The first seal is shown in the cutaway view of the assembled tool below: |

| Claim 1 – '035 Patent | Accused System |
|---|---|
| |  |
| g. a second seal extending between said bore in said enclosed end of said barrel piston and said second section of said mandrel for sealing a second portion of said annular-shaped space; | |

First portion of annular shaped space (adjacent to the ports on the mandrel)

Grooves for O-ring seals in the intermediate portion of the mandrel to seal against the interior of the barrel piston and the first section of the annular shaped space

O-ring grooves in the interior of the barrel piston for sealing against the second (lower) section of the mandrel during actuation

The cutaway view of the tool shows the second seal in greater detail. The barrel piston's enclosed portion includes the O-ring grooves:

Grooves for O-ring seals in the enclosed end of the barrel piston extending between the enclosed end and the second section of the mandrel to seal the second portion of the annular shaped space

Second section of mandrel

Enclosed end of Barrel Piston

| Claim 1 – '035 Patent | Accused System |
|---|---|
| h. said mandrel further having an upper end with a seal section for securing to the firing head, and wherein said mandrel and said barrel piston have lowermost ends adapted for securing to respective ones of a setting sleeve and a packer mandrel; and | The upper end of the mandrel has a machined sealing face to fit into the firing head:<br><br>*sealing section of upper end fits inside the sealing surface of a firing head adapter*<br><br><br><br>*Lowermost ends of barrel piston and mandrel* |
| i. wherein a power charge is disposed in said power charge chamber and ignited to generate pressurized gas, pass said pressurized gas through said one or more ports and stroke said barrel piston over said second section of said mandrel, moving the setting sleeve relative to the packer mandrel and setting a well tool secured thereto. | When a power charge in the power charge chamber is ignited, the tool is operable to stroke the barrel down and over the second section of the mandrel, moving the setting sleeve relative to the packer mandrel and setting a well tool secured to the packer mandrel.<br><br>*Gasses from power charge move barrel piston over mandrel*<br><br> |

## V.    Causes of Action

37.    All of the foregoing allegations and facts pleaded are incorporated here by reference in pleading the following causes of action.

## I. MISAPPROPRIATION OF TRADE SECRETS IN UNDER THE DEFEND TRADE SECRETS ACT

38.    Gary Martin, acting on behalf of Repeat Precision, received from Trea Baker Diamondback's trade secrets immediately after Trea Baker's termination by Diamondback and which Trea Baker and acquired by improper means.

39.    By virtue of their employment at Diamondback, T. Baker and J. Baker were subject to Diamondback's company policies, at least as set forth in the Diamondback Employee Handbook, which listed each of the following as confidential business information and trade secrets:

Confidentiality/Non-Disclosure

The protection of confidential business information and trade secrets, within and outside Diamondback Industries, is vital to the operation of Diamondback Industries. Such confidential information includes, but is not limited to, the following examples:

- Billing information
- Computer programs/data
- Computer security codes
- Financial information
- Sales, Marketing and Management strategies
- New materials/product research
- Customer lists
- Customer preferences
- Pending projects and proposals
- Plans
- Referral sources or information
- Office security keys/codes
- Research and development strategies
- Management strategies
- Personal information regarding other members

No employee may copy or disclose such information for personal benefit or the benefit of another without express written consent of Diamondback Industries. Any employee who improperly uses

(Dkt. 1-1) (Diamondback Employee Handbook, February 17, 2018, Exh. 27, Appx. 405). Plaintiff's trade secrets include the proprietary technical plans drawings, power charge formula(e), sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

40.     As of February 17, 2018, the Diamondback Employee Handbook prohibited any employee from "copy[ing] or disclos[ing] such information for personal benefit or the benefit of another without express written consent of Diamondback Industries." (*Id.*).

41.     In addition to the Diamondback Employee Handbook, which identified the trade secrets of Diamondback, Diamondback took other reasonable measures to secure its trade secrets, including limiting access to file-shares to individuals with password authorization, limiting access to protected documents to locked rooms and cabinets, and prohibiting copying of certain highly protected formulas and plans.

42.     Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, investment history, data regarding customer history, data regarding Diamondback's sales to individual customers, including the purchase history of Diamondback's customers, and Plaintiff's methods, techniques, processes, and procedures pursuant to 18 U.S.C. § 1839(3) among others.

43.     Diamondback's measures were more than "reasonable," as evidenced by the notices placed on technical drawings, such as DI-NDTex-044949, which prohibited any clearly informed anyone in possession of that document that the information was proprietary to Diamondback. Officers of Diamondback and the select employees with a "need to know" had to sign hard-copy information in- and out- of locked files, and could only access the proprietary information with their

own specific passwords. Additionally, the trade secrets, including the power charge formula, are kept in a secure share file with access restricted to officers of the company and specific individuals with a "need to know." The power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

44.     Plaintiff is the owner of trade secrets misappropriated by Kingdom, T. Baker and J. Baker, as the term "owner" is defined in 18 U.S.C. § 1839(4).

45.     The information in Kingdom's, T. Baker's and J. Baker's possession as described herein derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

46.     J. Baker misappropriated Plaintiff's trade secrets, at least by downloading the trade secrets of Plaintiff onto thumb drives and emailing copies of technical drawings and plans to the email address of his father, then-terminated employee T. Baker. However, J. Baker slipped up when he accidently emailed some of the trade secrets he was stealing to T. Baker's @diamondbackindustries.com account, thereby alerting Diamondback personnel to the theft. J. Baker did not have any authorization to email Diamondback's proprietary, confidential, and trade secret information to anyone outside of Diamondback.

47.     Kingdom and T. Baker misappropriated Diamondback's trade secrets by either obtaining the trade secrets from or through a person (J. Baker) who owed a duty to Diamondback to maintain the secrecy of the trade secrets and limit use of the trade secrets, or by personally copying and/or taking Diamondback's information from Diamondback's premises.

48.     Upon information and belief, T. Baker accessed and removed Diamondback's trade secrets from Diamondback's premises for an unauthorized purpose – e.g., to compete directly against Diamondback in the setting tool market, including the power charge market.

49.     Kingdom, J. Baker and T. Baker remain in possession of at least some of Diamondback's trade secrets, and are attempting to use them in a way that is harmful to Diamondback and for their personal financial gain.

50.     T. Baker and J. Baker acquired Plaintiff's trade secrets through theft, misrepresentation, and based at least upon their breach of their duty to maintain the secrecy of Plaintiff's trade secrets. This unauthorized theft was a use of Diamondback's trade secrets that was not authorized under the Diamondback Employee Handbook. Nor did either T. Baker or J. Baker have authorization to use Diamondback's trade secrets outside of Diamondback.

51.     On June 18, 2018, T. Baker and J. Baker formally established Kingdom Downhole Tools, LLC for the purpose of competing with Diamondback in the power charge, igniter, and setting tool space. Upon information and belief, Kingdom, T. Baker and J. Baker are using the information stolen from Diamondback as a basis to compete against Diamondback with Diamondback's own information.

52.     T. Baker also misappropriated Diamondback's trade secrets by providing them to the R-P Defendants and/or the NCS Defendants, who, upon information and belief, misappropriated Plaintiff's trade secrets by paying T. Baker for information about Diamondback products, product technology, and customer relationships, after T. Baker's termination from Diamondback.

53.     Plaintiff has been harmed by Kingdom's, T. Baker's, and J. Baker's misappropriation of Plaintiff's trade secrets, and pursuant to law, is entitled both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages for unjust enrichment – including

disgorgement – caused by the misappropriation that is not included in a claim for actual loss, or at a minimum, a reasonable royalty for the R-P Defendants' misappropriation.

54.    Kingdom's, T. Baker's, and J. Baker's misappropriation of Plaintiff's trade secrets was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the other Defendants, they too are liable for misappropriation of trade secrets.

## II. COMPUTER FRAUD AND ABUSE ACT

55.    Justice Baker exceeded the authorization granted to him by Diamondback to access and use data contained on Diamondback's computer network.

56.    J. Baker was granted access to Plaintiff's data via a Diamondback protected computer, a "protected computer," in a manner that was unauthorized, or exceeded authorization, or both, by accessing the data with the intention to commit fraud, and/or the intention to harm Diamondback.

57.    Despite having authorization for access as a result of his employment by Diamondback, the J. Baker, nonetheless, knowingly accessed the data with the intent to defraud Plaintiff, and/or to violate company policies, and furthered the fraud by obtaining valuable customer sales, financial, and technical information, in violation of 18 U.S.C. § 1030(a)(4), and then either downloading Plaintiff's confidential business information onto thumb drives, and/or forwarding the data to non-Diamondback personnel, to wit, Trea Baker, J. Baker's father – a previously terminated Diamondback employee.

58.    Plaintiff has been harmed in an amount exceeding $5,000.00, at least by the amounts spent on determining what data was accessed, as well as repairing its goodwill and business relationships damaged by the unauthorized use of the data Defendants unlawfully obtained.  Plaintiff estimates that the damage caused by only accessing the data for the purpose other than the purpose

contemplated by their being granted access – i.e., furthering the interests of Diamondback and for the use and benefit of Diamondback – is in excess of $15,000.00 in the previous year, however, if additional data is uncovered, the amount of damages could exceed $10,000,000.00 depending on what was downloaded or to whom the information was sent.

### III. HARMFUL ACCESS BY COMPUTER

59.     Pursuant to Chapter 143 of the Texas Civil Practice and Remedies Code and as discussed herein, Diamondback has been injured by virtue of all Defendants' knowing and intentional improper access by computer.  Defendants accessed Plaintiff's computer in the form of the technical files and specifications contained on Diamondback's proprietary network without the effective consent of Diamondback.

60.     As a result of Defendants' conduct, Plaintiff has suffered damages within the jurisdictional limits of this Court.

### IV. CIVIL CONSPIRACY

61.     T. Baker and J. Baker, in addition to at least Gary Martin, combined to accomplish an unlawful purpose, which was to obtain Diamondback's confidential information and its trade secrets under false pretenses, through the Bakers' stolen information.

62.     Each of T. Baker and J. Baker had a meeting of the minds with Gary Martin, on the object or course of action.

63.     Defendant T. Baker and J. Baker committed acts of trade secret misappropriation to further the object or course of action.

64.     Diamondback was injured as a result of Defendants' acts in furtherance of the conspiracy.

### V. PATENT INFRINGEMENT

65.    The '035 Patent is valid and enforceable. Defendants do not have a license to practice the patent inventions of the '035 Patent.

66.    Defendants have infringed and are currently infringing, either literally or under the doctrine of equivalents, the '035 Patent by, among other things, making, having made, using, offering for sale, selling, and/or importing in the United States – without license or authority – the K20 disposable setting tool, which falls within the scope of claims 1, 5, 6, 7, 9, 10, 14, 15, 17, 18, & 19 of the '035 Patent.

67.    Defendants' K20 infringes the '035 Patent because it meets each and every limitation of the claims listed above, either literally or under the doctrine of equivalents.

68.    Alternatively, Defendants' K20 setting tool infringes under indirect infringement, including under contributory infringement and active inducement under 35 U.S.C. § 271(f), by knowingly supplying all or substantially all of the components of a patented invention in whole or in part, knowing that the combination and/or operation of the components would infringe the claims of the '035 Patent.

69.    Plaintiff has been damaged by Defendant's infringing conduct and will continue to be damaged unless, the Court grants both a preliminary and permanent injunction prohibiting Defendants from engaging their infringing conduct.    In addition to enjoining Defendants, Diamondback should be awarded damages adequate to compensate for the infringement, in an amount to be determined at trial, but in no event less than a reasonable royalty for the use made of the invention by the Defendants, together with interest and costs as fixed by the Court.

70.    Defendants actions constitute willful infringement, based on the fact that T. Baker, a listed inventor on the '035 Patent, knew and knows the scope of the claims of the '035 Patent, and actively and admittedly attempted (but failed) to design around the '035 Patent.

## VI. VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA") – 17 U.S.C. § 1202

71.     Plaintiff's technical drawings bearing Bates labels DI-NDTex-044949, 044951, 044952, include copyright management information as defined in 17 U.S.C. § 1202(c), including the title of the specification, the name of the author (James L. Carr), the notice of copyright, and the name of the owner of the work.

72.     Defendants intentionally removed and/or altered Diamondback's copyright management information as shown in FOT00212, 213, and 216 in violation of 17 U.S.C. § 1202(b)(1).

73.     Defendants distributed FOT00212, 213, and 216 in violation of 17 U.S.C. § 1202(b)(3), knowing that it would enable, facilitate, and/or conceal an infringement of Plaintiff's copyright.

74.     Plaintiff has been damaged by Defendant's intentional violation of the DMCA, and will continue to be damaged unless and until the Court grants a permanent injunction prohibiting Defendants' unlawful conduct pursuant to 17 U.S.C. § 1203(b)(1).   Based on the actions of Defendants to date, Plaintiff also believes that Defendants will continue to harm Plaintiff unless the articles of manufacture and the machines used to manufacture products utilizing Plaintiff's works illegally distributed under the DMCA are ordered impounded by the Court pursuant to 17 U.S.C. § 1203(b)(2).

75.     Plaintiff is also entitled to damages under 17 U.S.C. § 1203(c), costs under 17 U.S.C. 1203(b)(4), attorney's fees under 17 U.S.C. § 1203(b)(5), and, pursuant to 17 U.S.C. § 1203(b)(6) the destruction of all devices and products involved in the violation that are the custody or control of Defendants or that have been impounded under 17 U.S.C. § 1203(b)(2), and a preliminary, and permanent injunction.

## VII. INTEREST AND ATTORNEY'S FEES

76.     Diamondback seeks prejudgment and post-judgment interest at the maximum legal rate on its damages and its reasonable and necessary attorney's fees as provided for by Chapter 38 of the Texas Civil Practice and Remedies Code.  Plaintiff further seeks its attorney's fees under 18 U.S.C. § 1836(b)(3)(D) for the willful and malicious misappropriation of Plaintiff's trade secrets. Plaintiff further seeks its attorney's fees under 35 U.S.C. § 285 based on the fact that the willful infringement of Defendants, together with the blatant theft of Diamondback's engineering drawings that Defendants used to manufacture its infringing product, makes this case exceptional.  Plaintiff further seeks its attorney's fees under Section 134A.005 of the Civil Practice and Remedies Code for bad faith, willful, and malicious misappropriation of trade secrets.  Plaintiff further seeks its attorney's fees udner Section 143.022 of the Texas Civil Practice and Remedies Code for Harmful Access by Computer.

## VIII. CONDITIONS PRECEDENT

77.     All conditions precedent to Diamondback's recovery have occurred or have been performed as required by law.

## VI.   Prayer for Relief

For the foregoing reasons, Diamondback respectfully requests that the Court enter judgment against Defendants for all of the following:

a)     Injunctive relief;

b)     Actual damages;

c)     Exemplary Damages;

d)     Disgorgement;

e)     Prejudgment and post judgment interest;

f)      Costs;

g)      Infringement of at least one claim of the '035 Patent;

h)      Willful infringement of at least one claim of the '035 Patent;

i)      Damages based on the unjust enrichment of Defendants;

j)      Attorneys' fees;

k)      Injunctive relieve prohibiting the sale and distribution of products that infringe the
        '035 Patent;

l)      Injunctive relief prohibiting the sale and distribution of products manufactured using
        Diamondback's works distributed and altered in violation of the DMCA;

m)      Impoundment of all products and equipment involved in the manufacture of products
        using Diamondback's works distributed and altered by Defendants in violation of
        the DMCA;

n)      Destruction of all products and equipment involved in the manufacture of products
        using Diamondback's works distributed and altered by Defendants in violation of
        the DMCA;

o)      Damages, actual and statutory , and attorneys' fees and costs under 17 U.S.C. §
        1203; and/or

p)      Such other relief, both at law and in equity, as the Court deems just and right given
        the nature of Defendants' actions.

## VII.    Additional Relief

Plaintiff reserves the right to seek preliminary injunctive relieve against Defendants to

preclude the sale of their infringing tools, as well as such tools were manufactured using works

distributed in violation of the DMCA.

---

Dated: July 18, 2019

Respectfully submitted,

Decker A. Cammack (Lead Counsel)
Texas Bar No. 24036311
dcammack@whitakerchalk.com

David A. Skeels
Texas Bar No. 24041925
dskeels@whitakerchalk.com

Mack Ed Swindle
Texas Bar No. 19587500
mswindle@whitakerchalk.com

**WHITAKER CHALK SWINDLE
& SCHWARTZ PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Phone: (817) 878-0500
Fax: (817) 878-0501

*Counsel for Plaintiff Diamondback Industries, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this document is being served through e-filing and via email on this 18th day of July to all counsel who have appeared in this matter.

Decker A. Cammack