IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | | |
|---|---|---|
| DIAMONDBACK INDUSTRIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-cv-00902-A |
| | § | |
| KINGDOM DOWNHOLE TOOLS, LLC; | § | |
| TREA H. BAKER; and JUSTICE BAKER, | § | |
| | § | |
| Defendants. | § | |

DEFENDANTS' APPENDIX IN SUPPORT OF
DEFENDANTS' PARTIAL MOTION TO DISMISS
PLAINTIFF' S FIRST AMENDED COMPLAINT

| EXHIBIT NO. | DESCRIPTION | APPENDIX CITATION |
|---|---|---|
| 1 | Original Complaint filed in case styled *Diamond Back Industries, Inc. v. Repeat Precision, LLC, et al.;* Civ. Action No. 6:19-cv-00034 [D 001] (w/o exs) | App. 001 - 057 |
| 2 | Original Complaint filed in case styled *Repeat Precision, LLC v. Diamond Back Industries, Inc.;* Civ. Action No. 6:19-cv-00036 [D 001] (w/o exs) | App. 058 - 105 |
| 3 | Patent License filed in case styled *Diamond Back Industries, Inc. v. Repeat Precision, LLC, et al.;* Civ. Action No. 6:19-cv-00034 [D 001-5 (Original) and D 001-7 (Amended)] | App. 106 - 129 |
| 4 | ORDER Granting Unopposed Mtn to Join filed in case styled *Mann v. Cochlear, et al.;* Civ. Action No. 2:07-cv-08108 [D 162] | App. 130 - 132 |

Dated: September 6, 2019

Respectfully submitted,

By: _____

**Michael A. McCabe**
mmcabe@munckwilson.com
State Bar No. 24007628
**Kelly P. Chen**
kchen@munckwilson.com
State Bar No. 24062664
**Nichole M. Plagens**
nplagens@munckwilson.com
State Bar No. 24083665
MUNCK WILSON MANDALA, LLP
600 Banner Place Tower
12770 Coit Road
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 (*facsimile*)

**ATTORNEYS FOR DEFENDANTS**
**KINGDOM DOWNHOLE TOOLS, LLC,**
**TREA H. BAKER, AND JUSTICE BAKER**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served via electronic transmission, in accordance with the Federal Rules of Civil Procedure, on all parties of record on this 6th day of September 2019.

_____
**Michael A. McCabe**

811983

2

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | CASE NO. ___6:19-cv-34___ |
| | § | |
| **REPEAT PRECISION, LLC; NCS** | § | |
| **MULTISTAGE, LLC; NCS** | § | |
| **MULTISTAGE HOLDINGS, INC.;** | § | |
| **ADVENT INTERNATIONAL** | § | |
| **CORPORATION; RJ MACHINE** | § | |
| **COMPANY, INC.; GARY MARTIN,** | § | |
| **GRANT MARTIN; and ROBERT** | § | |
| **NIPPER,** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Now comes, Diamondback Industries, Inc. ("Plaintiff" or "Diamondback") and files

this Original Complaint against Repeat Precision, LLC ("R-P"), NCS Multistage, LLC

("NCSM"), NCS Multistage Holdings, Inc. ("NCS M-H"), Advent International Corporation

("Advent"), Gary Martin ("Ga. Martin"), Grant Martin ("Gr. Martin") and Robert Nipper

("Nipper"), , collectively ("Defendants"), and would show the Court as follows:

## Summary of Action

This is an action for trade secret misappropriation under 18 U.S.C. § 1836, and includes additional claims of trade secret misappropriation under the Tex. Civ. Prac. & Rem. Code § 143A.001, *et seq.*, violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030) as well as common law claims for fraud, tortious interference with prospective business relations, breach of contract, fraudulent inducement, and fraudulent concealment. Additionally, the Complaint includes a declaratory judgment claim of no patent infringement under the Declaratory Judgment Act (28 U.S.C. § 2201). Through a protracted and calculated effort, Defendants targeted Diamondback's business to raid its intellectual property, including patents and trade secrets to exclude Diamondback from the setting tool market. The "R-P Defendants," which include R-P, Ga. Martin, and Gr. Martin, and the "NCS Defendants," which include Advent, NCS M-H, NCSM, and Nipper, used deception, misrepresentation, and betrayal of trust to gain access to Diamondback's trade secrets, and then used those trade secrets in violation of at least two confidentiality agreements to force Diamondback out of a market that it created through innovation as embodied in its intellectual property.

## Defendants Target Diamondback

Diamondback, which is owned by its president and majority shareholder, Derrek Drury ("Drury"), is a company engaged in the development, manufacture, and sale of oil and natural gas well-completion products, including, without limitation, setting tools, power charges, and igniters. Diamondback is also the assignee of U.S. Patent No. 9,810,035 (the

"'035 Patent"), titled "Disposable Setting Tool," which issued on November 7, 2017. (U.S.

Patent No. 9,810,035, Nov. 7, 2017, Exh. 2), which names Drury as one of its inventors. In

early 2018, Diamondback was approached by Defendant Ga. Martin, purportedly as the

owner of Defendant R-P, to Discuss the possibility of R-P licensing the '035 Patent from

Diamondback. The parties entered into a Mutual Confidentiality Agreement on February 16,

2018, in furtherance of Ga. Martin's discussions with Drury regarding licensing and potential

acquisition of Diamondback. (Mutual Confidentiality Agreement, February 25, 2018, Exh.

3).

Unbeknownst to Diamondback, at the time Ga. Martin first approached Drury, R-P

was jointly owned by defendant RJ Machine Co. (Ga. Martin's company) and NCS M-H.

Upon information and belief, and also unbeknownst to Drury, at the time Ga. Martin first

made contact with Drury, Diamondback was on a list of target companies that the NCS

Defendants had targeted for either acquisition or takeover.   Subsequently, and without

revealing any of the foregoing information, R-P sought and received an exclusive right and

license to make, have made, use, offer to sell, import, and export products that fall within the

scope of the claims of the '035 Patent (the "Patent License").   (Patent License, March 16,

2018, Exh. 4, § 2). Ga. Martin initially proposed the Patent License as part of a promise to

expand the production capacity of the licensed products, and includes a confidentiality

clause. (*See id.*, § 8).   In order to entice Diamondback to enter into the exclusive Patent

License, R-P and its owner, Ga. Martin, repeatedly promised Diamondback that R-P's

ultimate goal was to acquire Diamondback, and that the Patent License was a necessary step

for R-P to secure the funding necessary for the acquisition. (Declaration of Derrek Drury in Support of Original Complaint ("Drury Decl."), Ex. 1, ¶ 4, Appx. 003). Additionally, on March 9, 2018, through a text message, Ga. Martin informed Drury that Defendant Nipper (with no mention of NCSM or NCS M-H) "owns the other half of" Repeat Precision. (Text Message from Ga. Martin to Drury, March 9, 2018, Exh. 5, pp. 26/186 – 30/186 (redacted)). Consistent with Ga. Martin's prior representations, on or about April 12, 2018, Ga. Martin offered Drury $100,000,000.00 to purchase Diamondback. (Drury Decl., Exh. 1, ¶ 5).

Thereafter, in continued, but what turned out be disingenuous efforts to purchase or otherwise acquire Diamondback, R-P sought an amendment to the Patent License that amended the definition of "License Products" and added a "Right of First Refusal" in the event Diamondback entered into discussions with a third party regarding acquisition or an asset sale. During the period after the Patent License was executed, Diamondback entered discussions with a company unrelated to Defendants to sell Diamondback. Ga. Martin sought the "Amendment to Patent License Agreement and Right of First Refusal Agreement," which has an effective date as May 30, 2018, to prevent Drury from selling Diamondback to this other company. (Amended Patent License, Exh. 6). To obtain Diamondback's consent to amend the Patent License to include a different definition of "Licensed Products" and a "Right of First Refusal," Defendant Ga. Martin promised Diamondback that R-P would ramp up tooling for the production of Licensed Products for broad distribution, and increased its offer to purchase Diamondback to $170,000,000.00. (Drury Decl.. Exh. 1, ¶6).

During these continued discussions with R-P regarding R-P's stated intent to acquire Diamondback, R-P concealed the fact that R-P was jointly owned by RJ Machine Co. (Ga. Martin's Company) and Defendant NCS M-H, which Advent controls by virtue of owning greater than fifty percent (50%) of NCS M-H's stock..   However, and to continue discussions, R-P and Ga. Martin finally disclosed fully for the first time, on June 13, 2018, the extent of NCS M-H's involvement, including that NCS M-H was actually the real-party in interest for R-P, but only in the form of a draft "Project 'Power' Term Sheet" or "Letter of Intent") proffered by Ga. Martin, that listed NCS M-H as the acquiring party. .  (Draft LOI, Exh. 7).  On June 27, 2018, Diamondback and Defendant NCSM, a subsidiary of NCS M-H, agreed to a final version of the Letter of Intent ("LOI") for "Project Power" dated June 27, 2018, purportedly for the purpose of evaluating the purchase and/or acquisition of Diamondback. (Executed LOI, Exh. 17).

As part of the due diligence process, two R-P representatives from R-P (including Gr. Martin) along with several NCS personnel came to Fort Worth to meet in person with Drury. Marty Stormquist from NCS attended via telephone.  During that meeting, which all parties acknowledged was governed by the Confidentiality clause of the Patent Agreement between R-P and Diamondback, the NCS and R-P representatives questioned Drury extensively about Diamondback's customers, purportedly as part of the due diligence process.  Thereafter, on July 12, 2018, Diamondback set up a virtual secure data room for "Project Power" that included highly confidential and trade secret information and materials that were to be provided to NCSM and R-P for the purposes of evaluating the purchase and/or acquisition

of Diamondback. (Drury Decl., Ex. 1, ¶ 8 , Appx. 005 – 6, Excel Spreadsheet, Project Power

Project Report, Exh. 9). NCS M-H also entered into a Mutual Confidentiality Agreement

("MCA") with Diamondback on July 25, 2018, which provided, *inter alia*, that NCSM and

R-P, would keep all information and materials discovered during the evaluation of the

potential acquisition of Diamondback confidential. (Executed MCA, Exh. 8). NCSM and

R-P personnel were granted access beginning on or about July 26, 2018, the day after the

MCA was signed. Virtually all of the information and materials provided to NCS M-H,

NCSM, and R-P through access to the secure data room were trade secrets, including the

sales numbers and contacts that Diamondback relied upon for its sales of well completion

products to Diamondback's then largest customer, "Company A". (Drury Decl., Ex. 1, ¶9,

Appx. 006 – 7 (redacted)). It was clear from the initial meeting on July 5, 2018, that prior

to that meeting, neither the R-P Defendants nor the NCS Defendants were even aware that

Company A was in the setting tool market as a customer, much less a large customer of

Diamondback.

After NCS M-H and its subsidiaries NCSM and R-P accessed Diamondback's trade

secret customer and sales information, NCS M-H informed Diamondback that it would no

longer pursue acquisition of Diamondback. NCS M-H's decision to cease its efforts to

acquire Diamondback was memorialized in a letter from Diamondback's then-counsel to

NCS M-H's Chief Financial Officer, Ryan Hummer, on August 29, 2018. (Letter from John

Harenza to Ryan Hummer, August 29, 2018, Exh. 10).

After NCS M-H obtained Diamondback's trade secret customer and sales information, NCS M-H contacted Company A's representatives directly, as evidenced by Ga. Martin's text message response to Drury's text message on August 2, 2018:



(Text Msg. from Ga. Martin to Drury, Aug. 2, 2018, Exh. 11 (showing 842 messages between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186 (redacted)). Upon learning of NCS M-H's unauthorized use of Diamondback's trade secrets, Diamondback met with Company A's representatives in person to ascertain the extent of NCS M-H's interference with Diamondback's business. (Drury Decl. Ex. 1, ¶ 9).

Thereafter, NCSM informed Diamondback that it would agree that it would amend the Amended Patent License to remove the "Right of First Refusal" provision, apparently believing that it could steal Diamondback's largest customer and force Diamondback out of the setting tool market. (Email from Robert Nipper to Derrek Drury, Sept. 11, 2018, Exh. 12). After Diamondback met with Company A's representative, Company A ceased negotiations with NCS M-H, NCSM, and R-P. But thereafter, R-P refused to remove the Right of First Removal Provision from the Amended Patent License. (Drury Decl. ¶ 9).

**Involvement of Kingdom, Trea Baker and Justice Baker**

In March of 2018, Diamondback learned that one of its employees, Trea Baker ("T.

Baker"), Vice President of Operations, had, without authorization, stolen trade secrets and

highly confidential information in the form of technical specifications for Diamondback's

setting tool technology in an effort to compete directly against Diamondback. Before T.

Baker's termination, he had authorization to access Diamondback's confidential and trade

secret information in for the sole purpose of performing his duties and responsibilities to

Diamondback, but not for his own personal benefit. Drury informed Defendant Ga. Martin

of T. Baker's dismissal on March 26, 2018, via text message:



(Text Msg. Between Drury and Ga. Martin, March 26, 2018, Exh. 5, (showing 842 messages

between Drury and Ga. Martin between March 2, 2018 and October 7, 2018), p. 47/186

(redacted)).

On April 12, 2018, Drury captured an email that Justice Baker ("J. Baker") mistakenly

sent to T. Baker's Diamondback email account, which Drury was monitoring after T. Baker's

termination for inappropriate workplace conduct. In that email, J. Baker had attempted to

send T. Baker detailed technical specifications of Diamondback tools and products. When

confronted, J. Baker admitted that he was "stealing" Diamondback's information. After the Bakers' termination, T. Baker and J. Baker formed Kingdom Downhole Tools LLC, and have created marketing materials utilizing Diamondback's proprietary trade secrets and highly confidential information. Additionally, Ga. Martin admitted to Diamondback that R-P and NCS M-H paid T. Baker over a period of approximately six weeks, including his health insurance, for what Ga. Martin called "consulting." Upon information and belief, Ga. Martin was paying T. Baker for Diamondback's proprietary trade secret and confidential information and materials.

On October 4, 2018, R-P's representative Ga. Martin conducted a telephone conversation with Diamondback's Derrek Drury, during which R-P informed Diamondback that it "owned" the subject matter of the '035 Patent by virtue of the exclusive nature of the Amended Patent License, and that R-P would never purchase or acquire Diamondback, and that there was nothing that Diamondback could do about it. (Drury Decl., Ex. 1, ¶ 10, Appx. 007).

Through the facts as summarized above, it is clear that R-P and its owner Ga. Martin, NCS M-H and NCSM, with their owner Defendant Nipper, have engaged in fraudulent and illegal conduct. First, before the first contact between Ga. Martin and Drury, NCS M-H targeted Diamondback for acquisition and/or takeover. Second, R-P fraudulently induced Diamondback to enter into the Patent License without disclosing to Diamondback that it could not act without NCS M-H's approval and authority, much less that R-P was controlled by NCS M-H. Third, R-P promised to Diamondback that it would itself provide a more

robust offer to acquire Diamondback in exchange for a broadened definition of "Licensed Products" and the inclusion of the "Right of First Refusal" in the Amended Patent License. Fourth, only after R-P obtained the amendment to the Patent License did R-P disclose to Diamondback that its co-owner/parent company, NCS M-H was necessary to pursue acquisition and/or purchase of Diamondback. Finally, NCS M-H entered into the Letter of Intent with the sole purpose to access Diamondback's proprietary customer and sales trade secrets in an effort to steal Diamondback's largest customer and then force Diamondback out of the setting tool market.

Defendants R-P, NCSM, NCS M-H, Ga. Martin, Gr. Martin, Nipper, with the assistance of T. Baker and J. Baker have engaged in concerted activity to steal Diamondback's trade secrets, perpetrate a fraud on Diamondback to induce Diamondback's agreement to the Patent License, the Amended Patent License, and to provide access to Diamondback's trade secrets under the false pretense of acquiring and/or purchasing Diamondback. Additionally, NCS M-H and its co-defendants tortiously interfered with Diamondback's prospective business relationship with Company A. R-P's actions in concert with its co-Defendants has resulted in the breach of the Patent License's "Confidentiality Provision," the July 25·2018, Confidentiality Agreement, and render the Patent License void. Additionally, Defendants' conduct represents a violation of the Securities Act of 1934 (15 U.S.C. § 78j & 17 C.F.R. § 240.10b-5) because the fraud committed by Defendants was based on false representations regarding the R-P Defendants and the NCS Defendants acquiring the equity interests of Diamondback.

Plaintiff originally filed a complaint with substantially similar allegations in the

United States District Court for the Northern District of Texas, Fort Worth Division (Civil

Action No. 4:18-cv-902-A).   Thereafter, R-P filed a complaint in the Southern District of

Texas, Houston division, alleging that by virtue of the Amended Patent License,

Diamondback infringed the '035 Patent (Civil Action No. 4:18-cv-04456).   The parties

agreed on January 8, 2019 to mutually dismiss those actions and attempt to resolve the parties

competing claims.   As a part of that agreement, the parties agreed that to avoid venue and

jurisdiction disputes, any further action between the parties would be filed in the United

States District Court for the Western District of Texas, Waco Division.

## I.    PARTIES

1.    Diamondback is a Texas corporation with its headquarters and principal place

of business located at 3824 Williamson Road, Crowley, TX 76036.

2.    Defendant Repeat Precision, LLC is a Texas limited liability company with a

principal place of business at 130 Northridge Road, Marble Falls, Texas, 78654, and may be

served through its registered agent, NCS Multistage, LLC, c/o General Counsel, 19450 State

Highway 249, Suite 200, Houston, Texas 77070.

3.    Defendant NCS Multistage Holdings, Inc. is a Delaware corporation with a

principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070.

NCS Multistage Holdings, Inc. does not have a registered agent for service in the State of

Texas, and therefore may be served at its principal place of business pursuant to the Federal

Rules of Civil Procedure, or by service on the Texas Secretary of State pursuant to the Texas Long Arm Statute.

4.      Defendant NCS Multistage, LLC is a Texas limited liability company with a principal place of business at 19450 State Highway 249, Suite 200, Houston, Texas 77070, and may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

5.      Defendant Advent International Corporation is a Delaware corporation with a principal place of business at Prudential Tower 800 Boylston Street, Boston, Massachusetts, 02199-8069. Plaintiff is not aware of any registered agent for service in Texas. Therefore, service may be made through the Secretary of State under the Texas Business Organizations Code § 5.251.

6.      Defendant RJ Machine Company, Inc. ("RJM") is a Texas corporation with a principal place of business at 130 Northridge Rd, Marble Falls, Texas, and may be served through its registered agent, Gary H. Martin, 130 Northridge Rd, Marble Falls, Texas, 78665.

7.      Defendant Gary Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County, Texas, and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

8.      Defendant Grant Martin is an individual residing, upon information and belief, in Marble Falls, Burnet County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

9.     Defendant Robert Nipper is an individual residing, upon information and belief, in Houston, Harris County, Texas and may be served personally where he may be found, pursuant to the Federal Rules of Civil Procedure.

## II.    JURISDICTION AND VENUE

10.     This is an action for trade secret misappropriation arising under Title 18 of the United States Code, declaratory judgment of non-infringement of a patent under 35 U.S.C. § 1, *et seq.*, and 28 U.S.C., § 2201, as well as various claims under the laws of the State of Texas.

11.     This Court has original jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1338,and Supplemental Jurisdiction of Plaintiff's claims under Texas Law pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b).  On information and belief, Defendants conduct business in this District, at least a portion of the claims alleged in this Complaint arise in this District, and at least some of the acts of misappropriation, fraud, fraudulent inducement, fraudulent concealment, breach of contract, and tortious interference have taken place and are continuing to take place in this District.

13.     Defendants are subject to this Court's general and specific personal jurisdiction because Defendants have sufficient minimum contacts within the State of Texas and this District, pursuant to due process and/or the Texas Long Arm Statute because Defendants purposefully avail themselves of the privileges of conducting business in the State of Texas and in this District, because Defendants are in the process of establishing a competing

enterprise, which is in the State of Texas, and based on fraudulent activities and breaches of contracts entered into in this District, and because Plaintiff's causes of action arise directly from Defendants' business transactions and other activities in the State of Texas and in this District. Additionally, Defendants are subject to this Court's jurisdiction because the Patent License requires that it be construed under the laws of the State of Texas, and was at least partially executed in this District. All of the claims herein are inextricably intertwined with the claims under 18 U.S.C. § 1836, *et seq.*, which are under the original jurisdiction of the Federal Courts of the United States and specifically are subject to the jurisdiction in the Northern District of Texas. Finally, because Defendants have committed acts of misappropriation in the Northern District of Texas, jurisdiction and venue are proper in this district.

14.    Additionally, the parties have agreed that both jurisdiction and venue are proper in this District for the allegations asserted herein.

15.    The subjects of the misappropriation include the customer sales and volume information, which are the trade secrets and confidential information provided in the secure data room under the LOI that Defendants entered into under false pretenses or as the result of fraudulent conduct by the Defendants. Additionally, other confidential and trade secret information obtained, upon information and belief, by Defendants through Plaintiff's former employee Trea H. Baker, was also misappropriated. Additionally, the trade secrets Defendants have misappropriated relate directly to products sold by Plaintiff in interstate commerce.

### III.   BACKGROUND FACTS

16.     The allegations set forth in paragraphs 1 – 14 and the Summary of Action are incorporated into the foregoing.

17.     Diamondback was founded by Derrek Drury ("Drury") on July 12, 1999, and has become a leading source of setting tool and explosive setting tool technology in the drilling industry.

18.     As part of its technology development, Diamondback's owner and former employees Jimmy L. Carr (deceased) and Trea H. Baker (terminated) developed a setting tool that resulted in the '035 Patent. The '035 Patent issued on November 7, 2017.

19.     Shortly after the '035 Patent issued, on February 7, 2018, Clint Mickey ("Mickey"), R-P's Product Line Manager, contacted T. Baker via telephone, to inquire as to whether Diamondback was interested in licensing the '035 Patent. T. Baker followed up with an email to T. Baker and Drury referencing the call, and inviting Drury to contact Ga. Martin directly. (Email from T. Baker to Drury, Feb. 8, 2018, Exh. 13).

20.     Upon information and belief, prior to Clint Mickey or anyone else from Defendants made contact with Diamondback personnel, the R-P Defendants and the NCS Defendants had determined that Diamondback was a target for acquisition and/or takeover.

21.     On February 8, 2018, Drury responded to a follow-up email from T. Baker, stating that Diamondback would "not be licensing the product," but was "thinking about" R-P's proposal. (*Id.*).

22.     Also on February 8, 2018, Drury called Ga. Martin to discuss R-P's proposal. During that call Ga. Martin averred that he owned a company called "Repeat Precision,"

ORIGINAL COMPLAINT - 15
DM#383952

App. 016

discussed R-P's international manufacturing capabilities, and discussed his company's composite frac plugs, which are marketed under the name "Purple Seal." During the call, Ga. Martin proposed coming to Diamondback's facility in Crowley, Texas, which Drury accepted, ostensibly to discuss a mutually beneficial business arrangement.

23.    On February 16, Diamondback and R-P entered into a Mutual Confidentiality and Non-Disclosure Agreement. (Exh. 3).

24.    On February 19, 2018, Ga. Martin, Gr. Martin, and Mickey visited Diamondback's Crowley headquarters, and met with Drury, T. Baker, and J. Baker. At the meeting Ga. Martin led off the meeting by explaining that R-P had begun the development of a "short disposable setting tool" in November 2017, and immediately stopped development after he discovered that Diamondback was the assignee on the '035 Patent, which led to the emails and telephone calls on February 7th and 8th, respectively.

25.    Also at the February 19, 2018, meeting, Ga. Martin proposed a deal through which R-P would manufacture the setting tools in its Mexico facility, would label all sales materials and packaging with Diamondback's brand, but promised that R-P would not manufacture power charges. However, upon information and belief, no Defendant currently holds sufficient licensing and approval to manufacture explosives of the type required to manufacture power charges for the Diamondback setting tools. Yet, during this initial face-to-face meeting, Ga. Martin accentuated the benefit to Diamondback through partnering with R-P to leverage R-P's manufacturing capabilities. Ga. Martin also represented to Drury that R-P could easily design around Diamondback's '035 Patent.

26.     Ultimately, Drury committed to a license arrangement based on Ga. Martin's representation of his company's (R-P's) manufacturing capabilities, R-P-s threat to design around the '035 Patent, R-P's promise to sell all tools under the license with Diamondback power charges and igniters, the prospect of a substantial near-term market presence of Diamondback's patented setting tool with Diamondback's igniters and separately-patented power charges.

27.     .  On March 16, 2018, R-P and Diamondback entered into the Patent Agreement, which includes a grant clause that reads "[Diamondback] hereby grants to [Repeat Precision] and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products…." (Exh. 4, § 2).  At the time of the Patent Agreement, neither Ga. Martin, nor any other representative of R-P had disclosed to Diamondback that anyone other than Ga. Martin and Robert Nipper were the owners of R-P.  Had Drury known that R-P was controlled by NCS M-H, a publicly traded holding company that is owned and controlled by Advent International Corporation by virtue of a 2012 buyout of NCS M-H, he would never have agreed to the terms of the Patent License.

28.   The Patent Agreement defines "Confidential Information: as follows:

**"Confidential Information"** means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party.  Confidential Information shall not include Nonproprietary Information.

(Exh. 4, § 1).

29.   The Patent Agreement also includes a confidentiality clause, which states as

follows:

8.1   Confidentiality Obligations. The parties acknowledges that in connection with this Agreement it will gain access to Confidential Information of the other party. As a condition to being furnished with Confidential Information, parties agree, during the Term and for 1 years thereafter to:

(a)   not use the Disclosing Party's Confidential Information other than as strictly necessary to exercise its rights and perform its obligations under this Agreement; and

(b)   maintain the Disclosing Party's Confidential Information in strict confidence and, subject to the exceptions below, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent, provided, however, the Receiving Party may disclose the Confidential Information to its Representatives who:

(i)   have a "need to know" for purposes of the Receiving Party's performance, or exercise of its rights with respect to such Confidential Information, under this Agreement;

(ii)   are aware of this restriction; and

(iii)   are themselves bound by confidentiality, provided further that the Receiving Party shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives of, this section.

The Receiving Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

(*Id.*, ¶ 8.1, Appx. 032 – 33).

30.    On or about March 22, 2018, Drury became aware of a personal conduct issue related to T. Baker, which led to his termination from Diamondback.  (Disciplinary Action Report to T. Baker, March 22, 2018, Exh. 14  (redacted)).

31.    On March 28, 2018, Drury sent a subsequent email to the leadership of Diamondback, reiterating that it was unlawful to take any proprietary materials from Diamondback.  J. Baker was included on that email:

From: Derrek Drury
Sent: Wednesday, March 28, 2018 12:49 PM
To: Tonya Cheek; Rob Andres; Ron Swiger; Justice Baker; Kim Bellah; Jeb Wright; Nichole Bucher; Kevin Carter; Taylor Davis
Subject: Notification

Please be advised that divulging or disseminating Diamondback Industries proprietary trade secrets, designs, prints, emails, sales numbers, or other such items to individuals or companies outside the approval of the Owner of Diamondback is expressly prohibit.  Such behavior or actions could lead to that individual being terminated and or prosecuted by law.

Derrek Drury
President
Diamondback Industries, Inc.
3824 Williamson Road
Crowley, TX 76036
Office: 817-297-1059
Cell: 817-480-2139
derrek.drury@diamondbackindustries.com



(Email to Diamondback Personnel, March 28, 2018, Exh. 15).

32.    On or about April 12, 2018, Drury discovered that J. Baker was sending emails to T. Baker that included trade secrets.  J. Baker was terminated immediately.  (Termination Notice of J. Baker, April 12, 2018, Exh. 16).

33.    At the time of his termination, J. Baker admitted to "stealing" Diamondback's proprietary information, including knowing that it was "wrong."  Less than two weeks after J. Baker was terminated, Diamondback received a document created on April 22, 2018 called "Kingdom Downhole Tools – Executive Summary."  This document states clearly that it "contains confidential, trade-secret information," and states that Kingdom has "expertise in

automation of Power Charge manufacturing and perfecting the one-run tool design." (Exh. 20 (redacted)). Both J. Baker and T. Baker are listed as managing members of Kingdome Downhole Tools, LLC, an entity formed on June 18, 2018. Any trade secret information in the possession of Kingdom, J. Baker, and/or T. Baker is, upon information and belief, the trade secret and/or highly confidential information of Diamondback.

34.     On or about April 12, 2018, Ga. Martin offered to purchase Diamondback through R-P for $100,000,000.00, which Ga. Martin stated he could "pay in cash."

35.     Drury rejected Ga. Martin's offer to purchase Diamondback, stating that he believed the value of the company well above $200,000,000.00. At this point, Ga. Martin disclosed, for the first time, that Advent International and Robert Nipper were "investors" in R-P, and that R-P required their approval to enter into any further discussions regarding acquisition of Diamondback. At this point, Ga. Martin still had not discussed any involvement by Defendants NCSM or NCS M-H. (*See* Drury Decl., Exh. 1, ¶ 7 (redacted)).

36.     After the rejection of the R-P offer, Diamondback entered into negotiations with another company ("Company B") for the sale of Diamondback for approximately $170,000,000.00. When Drury was about to sign a letter of intent with Company B, on May 23, 2018, Ga. Martin reemerged, stating that the "hand cuffs were off" from his investors, and that he had approval to offer $170,000,000.00 to $180,000,000.00 for the purchase of Diamondback. (Drury Decl., Ex. 1, ¶ 6, Exh. 4).

37.     On May 25, 2018, Drury cut off negotiations with Company B because of the perceived trusted relationship with Ga. Martin and Ga. Martin's renewed interest in acquisition for almost the same amount Diamondback was discussing with Company B.

38.     As part of the new opening offer to Diamondback, Ga. Martin and R-P also proposed an amendment to the patent license agreement that included a Right of First Refusal ("ROFR"), which Ga. Martin stated that he needed to secure the needed funding for retooling and expansion of R-P's manufacturing capabilities in its Mexico manufacturing facility.

39.     The amendment also purported to expand the license grant, changing the definition of "Licensed Products" from "bridge plugs" to "electric wireline setting tool." (Amended Patent License, Exh. 6).

40.     The Amended Patent Agreement, that includes the expanded definition of "Licensed Products" and the ROFR, does not recite any consideration for the amendment.

41.     In fact, Ga. Martin presented the Amended Patent Agreement to Drury at a lunch on or about May 28, 2018, and actually *discouraged him from seeking legal counsel*, stating words to the effect of "your lawyers will just mess this up," and encouraging Drury to sign it on the spot, with no review by Diamondback's legal counsel.

42.     Once R-P obtained Diamondback's execution of the Amended Patent Agreement, on May 30, 2018, Ga. Martin continued to discuss the acquisition of Diamondback with Drury.

43.     On June 13, 2018, Ga. Martin sent Drury a first draft of the LOI, which for the first time listed NCSM, a direct subsidiary of NCS M-H (a publicly traded company, NASDAQ: NDSM), as the real party in interest to any transaction. (Draft "Project 'Power' Term Sheet ("LOI"), June 13, 2018, Exh. 7). Ga. Martin explained to Drury when the LOI was delivered, that Defendant RJ Machine Company, Inc. ("RJM") was his company, and was 50% owner of R-P, and NCS M-H owned the other 50% of R-P. This was the first time

that Ga. Martin, Gr. Martin, or R-P disclosed any ownership relationship between R-P and NCS M-H or NCSM.

44.    After a single round of edits, Gr. Martin, general manager of R-P, sent an edited copy of the LOI to Drury for execution.

45.    Despite concealing NCS M-H's role in the proposed acquisition of Diamondback, NCSM and R-P continued to pursue the acquisition, so ultimately Drury signed the LOI on behalf of Diamondback, on June 27, 2018. (Executed LOI, June 27, 2018, Exh. 17).

46.    Diamondback agreed to continue acquisition discussions because of the relationship of trust and the confidence that Ga. Martin had cultivated regarding the potential success of R-P's acquisition and subsequent distribution of Diamondback's patented products with Diamondback's power charges and igniters. Additionally, Drury had yet to discovery the significant airworthiness issues of the Learjet 60 that Ga. Martin had sold to Drury. Additionally, Ga. Martin continued to assure Drury that the fact that NCS M-H was involved did not have any effect on the success of closing the deal.

47.    Shortly after the LOI was signed, on or about July 5, 2018, Diamondback set up a secure data room that included most of Diamondback's technical, financial, and sales data so that NCS M-H could conduct due diligence to complete the acquisition of Diamondback. (Project Power Session Log, Exh. 18).

48.    None of the information regarding Diamondback's technical specifications for products, including diamondback's charge formula, igniter technology, automated charge manufacturers, single run setting tool technology manufacturing specifications, testing data,

customer data, customer identity, sales volume, pricing, or sales contacts information was or is publicly available, as evidenced by the need for a secure data room to provide Defendant NCS M-H and its affiliates, and representatives, including all named defendants in this lawsuit (excepting T. Baker and J. Baker) with access for the purposes of due diligence surrounding the acquisition.

49.     On July 25, 2018, Diamondback and NCS M-H entered another Confidentiality Agreement (Project Power Confidentiality Agreement, July 25, 2018, Exh. 8), which specifically named Defendants R-P and NCSM as "subsidiaries" to be bound by the provisions of that agreement.  This additional confidentiality agreement did not supersede the Patent License Agreement confidentiality clause.. (Exh. 4, § 8.1).

50.     Throughout the period of time between February 16, 2018 and July 25, 2018, the Patent Agreement prohibited the use of Diamondback's confidential information and trade secrets for any purpose other than the purpose of the Patent Agreement, which was to make, have made, use, sell, offer to sell, import, and export Licensed Products.

51.     Diamondback's information in the secure data room was under confidentiality agreement either by the Patent Agreement and/or the Confidentiality Agreement at all times from February 16, 2018 through the present.

52.     Neither Ernst & Young, nor Baker Botts, the two entities NCS M-H listed as their accounting and legal teams for the acquisition, ever contacted Diamondback for materials related to the acquisition, further indicating that Defendants proposed the LOI with fraudulent intent, to access Diamondback's trade secrets.  In fact, between Ernst & Young

and Baker Botts, the two companies spent only a combined sixteen (16) minutes in the secure data room. (Session Log, Exh. 18).

53.     NCS M-H and its affiliates never intended to follow through with the acquisition of Diamondback.

54.     Rather, Ga. Martin, Nipper, and other representatives of NCS M-H, NCSM, and R-P continually questioned Drury regarding his largest customers, sales volume, pricing, sales tactics, contacts, overhead, and technical information regarding power charges, igniters, and setting tools, none of which was publicly available.

55.     On or about August 3, 2018, after NCS M-H's representatives had access the secure data room, Nipper approached Drury to tell him that NCS M-H and NCSM intended to meet Company A (Diamondback's largest customer) on August 6, 2018, ostensibly related to due diligence.

56.     Drury refused to allow the meeting, because Nipper proposed to conduct the meeting without Drury or a Diamondback representative.

57.     On August 10, 2018, Drury met with Company A's representatives in person. At the meeting, Company A confirmed that NCS M-H and NCSM had been in contact with some of Company A's representatives for the purpose of negotiating an exclusive contract whereby NCSM would, upon information and belief, supply power charges, setting tools, and igniters to Company A, to the exclusion of Diamondback.

58.     Upon information and belief, from August 10, 2018 until approximately mid-September 2018, Defendants NCS M-H, NCSM, and R-P continued to attempt to negotiate

with Company A in an effort to negotiate an exclusive distribution agreement in which Diamondback would be excluded.

59.     From July 26, 2018, until Defendants NCS M-H and its affiliates (including NCSM and R-P) had access to Diamondback's trade secrets, that Ga. Martin also admitted to having paid six weeks of T. Baker's salary, including going as far as adding T. Baker to his company health insurance plan.

60.     Having effectively raided Diamondback's proprietary information through the guise of acquisition, on September 10, 2018, informed Diamondback that it was no longer pursuing the acquisition.  (Letter to Ryan Hummer, August 29, 2018, Exh. 10).

61.     NCS M-H did not disclose the complete relationship to between NCS M-H, NCSM, Ga. Martin, and R-P until June 2018. (Amended and Restated Company Agreement of Repeat Precision, LLC, February 1, 2017, ("R-P Company Agreement") Exh. 19).

62.     Upon information and belief, Ga. Martin was also paying T. Baker for Diamondback's proprietary information regarding Diamondback's setting tool, igniter, and power charge technology.

63.     In July 2018, Drury became aware that T. Baker had begun Kingdom Downhole Tools, and is planning to enter the market as a competitor using the technology and materials stolen from Diamondback. (Kingdom Downhole Tools Request for Financing ("Prospectus"), [undated], Exh. 20 (redacted)).  In fact, Kingdom Downhole Tools LLC was formed on June 18, 2018, with filing number 803046167, listing both Justice Baker and Trea Baker as Managing Members.  (Kingdom Downhole Tools, LLC Certificate of Formation, June 18, 2018, Exh. 21).

ORIGINAL COMPLAINT - 25
DM#383952

64.    In this document, T. Baker seeks financing for his company, which states that Kingdom Downhole Tools intends to enter the market in each of the areas that Diamondback is an established market presence, in direct competition with Diamondback.

> **Competition**
>
> <u>Power Charges</u>
>
> There are currently only two major competitors with power charges one containing 60% of the market and the other at 30% of the market.
>
> <u>Setting Tools</u>
>
> There is only one setting tool manufacturer of the one run type of setting tools.
>
> **Why Us?**
>
> We provide an extensive background in downhole tool manufacturing. We are the chief designer of the first ever one run setting tool the market has ever seen. We also have designed and approved for production the first automation system for Power Charge manufacturing. We operate under Christian principles and ethics.

*Id.*

65.    On September 11, 2018, Nipper informed Drury that NCSM was willing to terminate the ROFR, apparently believing that with the R-P exclusive patent license and an exclusive distribution deal with Company A, Defendants NCSM and NCS M-H had effectively usurped Diamondback's market value by conning Drury to grant the exclusive Patent Agreement and entering into the disingenuous LOI to acquire Diamondback. (Exh. 12).

66.    Later, on September 26, 2018, Ori Lev, an NCSM employee confirmed to counsel for Diamondback that NCSM would terminate the ROFR, but refused to revisit the other terms of the Patent Agreement. (Email from Ori Lev to Todd Blumenfeld, Sept. 26, 2018, Exh. 22).

67.     Once Company A realized that NCSM, NCS M-H, and R-P were going behind Diamondback's back in attempting to negotiate with Company A, Company A refused to continue to negotiate with Defendants.   Subsequently, on October 4, 2018, Ga. Martin informed Drury that Defendants "owned Diamondback's IP," and refused to amend the Amended Patent Agreement to remove the ROFR.

## IV. SUMMARY OF BACKGROUND FACTS

68.     Based on the foregoing, it is clear that Defendant R-P, together with its members RJ Machine Company, Inc., and NCS M-H, and its managers Ga. Martin and Gr. Martin, sought to defraud Diamondback from the initial discovery that Diamondback owned patented technology related to disposable setting tool technology.

### a.  Gary Martin, Grant Martin, and R-P

69.     Upon information and belief, Ga. Martin used terminated employees T. Baker and J. Baker to obtain Diamondback's proprietary trade secret information.

70.     Other than the initial meeting with Diamondback during which Ga. Martin stated that R-P had begun development of a single-run setting tool, R-P has never shown that it had performed any research and development on single-run setting tools.

71.     Defendants Ga. Martin (by himself and through RJM), Gr. Martin, and R-P (collectively, the "R-P Defendants") orchestrated a scenario by which Diamondback was led to believe he was being courted for acquisition by R-P, when in fact it was a publicly traded company (NCS M-H) that was behind the acquisition.

72.     Upon information and belief, Ga. Martin and Nipper constructed the ruse of acquisition to obtain the rights to Diamondback's '035 Patent.

73.     The deception continued after the original Patent Agreement, with Ga. Martin seeking to expand the definition of "Licensed Products" to include all wireline setting tools, rather than just "bridge plugs," all while maintaining the guise of acquisition.     This amendment, made without any consideration to Diamondback, was entered into, upon information and belief, to allow Defendants to sell setting tools with non-Diamondback charges and igniters, which was the entire purpose of the original deal with R-P.

74.     Meanwhile, Ga. Martin built further on the trusting relationship he had developed with Drury by convincing Drury to purchase a plane that was not airworthy, much less in "tip top" shape.

75.     After Diamondback terminated T. Baker and J. Baker, Ga. Martin sought to pay T. Baker for the proprietary information that T. Baker and J. Baker stole from Diamondback in the wake of T. Baker's departure, and that T. Baker and J. Baker were and are attempting to use to compete directly with Diamondback.

76.     Ga. Martin effectively concealed the fact that he was, in fact, an agent working on behalf of NCS M-H the entire time.

77.     Once NCS M-H, NCSM, and the R-P Defendants had effectively raided the trade secret coffers of Diamondback, believing his corporate raid was complete, he completely turned on Drury and Diamondback, telling Drury that he "owned" Diamondback's technology.

78.     Gr. Martin is the general manager of R-P, and as such, orchestrated the signing and made representations regarding the Patent Agreement and Amended Patent Agreement, as well as the acquisition, that he knew to be false.

79.    Gr. Martin worked with Ga. Martin to secure the data from Diamondback regarding Company A and Diamondback's other customers, so that once NCS M-H, NCSM, and R-P had acquired the exclusive license, as well as Diamondback's proprietary sales, financial, and technical data, Diamondback was no longer needed, and publicly traded NCS M-H could pursue new markets without public disclosure.  Ga. Martin, Gr. Martin, and R-P were willing and complicit partners in this scheme to destroy Diamondback to Defendants' benefit.

**b.    Advent, NCS M-H, NCSM, and Robert Nipper**

80.    At all times from the first contact by Ga. Martin, Defendants Advent, NCS M-H, NCSM, and Nipper (collectively the "NCS Defendants") were involved in this scheme to defraud Diamondback by using the R-P Defendants as front men to obtain the exclusive patent license, at which point Diamondback was so far down the road of acquisition it had no choice but to cooperate with the NCS Defendants.  Defendant Advent, at all times was in control of the NCS Defendants, as evidenced by Ga. Martin's statement to Drury that he could not make an offer over $100,000,000.00 without permission from Advent and NCS. According to public records, Advent owns 66.67% of NCS M-H stock, and Advent and NCS M-H share at least one common director.

81.    Yet the NCS Defendants never intended to acquire Diamondback, as evidenced by the fact that neither Ernst & Young nor Baker Botts ever so much as contacted Diamondback, and accessed the Secure Data Room for no more than sixteen minutes combined.

82.     The facts as a whole demonstrate that the NCS Defendants and R-P Defendants worked in concert at every step to:

    1)  Obtain the exclusive license agreement;

    2)  Expand the exclusive license agreement to exclude the requirement of using Diamondback's power charges and igniters;

    3)  Under the ruse of acquisition, obtain Diamondback's technical specifications for manufacture, sale, and distribution of the licensed technology; then

    4)  Unceremoniously cast Diamondback aside once all of Diamondback's useful technology and trade secrets were in the NCS Defendants' possession.

83.     The NCS Defendants' intent in its entire relationship with Diamondback has been to take all information and trade secrets of value and to supplant Diamondback in the marketplace, through nothing more than deception and fraud.

## CLAIM I – THE R-P DEFENDANTS' MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836, *et seq.*

84.     The allegations set forth in paragraphs 1 –83 and the Summary of Action are incorporated herein.

85.     Ga. Martin, RJM, Gr. Martin, and R-P obtained access to Diamondback's trade secrets through false pretenses of the Patent Agreement and the Letter of Intent by NCS M-H, which Defendants led Diamondback to believe were in furtherance of Defendants' efforts to acquire Diamondback.

86.     Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

87.    Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, investment history, data regarding past investment performance, data regarding Plaintiff's clients' investments, including the ability of clients to invest, Plaintiff's methods, techniques, processes, and procedures pursuant to 18 U.S.C. § 1839(3) among others.

88.    Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge. Access was limited for each of the above categories to the officers of the company and selected employees in each area of the business that had a "need to know." Diamondback's measures surpassed "reasonable," in fact, as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein. Officers of Diamondback and the select employees with a "need to know" had to sign hard-copy information in- and out- of locked files, and could only access the proprietary information with their own specific passwords. Additionally, Diamondback maintains the trade secrets, including, but not limited to, the power charge formula, in a secure share file with access restricted to officers of the company and specific individuals with a "need to know." The

power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

89.      Plaintiff is the owner of the trade secrets now in the possession of the R-P Defendants, as the term "owner" is defined in 18 U.S.C. § 1839(4).

90.      The information in the R-P Defendants' possession as described herein derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

91.      The R-P Defendants misappropriated Plaintiff's trade secrets, at least because the R-P Defendants used the trade secrets of Diamondback without any consent – express or implied – and the Diamondback trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets *and limit the use of the trade secrets*, and, in the case of information obtained from T. Baker, was derived from or through a person who owed a duty to Diamondback to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

92.      The R-P Defendants remain in possession of Diamondback's trade secrets, and are attempting to use them in a way that is harmful to Diamondback and for the financial gain of the R-P Defendants.

93.      The R-P Defendants acquired Plaintiff's trade secrets through theft, misrepresentation, and based at least upon their breach of their duty to maintain the secrecy of Plaintiff's trade secrets.  The R-P Defendants breached their duty under the July 25, 2018,

Confidentiality Agreement and the Confidentiality Clause of the Patent Agreement at least by their use of the trade secrets to contact Company A – Diamondback's largest customer – to attempt to enter into an exclusive distribution agreement with Company A to the exclusion of Diamondback. This unauthorized contact was a use of Diamondback's trade secrets that was not authorized under either the Patent Agreement or the July 25, 2018, Confidentiality Agreement, because the trade secrets misappropriated were not necessary to practice the license.

94.     The R-P Defendants also, upon information and belief, misappropriated Plaintiff's trade secrets by paying T. Baker for information about Diamondback products and trade secret technology and information after T. Baker's termination from Diamondback, because the trade secrets were obtained from a person (T. Baker) who either used improper means to acquire the trade secret, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or limit the use of the trade secrets or both.

95.     Plaintiff has been harmed by the R-P Defendants' misappropriation of Plaintiff's trade secrets, and, pursuant to law, is entitled to both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages – including disgorgement – for unjust enrichment caused by the misappropriation that is not included in a claim for actual loss, or at a minimum, a reasonable royalty for the R-P Defendants' misappropriation.

96.     The R-P Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious. To the extent that the other Defendants have acted jointly and in concert with the R-P Defendants, they too are liable for misappropriation of trade secrets.

## CLAIM II – MISAPPROPRIATION OF TRADE SECRETS AGAINST THE NCS DEFENDANTS UNDER 18 U.S.C. § 1836, *et seq.*

97.     The allegations set forth in paragraphs 1 – 96 and the Summary of Action are incorporated herein.

98.     The NCS Defendants obtained access to Diamondback's trade secrets through false pretenses of pretending to be in pursuit of acquiring Diamondback, a ruse perpetrated by entering into the Patent Agreement and the Letter of Intent by NCS M-H to acquire Diamondback.  Upon information and belief, the NCS Defendants were fully aware of Ga. Martin's and the other R-P Defendants' efforts from the earliest contact that R-P made with Diamondback.

99.     Plaintiff's trade secrets include the proprietary technical, sales, and financial information that Diamondback uses to build and sell its products in the marketplace.

100.   Plaintiff's trade secrets explicitly include Plaintiff's compilations of client information, including, but not limited to, data regarding Diamondback's sales history (both as a whole and to individual customers), Diamondback's sales of individual products, Diamondback's technical product specifications, including tolerances, manufacturing data, charge formula, investment history, data regarding past investment performance, data regarding Plaintiff's clients' investments, including the ability of clients to invest, in Plaintiff's methods, techniques, processes, and procedures pursuant to 18 U.S.C. § 1839(3) among others.

101.   Plaintiff has taken reasonable measures to protect the secrecy of its trade secrets, including, but not limited to, limiting access to financial information, technical

specifications for the manufacture of Diamondback's products, sales volume and information, and the formula for Diamondback's power charge. Access was limited for each of the above categories to the officers of the company and selected employees in each area of the business that had a "need to know." Diamondback's measures surpassed "reasonable," in fact, as evidenced by the establishment of the secure data room, which prohibited any download or electronic copying of the information contained therein. Officers of Diamondback and the select employees with a "need to know" had to sign hard-copy information in- and out- of locked files, and could only access the proprietary information with their own specific passwords. Additionally, the trade secrets, including the power charge formula, are kept in a secure share file with access restricted to officers of the company and specific individuals with a "need to know." The power charge formula is also kept in what Diamondback refers to as the "Sacred Book," which is kept in the Vice President of Accounting's locked office.

102. Plaintiff is the owner of the trade secrets in the possession of the NCS Defendants, as the term "owner" is defined in 18 U.S.C. § 1839(4).

103. The information in the NCS Defendants' possession as described herein derives independent economic value, both actual and potential, from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, pursuant to 18 U.S.C. § 1839(3)(B).

104. The NCS Defendants misappropriated Plaintiff's trade secrets, at least because the NCS Defendants used the trade secrets of Diamondback without any consent – express

or implied – and the Diamondback trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets *and limit the use of the trade secrets*, and, in the case of information obtained from T. Baker, was derived from or through a person who owed a duty to Diamondback to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

105.   The NCS Defendants, upon information and belief, remain in possession of Diamondback's trade secrets, and are attempting to use them in a way that is harmful to Diamondback and for the NCS Defendants' personal financial gain.

106.   The NCS Defendants acquired Plaintiff's trade secrets through theft, misrepresentation, and based at least upon their breach of their duty to maintain the secrecy of Plaintiff's trade secrets. The NCS Defendants breached their duty under the July 25, 2018, Confidentiality Agreement and the Confidentiality Clause of the Patent Agreement at least by their use of the trade secret to contact Company A – Diamondback's largest customer – to attempt to enter into an exclusive distribution agreement with Company A to the exclusion of Diamondback. This unauthorized contact was a use of Diamondback's trade secrets that was not authorized under either the Patent Agreement or the July 25, 2018, Confidentiality Agreement, and was therefore prohibited by both agreements.

107.   The NCS Defendants also, upon information and belief, misappropriated Plaintiff's trade secrets by  obtaining the trade secrets obtained by one or more of the R-P Defendants through the R-P Defendants paying T. Baker for information about Diamondback products after T. Baker's termination from Diamondback, because the trade secrets were obtained from a person (T. Baker) who either used improper means to acquire

the trade secrets, or owed a duty to the person (Diamondback) seeking relief to maintain the secrecy of the trade secrets or limit the use of the trade secret or both.

108.    Plaintiff has been harmed by the NCS Defendants' misappropriation of Plaintiff's trade secrets, and pursuant to law, is entitled both monetary and injunctive relief, including damages for actual loss by Plaintiff and damages for unjust enrichment – including disgorgement – caused by the misappropriation that is not included in a claim for actual loss, or at a minimum, a reasonable royalty for the NCS Defendants' misappropriation.

109.    The R-P Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious.  To the extent that the other Defendants have acted jointly and in concert with the R-P Defendants, they too are liable for misappropriation of trade secrets.

### CLAIM III – FRAUD BY THE R-P DEFENDANTS

110.    The allegations set forth in paragraphs 1 – 109 and the Summary of Action are incorporated herein.

111.    The R-P Defendants represented to Plaintiff that Defendants had the ability to purchase Plaintiff and all of its assets, including Plaintiff's trade secret setting tool technology.

112.    The R-P Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that Defendants were honest, good-faith potential purchasers of Plaintiff and its assets.

113.    The R-P Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to enter into the Amended Patent Agreement first, and then disclose its trade secret as described above in Claim I.  This information was

ORIGINAL COMPLAINT - 37
DM#383952

App. 038

material to Plaintiff because Plaintiff would not have entered into the Amended Patent Agreement or disclosed its sales, financial information, or technology to Defendants except to demonstrate its value in the marketplace. But for its belief that the R-P Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to Defendants.

114.   Defendants' representation of its ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to disclose its valuable information. Defendant was, in fact, either not willing or not able to close on the purchase of Plaintiff because Defendants are an affiliate of NCS Multistage Holdings, Inc., a publicly traded company, and could therefore not acquire Plaintiffs on the timeline represented or without additional hurdles.

115.   The R-P Defendants made these false representations knowing them to be false and without any intention to perform as promised.

116.   Because of the R-P Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

117.   Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a). Moreover, Defendant violated Texas Business & Commerce Code Section 27.01 with actual awareness of the falsity of Defendant's representations, which is an additional basis for Plaintiff's recovery of exemplary damages. Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice.

ORIGINAL COMPLAINT - 38
DM#383952

## CLAIM IV – FRAUD BY THE NCS DEFENDANTS

118.   The allegations set forth in paragraphs 1 – 117 and the Summary of Action are incorporated herein.

119.   The NCS Defendants represented to Plaintiff that Defendants had the ability to purchase Plaintiff and all of its assets.

120.   The NCS Defendants knew that Plaintiff would be unwilling to disclose its trade secret information unless it believed that Defendants were honest, good-faith potential purchasers of Plaintiff and its assets.

121.   The NCS Defendants falsely represented to Plaintiff that they intended to purchase Plaintiff in order to induce Plaintiff to disclose its trade secret as described above in Claim II.   This information was material to Plaintiff because Plaintiff would not have disclosed its sales, financial information, or technology to Defendants except to demonstrate the information's value in the marketplace.   But for its belief that the NCS Defendants were evaluating Plaintiff with the intention of purchasing the entire company as a going concern, Plaintiff would not have disclosed its valuable confidential information to the NCS Defendants.

122.   Defendants' representation of its ability to purchase Plaintiff was a false statement merely designed to induce Plaintiff to disclose its valuable information.   The NCS Defendants were, in fact, either not willing or not able to close on the purchase of Plaintiff and have yet to demonstrate that they had the approval for such a large acquisition by either their board of directors, their shareholders, or both, and could therefore not acquire Plaintiffs on the timeline represented or without additional hurdles, if at all.

123.   The NCS Defendants made these false representations knowing them to be false and without any intention to perform as promised.

124.   Upon information and belief, the NCS Defendants used the R-P Defendants, none of whom are publicly traded, as their agent to skirt one or more securities laws regarding acquisitions of other companies.

125.   Because of the R-P Defendants' fraud, Plaintiff has been injured in an amount of at least $100,000,000.00, and likely much more.

126.   Furthermore, Plaintiff's injury resulted from Defendants' actual fraud, gross negligence, or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).   Moreover, Defendant violated Texas Business & Commerce Code Section 27.01 with actual awareness of the falsity of Defendant's representations, which is an additional basis for Plaintiff's recovery of exemplary damages.   Accordingly, Plaintiff seeks to recover exemplary damages for Defendants' actual fraud and malice.

## CLAIM V – FRAUDULENT INDUCEMENT RELATED TO THE PATENT LICENSE

127.   The allegations set forth in paragraphs 1 – 126 and the Summary of Action are incorporated herein.

128.   Defendant Ga. Martin, operating on behalf of the R-P Defendants and the NCS Defendants, represented to Diamondback that Ga. Martin owned R-P.   Then, on March 9, 2018, Ga. Martin, via text message, informed Drury that "Robert [Nipper] owns the other half of the repeat company."   (Exh. 5, p. 30/186).

129.    This misrepresentation of the actual ownership of R-P was material because Drury would have never entered into a patent license with R-P had he known that R-P was not only not owned by Ga. Martin and Nipper at all, but that, in fact, NCS M-H—a publicly traded company backed by an international fund—owned fifty percent (50%) of R-P and controlled the company by virtue of holding two of three seats on R-P's board of directors.

130.    The representations by Ga. Martin that Ga. Martin and Nipper each owned fifty percent (50%) of R-P were false, because the Amended and Restated Company Agreement of R-P shows that NCS M-H, as opposed to Nipper, owns 50% of R-P.

131.    Ga. Martin knew when he made the statement regarding Nipper's personal ownership that the statement was false.

132.    Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin knew that Drury was very selective about the persons and/or businesses with whom he did business, and he wanted Drury to believe that he was merely transacting with a friend, as opposed to a publicly traded company.

133.    Drury and Diamondback relied on the representation by entering into the Patent License with R-P.

134.    Drury's reliance on the representation caused Diamondback injury because it entered Diamondback into a purportedly binding agreement that granted the exclusive rights related to the '035 Patent to a company that Drury did not know was in control of R-P, to wit, NCS Multistage Holdings, Inc.

## CLAIM VI – FRAUDULENT INDUCEMENT RELATED TO THE AMENDED PATENT LICENSE

135.   The allegations set forth in paragraphs 1 – 134 and the Summary of Action are incorporated herein.

136.   After Diamondback and R-P entered into the Patent License, Defendant Ga. Martin, operating on behalf of the R-P Defendants and the NCS Defendants, represented to Diamondback that R-P needed to amend the Patent License to broaden the definition of "Licensed Products" from "bridge plugs" to "electric wireline setting tools" and to include a "Right of First Refusal" in the Patent License. Ga. Martin represented that the amendment was needed because R-P intended to acquire Diamondback, so R-P needed the ability to match any terms proffered by a third party.

137.   This representation that R-P intended to acquire Diamondback was material because Drury would have never agreed to the Amended Patent License with R-P had he known that R-P did not have the ability to acquire Diamondback due to its control by a publicly traded company (Defendant NCS M-H), or that neither the R-P Defendants nor the NCS Defendants had any genuine interest in acquiring Diamondback at all.

138.   The representations by Ga. Martin that R-P intended to acquire Diamondback were false, at least because R-P did not have the ability to consummate a transaction to acquire Diamondback. Per Ga. Martin, NCS M-H would have to be the acquiring entity—a fact only fully disclosed to Diamondback at the provision of the first draft of the LOI (June 13, 2018), which was only after the Amended Patent License was executed (May 30, 2018). (Exh. 7).

139.    Ga. Martin knew when he made the statement regarding R-P's acquisition Diamondback that the representation to that effect was false, and such act represents a false promise of future performance.

140.    Ga. Martin made the representation with the intent that Drury act on the representation, because Ga. Martin wanted to have an exclusive license not only on bridge plugs, but also on all electric wireline setting tools that would otherwise infringe the claims of the '035 Patent.

141.    Drury and Diamondback relied on the representation by entering into the Amended Patent License with R-P.

142.    Drury's reliance on the representation caused Diamondback injury because it induced Diamondback to enter into a purportedly binding agreement with R-P that granted the exclusive rights to R-P and NCS M-H (by virtue of affiliation) that diminish the value of Diamondback and foreclose Diamondback's ability to enter into other licenses with third parties for products within the scope of the claims of the '035 Patent.

## CLAIM VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS BY THE R-P DEFENDANTS AND NCS DEFENDANTS

143.    The allegations set forth in paragraphs 1 – 142 and the Summary of Action are incorporated herein.

144.    Plaintiff had an ongoing business relationship with Company A.

145.    Company A was Plaintiff's largest customer.

146.    The NCS and R-P Defendants were aware, through access to Plaintiff's trade secrets as described in the foregoing paragraphs, that Plaintiff had a substantial and ongoing business relationship with Company A.

147.    The R-P and NCS Defendants deliberately misled Plaintiff in order to procure Plaintiff's trade secrets and use the misappropriated information to attempt to prospect Company A for business and divert that business away from Plaintiff.

148.    Defendants' conduct was independently tortious because it constituted fraud, and violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the Tex. Bus. & Comm. Code § 27.01, *et seq.*

149.    Defendants' interference attempted to divert sales that Plaintiff would have otherwise made, thus causing Plaintiff to suffer actual damages in the form of a damaged business relationship, loss of value caused by diminished good will.

150.    Plaintiff further seeks exemplary damages for Defendants' fraud and actual malice as it relates to Defendants' tortious interference between Plaintiff and Company A.

**CLAIM VIII – CIVIL VIOLATION OF THE COMPUTER FRAUD & ABUSE ACT 18 U.S.C. § 1030, BY THE R-P DEFENDANTS AND THE NCS DEFENDANTS**

151.    The allegations set forth in paragraphs 1 – 150 and the Summary of Action are incorporated herein.

152.    The NCS Defendants, as well as their affiliates and representatives, including the R-P Defendants, exceeded the authorization granted under the July 25· 2018, Confidentiality Agreement and the Patent Agreement.

153.    The R-P and NCS Defendants were granted access to Plaintiff's Secure Data Room, which constitutes a "protected computer," in a manner that was unauthorized, or exceeded authorization, or both, by accessing the data with the intention to commit fraud, and/or the intention to harm Diamondback.

154.    Despite having authorization for the stated and limited purpose of evaluating the potential acquisition of Diamondback, the R-P and NCS Defendants, nonetheless, knowingly accessed the data with the intent to defraud Plaintiff, furthering the fraud by obtaining valuable customer sales, financial, and technical information, in violation of 18 U.S.C. § 1030.

155.    Plaintiff has been harmed in an amount exceeding $5,000.00, at least by the amounts spent on determining what data was accessed, as well as repairing its goodwill and business relationships damaged by the unauthorized use of the data Defendants unlawfully obtained.  Plaintiff estimates that the damage caused by Defendants' unauthorized access of Diamondback's data for the purpose other than the purpose contemplated by their being granted access – i.e., the acquisition of Diamondback as a going concern – is in excess of $25,000.00 in the previous year.

## CLAIM IX – BREACH OF THE JULY 25TH CONFIDENTIALITY AGREEMENT

156.    The allegations set forth in paragraphs 1 – 155 and the Summary of Action are incorporated herein.

157.    Defendant NCS M-H entered into the July 25, 2018 Confidentiality Agreement with Diamondback, which covered NCS M-H's subsidiaries, including, but not limited to,

NCSM and R-P, as evidenced by the signature of NCS M-H's Chief Financial Officer, Ryan Hummer.

158.    The Confidentiality Agreement restricts NCS M-H and its affiliates' and representatives' use of Diamondback's information "solely for the purpose of evaluating a Transaction involving [Diamondback] and [NCS M-H] or [NCS M-H's] affiliates."

159.    NCS M-H breached the Confidentiality Agreement by using Plaintiff's trade secret information in direct competition with Plaintiff for its own financial advantage, and to the exclusion of Plaintiff.

160.    NCS M-H used information related to Diamondback's largest customer, Company A, and attempted to obtain an exclusive distribution agreement with Company A, to the exclusion of Diamondback.

161.    As a direct and proximate effect of these breaches, Diamondback has been injured.  Plaintiffs therefore seek all remedies to which they may be entitled at law or in equity, including but not limited to injunctive relief and money damages.

## CLAIM X – BREACH OF THE PATENT AGREEMENT BY R-P

162.    The allegations set forth in paragraphs 1 – 161 and the Summary of Action are incorporated herein.

163.    Defendant NCS M-H, and/or one of its affiliates, R-P, used the trade secret information related to Diamondback's customers in an authorized manner, as described above with respect to Claim IX.  Because NCS M-H was (although unknown to Diamondback) an affiliate of R-P, who entered into the Patent Agreement with

Diamondback, the confidentiality clause of the Patent Agreement covers all of the NCS Defendants and the R-P Defendants.

164.   NCS M-H's and/or its affiliates' use of the information related to Company A to attempt to establish a business relationship with Company A represents a breach of the confidentiality clause of the Patent Agreement.

165.   Clause 8.1 acknowledges that "in connection with this Agreement it will gain access to confidential Information of the other Party," where "Confidential Information" is defined as:

> **"Confidential Information"** means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party. Confidential Information shall not include Nonproprietary Information.

166.   The confidential information includes "information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party...," which includes information related to Company A.

167.   The confidentiality clause further states that the receiving party (R-P or its affiliates) agrees not to "use the Disclosing Party's Confidential Information other than is strictly necessary to exercise [R-P's] rights and perform [R-P's] obligations under this Agreement."

168.    At the time R-P and its affiliates used the trade secrets to approach Company A, Diamondback had not sold any patented products to Company A (as opposed to other, non-patented protducts), so nothing regarding Company A, could be conceivably construed as "strictly necessary to exercise its rights and perform its obligations under the Patent Agreement.

169.    As a direct and proximate effect of R-P's breach, Plaintiffs have been injured. Plaintiffs therefore seek all remedies to which they may be entitled at law or in equity, including but not limited to injunctive relief, setting aside the Patent Agreement, and money damages.

## CLAIM XI - DECLARATORY JUDGMENT THAT THE PATENT AGREEMENT IS VOID

170.    The allegations set forth in paragraphs 1 – 169 and the Summary of Action are incorporated herein, specifically the facts of Claim XII regarding R-P's breach of the Patent Agreement. Additionally, R-P is fifty percent (50%) owned by NCS M-H, a fact that was not fully disclosed prior to R-P entering into the Patent License with Diamondback. Moreover, Ga. Martin, while a Managing Member of R-P, did not have the authority to enter into the Patent License.

171.    R-P's breach of the Patent Agreement is incapable of cure, at least because it represents a violation of the trust between Diamondback on the one hand, and R-P and its affiliates on the other hand.

172.    Under Section 12.2(b) of the Patent Agreement, "Either [Party] may terminate this Agreement on written notice to other party if the other party materially breaches this Agreement and such breach: (i) is incapably of cure."

173.    Therefore, because (1) R-P breached the Patent Agreement, and such breach is incapable of cure, (2) Ga. Martin did not have the authority to enter into any agreement on behalf of R-P, and (3) the nature and extent of NCS M-H's involvement in R-P was never disclosed to Diamondback, an actual controversy exists within this Court's jurisdiction that necessitates the Court to declare the rights and other legal relations of Diamondback as related to the Patent Agreement, pursuant to 28 U.S.C. § 2201, including, without limitation, that Diamondback is entitled to terminate the Patent Agreement and that the Patent Agreement is itself void based on fraud by the R-P Defendantsa c.

## CLAIM XII – DECLARATION THAT THE AMENDED PATENT LICENSE IS VOID

174.    The allegations set forth in paragraphs 1 - 173 and the Summary of Action are incorporated herein.

175.    In addition the allegations of breach of the Patent Agreement as set forth in Claim XI, the Amended Patent License is void for a lack of consideration.

176.    Whereas Diamondback provided a right of first refusal and amended and expanded the definition of the licensed products, R-P provided no consideration whatsoever.

177.    In contrast to valuable consideration, the R-P and NCS defendants offered only a contingent promise of future consideration, which is no consideration.

178.    Therefore, because (1) the R-P Defendants breached the Amended Patent License through breach of the same terms of the Patent Agreement, and such breach is incapable of cure, (2) Ga. Martin did not have the authority to enter into any agreement on behalf of R-P, (3) the nature and extent of NCS Defendants' and Advent's involvement in R-P was never disclosed to Diamondback prior to execution of the Amended Patent License, and (4) the complete lack of consideration on the part of R-P in exchange for the amendments, an actual controversy exists within this Court's jurisdiction that necessitates the Court to declare the rights and other legal relations of Diamondback as related to the Amended Patent License, pursuant to 28 U.S.C. § 2201, including, without limitation, that the Amended Patent License agreement is void because of fraud by the R-P Defendants and the failure of consideration.

## CLAIM XIII – EMPLOYMENT OF MANIPULATIVE AND DECEPTIVE DEVICES IN VIOLATION OF 15 U.S.C. § 78j AND 17 C.F.R. § 240.10b-5

179.    The allegations set forth in paragraphs 1 – 178 and the Summary of Action are incorporated herein.

180.    Defendants made untrue statements and omitted material facts to Drury beginning with the representation by Ga. Martin that he owned R-P and was authorized to cause R-P to enter into the Patent License and the Amended Patent License with Diamondback, that Ga. Martin could personally purchase Diamondback, knowing that he could not act in any manner that would violate the R-P Company Agreement, and that NCS M-H was a publicly-traded company that was an owner of and controlled R-P.

181.    The failure to disclose to Drury that NCS M-H was an owner of and controlled R-P was a material omission and designed to hide the fact that NCS M-H, a publicly traded company, was the true party behind the Patent License and the Amended Patent License.

182.    NCSM entered into the Letter of Intent to acquire the equity interests of Diamondback in yet another effort to obscure the ownership interest of R-P by NCS M-H as a publicly traded company, and to provide Defendants with access to Diamondback's trade secrets for purposes that contravened the Patent License, the Amended Patent License and the Letter of Intent.

183.    The statements made or omitted by Ga. Martin and NCS M-H were material because they caused Drury in his capacity as President of Diamondback to rely on them to the detriment of Diamondback, to wit:

a.    Agreeing to the Patent License, under false pretense that R-P was seeking to purchase Diamondback;

b.    Agreeing to the Amended Patent License, which further expanded the definition of "Licensed Products" under false pretense that R-P was seeking to purchase Diamondback;

c.    Agreeing to the Letter of Intent with NCSM, which allowed Defendants access to Diamondback's trade secrets for the purpose of competing with Diamondback rather than for a proper purpose of evaluating the acquisition of Diamondback.

184.    But for Defendants' deliberate and calculated concealment of the involvement of the NCS Defendants—from the very outset of Ga. Martin's initial contact with Diamondback—Diamondback would never have given R-P a license to Diamondback's

patented setting tool technology, or Diamondback's trade secrets related to Diamondbacks setting tool technology.

185.    Diamondback has been harmed by the material misrepresentations and omissions made by Defendants under the ruse of acquiring Diamondback's securities because Diamondback's net value has been diminished due to the existence of the Patent License and the Amended Patent License as well as the fact that Defendants now possess, and, upon information and belief, are contacting Diamondback's customers and competing against Diamondback, using Diamondback's own trade secrets.

186.    Defendants' conduct has caused Diamondback damages in excess of $100,000,000.00.

## CLAIM XIV – CONSPIRACY BETWEEN T. BAKER, J. BAKER AND THE R-P DEFENDANTS

187.    The allegations set forth in paragraphs 1 – 186 and the Summary of Action are incorporated herein.

188.    The R-P Defendants, T. Baker and J. Baker, upon information and belief, entered into an agreement whereby R-P paid T. Baker as a "consultant."

189.    Kingdom Downhole Tool, LLC's prospectus document (Exh. 20 (redacted)), states "we are the chief designer [*sic*] of the first ever one run setting tool the market has ever seen. We also have designed and approved for production the first automation system for Power Charge manufacturing." The "we" of Kingdom includes T. Baker and J. Baker, the latter of whom admitted to stealing Diamondback trade secrets and transmitting them to the former. (See Exh. 21 (Kingdom Cert. of Form)).

190.    The Kingdom business plan states that it contains "confidential, trade-secret information," (Exh. 20, *passim* (redacted)), but was created on April 22, 2018, only ten days from the date of J. Baker's termination from Diamondback. It also states that the goal of Kingdom is to bring "[Kingdom's] expertise in automation of Power Charge manufacturing and perfecting the one-run tool design to make it more user friendly." (*Id.*). Any "expertise" regarding the automation of power charge manufacturing or perfecting the one-run tool design necessarily includes the trade secret information of Diamondback, because all information and knowledge regarding power charge manufacturing and one-run setting tools was proprietary information owned by Diamondback.

191.    Upon information and belief, the "consulting" performed by T. Baker for R-P constituted the misappropriation of Diamondback's trade secrets, because the technical information possessed by T. Baker was Diamondback's trade secrets.

192.    Upon information and belief, R-P has used and is using the trade secrets obtained from T. Baker, J. Baker, and Kingdom to compete with Diamondback.

193.    Diamondback has been injured by the unlawful overt act of R-P's misappropriation and use of Diamondback's trade secrets that were obtained illegally from T. Baker and J. Baker under the guise of employing T. Baker as a consultant.

194.    The unlawful overt act was performed pursuant to, and in furtherance of, the R-P Defendants to benefit financially to Diamondback's detriment.

195.    The R-P Defendants acted willfully, with malice, and for the purpose of benefitting financially at Diamondback's expense.

196.   Plaintiff is entitled to monetary relief, injunctive relief, and any combination thereof in law or equity to prevent further harm as a result of the R-P Defendants' unlawful overt acts and schemes.

## CLAIM XV – DECLARATION OF NON-INFRINGEMENT OF THE '035 PATENT

197.   The allegations set forth in paragraphs 1 - 196 and the Summary of Action are incorporated herein.

198.   The '035 Patent was issued on November 7, 2017, listing Jimmy L. Carr (deceased), Derrek Drury, and Trea H. Baker as inventors.

199.   By virtue of the Amended Patent License, R-P has claimed in Civil Action No. 4:18-cv-04456, filed in the Southern District of Texas, Houston Division, R-P has made clearly indicated that it intends assert a patent infringement claim against Diamondback. Therefore, a case or controversy exists under 28 U.S.C. § 2201.

200.   No party has asserted that any claim of the '035 Patent is invalid, and indeed every issued claim in the '035 is presumptively valid.

201.   In order for R-P or any other party to claim infringement, it must aver that the asserted claims are valid.

202.   Based on Claims XI and XII, *supra*, and the fact that the parties never intended to exclude Diamondback from practicing its own invention, Diamondback seeks a declaratory judgment that its practice of the claims of the '035 Patent does not infringe its own '035 Patent.

## **PRAYER**

For the foregoing reasons and circumstances, created wholly by the conduct of Defendants, Plaintiff respectfully requests that the Court enter judgment against Defendants for all of the following:

a)  Injunctive relief;

b)  Actual damages;

c)  Exemplary Damages;

d)  Disgorgement;

e)  Prejudgment and post judgment interest;

f)  Costs;

g)  Declaration of breach;

h)  Rescission of the Patent License;

i)  Rescission of the Amended Patent License;

j)  Declaration that Diamondback does not infringe its own '035 Patent;

k)  Attorneys' fees; and/or

l)  Such other relief, both at law and in equity, as the Court deems just and right given the nature of Defendants' actions.

Dated: February 3, 2019

Respectfully submitted,

*/s/ Decker A. Cammack*
Decker A. Cammack (Lead Counsel)
Texas Bar No. 24036311
dcammack@whitakerchalk.com

Mack Ed Swindle
Texas Bar No. 19587500
mswindle@whitakerchalk.com

David A. Skeels
Texas Bar No. 24041925
dskeels@whitakerchalk.com

**WHITAKER CHALK SWINDLE
   & SCHWARTZ PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Phone: (817) 878-0500
Fax: (817) 878-0501

John P. Palmer
Teas Bar No. 15430600
palmer@namanhowell.com
**NAMAN, HOWELL, SMITH & LEE, PLLC**
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Phone: (254) 755-4100
Fax: (254) 754-6331

*Counsel for Plaintiff Diamondback Industries,
Inc.*

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| REPEAT PRECISION, LLC, | |
| *Plaintiff,* | Civil Action No. 6:19-cv-36 |
| v. | |
| DIAMONDBACK INDUSTRIES, INC., | |
| *Defendant.* | |

## COMPLAINT

Plaintiff Repeat Precision, LLC ("Repeat Precision") files this Complaint for patent infringement, breach of contract, antitrust violations, tortious interference, and declaratory judgment against Defendant Diamondback Industries, Inc. ("Diamondback").

### I.    INTRODUCTION

1.    Repeat Precision sells products and provides machining services in the oil and gas industry.  Diamondback is the assignee of United States Patent No. 9,810,035 ("the '035 Patent"),[1] titled "Disposable Setting Tool," which includes 20 patent claims for a disposable setting tool used in oil and gas completion operations.  As claimed in the '035 patent and in operation, the disposable setting tool uses a power charge.  Because Diamondback did not have the facilities or resources to produce the disposable setting tool on a large-scale basis, Diamondback contracted for Repeat Precision to manufacture and sell the tool under an exclusive license to the '035 patent.  In return, Diamondback received the benefit of royalties on Repeat Precision's sales, as well as additional revenues from selling Diamondback's

---

[1] A true and correct copy of the '035 Patent is attached as Exhibit A.

1

Eliminator™ power charges, which buyers had to purchase in order to use the disposable setting tool.

2.     The parties' rights and obligations relating to the disposable setting tool and the '035 Patent are set forth in the Patent License Agreement dated March 16, 2018,[2] as amended on May 30, 2018[3] (collectively, the "License"). Under the License, Repeat Precision has the "exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export" the "Licensed Products." Ex. B at ¶2. "Licensed Products" are defined as "an electric wireline setting tool used for well completions … the manufacture, use, offer for sale, sale or importation of which would, but for this Agreement, infringe a Valid Claim" under the '035 Patent. Ex. C at ¶2.1.

3.     Relying on the License and the ability of its disposable setting tool customers to purchase Diamondback's Eliminator™ power charges, Repeat Precision invested millions of dollars in manufacturing facilities and equipment to build the tool. Repeat Precision has begun to manufacture and sell disposable setting tools, directing customers to also purchase Diamondback's Eliminator™ power charge. *See, e.g.*, Ex. D (brochure for the PurpleSeal Express™).

4.     Repeat Precision intended to sell its disposable setting tool for use with Diamondback's Eliminator™ power charge, and Diamondback knew that at the time of contracting. Repeat Precision needed access to a functioning power charge in order for it to receive the value and benefits it contracted to receive under its license with Diamondback. Diamondback's Eliminator™ power charge is the only commercially-available power charge on the market that works with a disposable setting tool. Diamondback is the exclusive assignee of

---

[2] A true and correct copy of the March 16, 2018 Patent License Agreement is attached as Exhibit B.
[3] A true and correct copy of the May 30, 2018 Amendment to Patent License Agreement and Right of First Refusal Agreement is attached as Exhibit C.

App. 060

two United States patents relating to power charges, which help it exclude others from competing against it in the power charge market.

5.     In contradiction of Repeat Precision's exclusive right to make and sell the disposable setting tool and in breach of the License, Diamondback has made (or has contracted with another entity to make) a disposable setting tool covered by the '035 patent, which Diamondback is selling in the market in competition with Repeat Precision.

6.     In view of Diamondback's breach of the License and other disputes between the parties, Repeat Precision filed suit against Diamondback in Houston.[4]   Diamondback retaliated by refusing to sell power charges to the customers of Repeat Precision who purchase disposable setting tools from Repeat Precision.   Diamondback sales personnel explained to Repeat Precision's customers that the only way to obtain the power charges needed to run the disposable setting tool was to buy the tool from Diamondback.   Diamondback's actions constitute an unlawful tying of one product (the power charge) to the sale of another (the disposable setting tool), with an intent to harm competition in the disposable setting tool market.   Diamondback's retaliatory refusal to sell to Repeat Precision customers is an illegal monopolization or an attempt to illegally monopolize the disposable setting tool market.   Diamondback's actions are an attempt to recapture the rights Diamondback previously conveyed to Repeat Precision under the License.

7.     Diamondback and Repeat Precision agreed to a mutual stand-down period, during which the parties would negotiate to try to resolve their disputes.   Diamondback agreed to sell its Eliminator™ power charges to Repeat Precision customers during that stand-down period.   In the interest of cooperation, Repeat Precision agreed to dismiss its Houston lawsuit, further

---

[4] *See* Case No. 4:18-cv-04456, *Repeat Precision, LLC v. Diamondback Industries, Inc.*, in the U.S. District Court for the Southern District of Texas, Houston Division.

App. 061

agreeing to Diamondback's request for a Waco forum if further litigation was needed. The parties' efforts to resolve this dispute during the stand-down period failed. As a result, Repeat Precision is once again operating under Diamondback's threat to withhold the sale of its Eliminator™ power charges to Repeat Precision customers.

8.     Repeat Precision seeks recovery of actual and compensatory damages against Diamondback arising out of its infringing sales, of disposable setting tools, its breach of the License, and its unlawful commercial activities, including treble damages for willful patent infringement, as well as treble damages under Section 4 of the Clayton Act and Section 15.21(a) of the Texas Free Enterprise and Antitrust Act of 1983 for the time periods when Diamondback has engaged, or is engaging, in antitrust violations. Repeat Precision further seeks injunctive relief to prohibit Diamondback from continuing its patent infringement, further breaching the License, and from engaging in its anticompetitive conduct (both during and after this suit) by refusing to sell power charges to Repeat Precision's customers. Although Repeat Precision's preference is for it and its customers' properly-licensed contractors to be able to purchase the Eliminator™ power charges for the disposable setting tool from Diamondback, given Diamondback's disruption of that supply for an essential and necessary product, Repeat Precision also seeks declaratory relief recognizing that the License grants Repeat Precision the alternative right to make or have made power charges.

## II.    PARTIES

9.     Repeat Precision is a Texas limited liability company with its principal place of business located at 19450 State Hwy 249, Ste. 200, Houston, Texas 77070.

4

App. 062

10.     On information and belief, Diamondback is a Texas corporation with its headquarters and principal place of business located at 3824 Williamson Road, Crowley, Texas 76036.

### III.     JURISDICTION AND VENUE

11.     Repeat Precision asserts claims for patent infringement against Diamondback arising under the patent laws of the United States, Title 35 of the United States Code, and for antitrust violations against Diamondback arising under the antitrust laws of the United States, Title 15 of the United States Code.  Accordingly, this Court has jurisdiction over the subject matter of this action under at least 28 U.S.C. §§ 1331, 1337, 1338, and 1367.

12.     This Court has personal jurisdiction over Diamondback because it is a resident of the State of Texas and has purposefully availed itself of the privileges of conducting business in the State of Texas and in this District.  Diamondback has also submitted to the jurisdiction of this Court under the Agreement signed by Diamondback's authorized representative on January 8, 2019.

13.     Venue is proper in the Western District of Texas under at least 28 U.S.C. § 1391(b) because, on information and belief, a substantial part of Diamondback's infringing activities giving rise to the claims herein occurred in this District.  Additionally, venue is proper in the Western District of Texas, Waco Division, because Diamondback specifically consented to jurisdiction and venue in this Court in the January 8, 2019 Agreement.

### IV.     FACTUAL BACKGROUND

**A.     Overview of the Use of Setting Tools and Frac Plugs in Well Completions**

14.     Repeat Precision was formed in 2017 to, among other things, manufacture and sell frac plugs.  Frac plugs are used during the completion of oil and gas wells to isolate specific

5

**App. 063**

zones within the well, particularly when the operator is perforating various zones within the well. It is common for there to be multiple completion zones within a well, with horizontal wells having many more zones than vertical wells. A frac plug is used to enable the operator to focus on a particular zone for completion, without adversely impacting the work that has already been performed further down the well (*i.e.* towards its "toe" or bottom hole location), by sealing off the lower sections.

15.    Setting tools are used to place the frac plug in the desired location within the wellbore. Installing a frac plug requires the use of a setting tool. The frac plug is attached to a setting tool prior to being inserted into the wellbore. That assembly (*i.e.* the setting tool and frac plug) usually includes additional equipment, such as perforation guns that are used to shoot holes into the well casing and surrounding structure to enable sand and water to be injected into the reservoir and allow hydrocarbons to subsequently flow into the well. The pieces of the assembly are combined at the surface of the well, usually by a wireline company contracted by the operator to perform this work. When inserted into the wellbore, the frac plug goes first, followed by the setting tool that is attached to the frac plug, followed by the perforation guns attached to the tool. These assemblies are typically limited to 30 feet in length.

16.    Using a traditional setting tool, the tool assembly must be inserted, removed, broken down, and reassembled for the well at each stage of completion in a multi-zoned well. For horizontal wells, this can be a repetitive and time consuming process, as wells often have up to ninety different stages, and perhaps many more. Even with well-qualified operators, and assuming all goes well, the process of setting the frac plug in place is time intensive. It could take 30 minutes to pump the setting tool assembly in place to set the frac plug, another 45 minutes to remove the assembly from the well, and (when conventional setting tools are used) 45

6

App. 064

minutes to break down and reassemble the setting tool assembly needed for the next completion. When using conventional tools, this is also a labor intensive process.

17.     When a frac plug reaches its correct location within the wellbore, the setting tool is activated to set the plug. This is done using a power charge installed within the setting tool, which is operated by electric switches via a wireline back to the controllers at the surface. Once the power charge activates, the explosive force applied to the setting tool forces the plug into place within the wellbore, blocking off the lower zones in the wellbore.

18.     If the setting process goes wrong, it can have severe negative consequences to the well. For example, if a "mis-run" occurs, meaning that the plug reaches the correct location in the wellbore but the setting tool fails to function when attempting to place the plug, it is necessary to remove the entire setting tool assembly, bring the plug to the surface, and redo the entire process—costing operators valuable time. If there is a "pre-set," meaning the plug is set in the well at the wrong location, but is successfully detached from the setting tool, it is usually necessary to use a workover rig to drill out and remove that plug—costing the operator time delays and extra costs that could be $60,000 or more for the workover rig. If there is a "soft-set," meaning that the plug is not set at the right location and fails to detach from the setting tool assembly, it is necessary to retrieve the entire setting tool assembly from the well by "fishing"— which can cost the operator extensive monetary damages and delays, and could even result in the loss of the well. Some attempts to fish out a soft-set plug and assembly have taken over a month, or failed entirely.

**B.     Conventional Setting Tools**

19.     Conventional setting tools have been used in the well completion process for decades. Conventional setting tools are designed to be used multiple times.

7

**App. 065**

20.     The original type of conventional setting tool (which is still commonly used today), is approximately 72 inches long, weighs about 153 pounds and requires a manual pressure release of gas at the surface.   There are health and safety risks associated with the manual pressure release, as the laborer who operates the bleed valve is required to straddle the pressure valve at the top of the wellbore and may be exposed to the gases escaping from the well when the pressure is manually released.

21.     Another type of conventional setting tool is often referred to as the "Shorty" or "Compact."  They are approximately 40 inches long, and weigh about 76 pounds, but do not require manual pressure release at the surface.

22.     All of these conventional setting tools require disassembly and rebuilding after each use—*i.e.* after the frac plug is set for each stage of production.  Done correctly, the setting tool is completely disassembled and cleaned to remove fluids and residue after every use.  It is then reassembled.  The most commonly used conventional setting tools require approximately 20 O-rings for assembly.   With the number of screws, O-rings, and other parts involved in reassembly, the risk of error is significant.  And if the conventional setting tool is not correctly rebuilt, it can cause mis-runs, pre-sets, and soft-sets.

23.     When an operator or wireline company cuts corners, and fails to do the full disassembly, cleaning, and rebuilding of the conventional setting tool before its next use, it greatly increases the risk of problems, and can have severe negative consequences.

**C.     The Disposable Setting Tool**

24.     The disposable setting tool is a major innovation.  It performs the same function as a conventional setting tool—*i.e.* setting frac plugs in place.  But it is significantly different.  It is shorter, lighter, and less expensive.  And it is assembled in a factory, minimizing the risk of

8

error in the field because it does not need to be rebuilt or cleaned in the field. It also saves labor costs, in the field, as laborers are not required to break-down, clean, and rebuild the setting tool assembly for each stage.

25.     On November 7, 2017, the United States Patent and Trademark Office issued the '035 Patent, titled "Disposable Setting Tool," which listed as the inventors Derrek D. Drury, Jimmy L. Carr, and Trea H. Baker. The '035 Patent was assigned by the listed inventors to Diamondback. On information and belief, the '035 Patent is currently in full force and effect.

26.     Diamondback has explained the benefits of the disposable setting tool as compared to conventional tools, as follows:

> The present invention provides advantages of a low cost setting tool which may be disposed of after one use. Since the tool is dry fired, without use of a hydraulic fluid such as oil, the tool may be disposed of without requiring tearing down of the tool for removal of hydraulic fluids. The disposable setting tool also eliminates rebuilding of the setting tool for later use, reducing risks the tool not being properly rebuilt during field dressing and eliminating the labor costs for field operators to field dress the tool.

Ex. A at 017-018. There are other benefits too. For example, because of its design and manufacturing, the disposable setting tool has a significantly decreased risk of mis-runs, soft-sets, or pre-sets, which could cause significant damage to a well. Operators using the disposable setting tool face a significantly decreased risk of injury because, unlike many conventional tools, the disposable tool does not require a manual pressure release at the surface of the well. Moreover, because the disposable setting tool is much smaller (only 25-26 inches) and lighter (weighing about 20 lbs.) than conventional tools, it takes fewer people to handle and operate, and it can be used with additional guns or weight bars compared to the heavier conventional tools.

27.     Repeat Precision sells the PurpleSeal Express™ system—a streamlined frac plug installation tool that combines Repeat Precision's PurpleSeal™ frac plug with an improved version of Diamondback's super short (or SS) disposable setting tool. The PurpleSeal Express

App. 067

is, in itself, a further innovation in the market, eliminating one step in the field assembly process—the combining of the setting tool and the frac plug.

28.    Repeat Precision has also sold a version of its SS disposable setting tool as a standalone product.

29.    By selling the PurpleSeal Express™ system and the standalone SS disposable setting tools in accordance with its License from Diamondback, Repeat Precision has expanded the potential market for Diamondback to sell its power charges.  The PurpleSeal Express™ system and the standalone disposable setting tools sold by Repeat Precision were designed to be used with Diamondback's Eliminator™ power charge.

30.    The improved Repeat Precision version of the disposable setting tool, like the SS disposable setting tool Diamondback introduced into the market, is designed to be used with a dry fired power charge, and unlike conventional setting tools, it does not use a hydraulic fluid, such as oil.  The inexpensive materials and simplistic machining used to make the SS disposable setting tool enable the disposable nature of the tool.

31.    Since its introduction to the oil and gas industry, the disposable setting tool, including Repeat Precision's PurpleSeal Express™ and the standalone SS disposable setting tools Repeat Precision makes in accordance with its License from Diamondback, have rapidly gained market acceptance for well completions.  There were over 500,000 stages completed in the last year.  On information and belief, disposable setting tools were used in approximately 20-30% of those completions.  This percentage will continue to grow rapidly if Repeat Precision is able to continue to move forward with its sales and production efforts.

**D.    The License**

32.    Diamondback's president and majority shareholder, Derrek Drury, has publicly

App. 068

admitted that one reason Diamondback entered into the License, and amended it in May 2018, was to "ramp up" production and sale of the disposable setting tool.[5]  Repeat Precision had the ability to do this.   The License was therefore a win-win opportunity for Diamondback and Repeat Precision.   Repeat Precision was able to produce, market, and sell the disposable setting tool for a profit.   Diamondback received an upfront payment for the License, as well as a per-sale royalty.   Ex. B at ¶¶4.1 & 4.2.   Diamondback also earned profits by selling Diamondback's Eliminator™ power charge to each Repeat Precision customer that purchased the disposable setting tool from Repeat Precision.

33.   The claims in the '035 Patent expressly include "a power charge." (*E.g.*, Claim 1 of the '035 Patent, Col. 7, line 50).

34.   The License, as reflected in its plain language, intended that Repeat Precision had all of the patent rights that it needed or were useful for it to manufacture and sell the disposable setting tool for the parties' mutual benefit.   Thus, in the License, Diamondback "represents and warrants that

> (a)  The patents and patent applications of the Licensed Patent are all the patents, and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful for Licensee to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory."

Ex. B at ¶9.2.

35.   Diamondback also agreed to "perform such other acts as may be necessary to give full effect to the terms of this Agreement." Ex. B at ¶13.3.

---

[5] *See* Declaration of Derrek Drury dated November 1, 2018, at ¶6, filed in Case No. 4:18-cv-00902-A, *Diamondback Industries, Inc. v. Repeat Precision, LLC*, in the U.S. District Court for the Northern District of Texas, Fort Worth Division.

11

36.     Diamondback's refusal to sell power charges to Repeat Precision customers undermines the purposes of the License, and is the opposite of performing "such other acts as may be necessary to give full effect to the terms of this Agreement." Ex. B at ¶13.3.

**E.     The Power Charges**

37.     Diamondback is currently the only entity that makes and sells power charges that may be used in a disposable setting tool.  Other traditional power charges, such as those used in conventional tools, are not a substitute.  The use of a power charge in the disposable setting tool is expressly disclosed in Claims 1, 10, and 18 of the '035 Patent.

38.     The '035 patent, in the "Summary of the Invention" section, discloses that the power charge used in the claimed gas operated setting tool "is dry fired in the disposable setting tool, that is, the setting tool does not use hydraulic fluid such as oil between pistons as does convention [sic] setting tool, allowing for disposal of the disposable setting tool without the need to recover oil prior to disposal." (Col. 2, lines 19-24 of the '035 patent).

39.     Diamondback has obtained patents relating to its power charge products.  On September 27, 2016, the United States Patent and Trademark Office issued United States Patent issued No. 9,453,382 B2 ("the '382 Patent"),[6] entitled "Power Charge Igniter Having a Retainer Protrusion" to the listed inventors Derrek D. Drury, Jimmy L. Carr, Robert Andres and Trea H. Baker.  On October 23, 2018, the United States Patent and Trademark Office United States issued Patent No. 10,107,054 B2 ("the '054 Patent"),[7] entitled "Power Charge Having a Combustible Sleeve" to the listed inventors Derrek D. Drury, Jimmy L. Carr, Robert Andres and Trea H. Baker.  On information and belief, the '382 and '054 patents were assigned by the listed inventors to Diamondback.

---

[6] A true and correct copy of the '832 Patent is attached as Exhibit E.
[7] A true and correct copy of the '054 Patent is attached as Exhibit F.

App. 070

40.     The '832 and '054 Patents disclose Diamondback's dry-fired power charges and disclose the materials for the preferred methods of making the charges.

41.     Diamondback knew that the '382 patent had issued on September 27, 2016 when it entered into the License on March 16, 2018.  Diamondback knew that the patent application leading to the issuance of the '054 patent was pending when it entered into the License.

42.     At the time it entered into the License, Diamondback knew that the '382 patent and the pending application for the '054 patent were "necessary or useful for Licensor to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory" as provided for in Section 9.2 of the License.

**F.     Diamondback's Refusal to Sell the Eliminator™ Power Charges**

43.     Based on the License, Repeat Precision should be the only party manufacturing or selling disposable setting tools in the disposable setting tool market.  That is the result compelled by the exclusive rights under the '035 Patent, which were licensed exclusively to Repeat Precision.  Nevertheless, in breach of the License, Diamondback is selling a disposable setting tool that infringes the '035 patent and directly competes with Repeat Precision's product. Diamondback and Repeat Precision are the only two sellers in the disposable setting tool market. There is currently no other disposable setting tool in the market.  The exclusive license under the '035 Patent gives Repeat Precision the right to exclude Diamondback and others from selling disposable setting tools.

44.     Prior to November 26, 2018, which is the date when Repeat Precision first sued Diamondback for breaching its license, Diamondback sold its power charges to all those who had purchased disposable setting tools, regardless of whether the customer purchased the product from Repeat Precision or from Diamondback.  On information and belief, Diamondback dealt

13

with customers seeking to purchase its Eliminator™ power charges for use in disposable setting tools on equal footing, with terms dictated by market conditions.

45.     On Friday, November 30, 2018, Repeat Precision learned that Diamondback was refusing to sell power charges to companies that purchased disposable setting tools from Repeat Precision.   Repeat Precision was first contacted about this issue from a wireline company ("Customer A") that had purchased approximately $140,000 in standalone disposable setting tools over a two month period in September and October 2018.   Customer A purchased an additional $30,000 of standalone disposable setting tools from Repeat Precision in November 2018.   When Customer A attempted to purchase the necessary power charges from Diamondback, Diamondback's representative asked where Customer A obtained the disposable setting tools.   Upon learning the source was Repeat Precision, Diamondback refused to sell the necessary charges to Customer A because of litigation between Diamondback and Repeat Precision. Diamondback thereby breached the License and also interfered with Repeat Precision's contractual relationship and future business relationship with the customer.   As a result of Diamondback's actions, Repeat Precision was forced to pick up the unused disposable setting tools from Customer A, giving it a credit.   Repeat has since learned that Diamondback further took advantage of this opportunity, by making sales to Customer A with power charges, thereby stealing Repeat Precision's business opportunity.

46.     On Tuesday, December 4, 2018, Repeat Precision was contacted by one of its largest disposable setting tool customers, Customer B, who Diamondback also denied the opportunity to purchase the power charges that are needed to run the tools.   Diamondback's representative told this customer that it was trying to "stick it to Repeat" and to "force Repeat out of the market."   Diamondback further told the customer that if it wanted to purchase power

14

charges from Diamondback, the customer would need to enter into an exclusive agreement to purchase its disposable setting tools only from Diamondback. Diamondback therefore breached the License and also interfered with Repeat Precision's contractual relationship and future business relationship with the customer.

47. A rational competitor would want to maximize its profits from sales. Given the growing consumer acceptance of disposable setting tools manufactured by Repeat Precision, it is economically irrational for Diamondback to refuse to sell power charges to Repeat Precision's customers. The only logical explanation for Diamondback's behavior is that Diamondback is using its position as the only supplier of power charges that will work on the disposable setting tool to foreclose competition in the market for disposable setting tools. This ultimately harms customers and competition in the disposable setting tools market because customers are either (a) denied access to the disposable setting tools, which are more cost effective, and less risky than traditional setting tools, or (b) forced to deal with a supplier other than the one they would have chosen under normal market conditions. This conduct will harm a substantial amount of competition, and, if allowed to continue, raises a dangerous risk that Diamondback will unlawfully monopolize the disposable setting tool market.

48. Withholding access to the necessary power charges for use by Repeat Precision and its customers is the opposite of providing Diamondback's patented technologies "that are necessary or useful for Licensor to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory." Ex. B at ¶9.2. Given that the power charges are essential to make the disposable setting tool work, they are both "necessary" and "useful" for Repeat to make, sell, and use the Licensed Products.

15

**App. 073**

## V.    CAUSES OF ACTION

### *Count 1: Patent Infringement*

49.    Repeat Precision incorporates by reference Paragraphs 1 through 48 above.

50.    In the interest of providing detailed averments of infringement, Repeat Precision has identified below one exemplary claim to demonstrate infringement by two exemplary Diamondback products. However, the selection of the exemplary claim and exemplary products should not be considered limiting, and any additional infringing Diamondback products or services and infringed claims of the '035 Patent will be disclosed in discovery.

51.    On information and belief, Diamondback has provided and currently provides super short (or SS) disposable setting tools, including the SS10 and SS20 tools shown in Exhibit G attached hereto ("Diamondback Setting Tools"). Diamondback also has provided and currently provides power charges that are used in various setting tools, such as the Diamondback Setting Tools ("Diamondback Power Charges"). Together, the Diamondback Setting Tools and Diamondback Power Charges (collectively, the "Diamondback Accused Products") directly infringe one or more claims of the '035 Patent.

52.    The Diamondback Accused Products include a mandrel having a first section, an intermediate section, and a second (or lower) section. The first section of the mandrel is defined for securing a firing head thereto. The mandrel also contains an upper end with a seal section for securing to the firing head. The mandrel further has a lowermost end that is adapted for securing to a packer mandrel.

53.    The intermediate section of the mandrel of the Diamondback Accused Products has an interior bore extending from the first section of the mandrel to a blind end of the interior bore, which defines a power charge chamber. The Diamondback Accused Products have one or

16

**App. 074**

more flow ports that extend radially outward from the power charge chamber through the mandrel to an exterior of the intermediate section of the mandrel. Intermediate section of the mandrel of the Diamondback Accused Products defines an intermediate exterior of a first uniform circumference.

54.   The second section of the mandrel of the Diamondback Accused Products has a lower exterior of a second uniform circumference that is in fluid communication with the interior bore of the intermediate section of the mandrel. The second uniform circumference of the lower exterior of the second section is smaller than the first uniform circumference of the intermediate exterior of the intermediate section.

55.   The Diamondback Accused Products include a barrel piston having a tubular body with an enclosed end and a central portion with a uniform interior circumference for slidably receiving the intermediate section and the second section of the mandrel. The enclosed end of the tubular body has a bore for slidably receiving the second section of the mandrel. The barrel piston further has a lowermost end that is adapted for securing to a setting sleeve.

56.   The Diamondback Accused Products include an annular-shaped space that extends between the central portion of the tubular body of the barrel piston and the second section of the mandrel.

57.   The Diamondback Accused Products include a first seal extending between the tubular body of the barrel piston and the intermediate section of the mandrel for sealing a first portion of the annular-shaped space.

58.   The Diamondback Accused Products also include a second seal extending between the bore in the enclosed end of the barrel piston and the second section of the mandrel for sealing a second portion of the annular-shaped space.

17

**App. 075**

59.     The Diamondback Accused Products include a power charge that is disposed in, or capable of being disposed in, the power charge chamber of the intermediate section of the mandrel. The power charge of the Diamondback Accused Products may be ignited to generate pressurized gas that is passed through the one or more flow ports to stroke the barrel piston over the second section of the mandrel, thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

60.     The Diamondback Setting Tools include a mandrel, a barrel piston, a first seal, a second seal, and all elements of the foregoing as described above. The Diamondback Power Charge includes a power charge that is capable of being disposed in the power charge chamber of the Diamondback Setting Tools and ignited to generate pressurized gas as described above.

61.     As described above, the Diamondback Accused Products practice all limitations of one or more claims of the '035 Patent, including claim 1.

62.     Diamondback has directly infringed and currently directly infringes one or more claims of the '035 Patent, including claim 1, by at least: (1) making the Diamondback Accused Products at its facilities in Crowley, Texas after the execution of the Amendment, and upon information and belief, having the Diamondback Accused Products made abroad for importation and sale within the United States; (2) offering the Diamondback Accused Products for sale at several technical conferences after the execution of the Amendment, including the 2018 Society of Petroleum Engineers Annual Technical Conference & Exhibition in Dallas, Texas, from September 24-26, 2018, and the 2018 DUG Midcontinent Conference & Exhibition in Oklahoma City, Oklahoma, from November 13-15, 2018; (3) offering the Diamondback Accused Products for sale through its website, as shown in Exhibit G, after the execution of the Amendment; (4) on information and belief, selling the Diamondback Accused Products to customers in the Western

District of Texas after the execution of the Amendment; and (5) on information and believe, importing the Diamondback Accused Products.

63.     Diamondback has been aware of the '035 Patent since at least its issuance and has induced infringement and continues to induce infringement of the '035 Patent. Diamondback sells and offers for sale the Diamondback Accused Products (or components thereof) to customers with knowledge of the '035 Patent and with the specific intent that the claims of the '035 Patent are infringed by disposing a Diamondback Power Charge (or other suitable power charge) in the power charge chamber of the Diamondback Setting Tools and igniting the power charge to generate pressurized gas that is passed through one or more flow ports of the mandrel of the Diamondback Setting Tools to stroke the barrel piston of the Diamondback Setting Tools over the second section of the mandrel thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

64.     Diamondback has been aware of the '035 Patent since at least its issuance and has contributed to and continues to contribute to the infringement of the '035 Patent by others. For the reasons described above, the Diamondback Setting Tools of the Diamondback Accused Products are a material part of the invention covered by the claims of the '035 Patent. Diamondback sells and offers for sale the Diamondback Setting Tools to customers knowing that the Diamondback Setting Tools are especially made or especially adapted for use in the infringement of one or more clams of the '035 Patent. The Diamondback Setting Tools are neither staple articles nor commodities of commerce suitable for substantial non-infringing use because they can only be used in an infringing manner to dispose a Diamondback Power Charge (or other suitable power charge) therein, which is then ignited to generate pressurized gas that is passed through one or more flow ports of the mandrel of the Diamondback Setting Tools to

**App. 077**

stroke the barrel piston of the Diamondback Setting Tools over the second section of the mandrel thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

65.    Diamondback has been aware of the '035 Patent since its issuance. Diamondback further has been aware of Repeat Precision's exclusive rights to make, have made, use, offer to sell, sell, import or export Licensed Products under the '035 Patent in the United States (and elsewhere) since granting Repeat Precision those rights in the Amended Patent License Agreement on May 30, 2018. The Diamondback Accused Products are electric wireline setting tools used for well completions and, as explained above, their manufacture, use, offer for sale, sale, or importation infringe one or more claims of the '035 Patent. Therefore, the Diamondback Accused Products fall within the scope of Licensed Products as defined in the Amended Patent License Agreement.

66.    Diamondback has made, sold, and offered for sale, and currently makes, sells, and offers for sale, the Diamondback Accused Products (and components thereof) to customers, as discussed above, with knowledge of the '035 Patent and Repeat Precision's exclusive rights under the Amended Patent License Agreement and with the specific intent that one or more claims of the '035 Patent are infringed by the Diamondback Accused Products and use thereof. Diamondback has represented and recognized that Repeat Precision's rights under the '035 Patent are exclusive and nonetheless continues to infringe one or more claims of the '035 Patent.

67.    Diamondback's infringement of the '035 Patent has been and is willful and done deliberately and with full knowledge that the continued manufacture and sale of the Diamondback Accused Products (and components thereof) infringe one or more claims of the

20

'035 Patent, justifying an increase in damages to be awarded to Repeat Precision up to three times the amount found or assessed in accordance with 35 U.S.C. § 284.

68.   The Diamondback Accused Products compete with one or more products sold by Repeat Precision, including at least the PurpleSeal Express™ system, which includes a version of the Diamondback SS disposable setting tool and uses Diamondback's Eliminator™ power charge.

69.   As a result of Diamondback's infringing acts, Repeat Precision has suffered and continues to suffer damage, including lost profits.  Under 35 U.S.C. § 284, Repeat Precision is entitled to recover damages for Diamondback's infringing acts, which in no event can be less than a reasonable royalty.

70.   Repeat Precision seeks a declaration that this is an exceptional case under 35 U.S.C. § 285, and that the Court award Repeat Precision its reasonable attorneys' fees.

71.   As a result of Diamondback's infringing acts, Repeat Precision has been and continues to be irreparably injured and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

72.   Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further infringement of one or more claims of the '035 Patent.

### Count 2: Breach of Contract
### Violation of the Exclusive Rights under the License

73.   Repeat Precision incorporates by reference Paragraphs 1 through 72 above.

App. 079

74.     On March 16, 2018, Diamondback and Repeat Precision entered into the Patent License Agreement that granted Repeat Precision and its Affiliates "an exclusive right and license under the Licensed Patents," including the '035 Patent, "to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory," which includes the United States.

75.     On May 30, 2018, Diamondback and Repeat Precision entered into the Amendment, under which Licensed Products is defined to mean "an electric wireline setting tool used for well completions and any other products that may be agreed upon in writing by [Diamondback] and [Repeat Precision] from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such a Valid Claim exists."

76.     As explained above, the Diamondback Accused Products are electric wireline setting tools used for well completions and their manufacture, use, offer for sale, sale, or importation infringe one or more claims of the '035 Patent.   Therefore, the Diamondback Accused Products fall within the scope of Licensed Products as defined in the Amended Patent License Agreement.

77.     At all times relevant herein, Diamondback knew of Repeat Precision's exclusive rights under the Amended Patent License Agreement.

78.     Diamondback's past and current manufacture, sale, and offer for sale of the Diamondback Accused Products after execution of the Amendment are material breaches of Repeat Precision's exclusive rights under the Amended Patent License Agreement.

79.     To the extent Diamondback has licensed others to make the Diamondback Accused Products for Diamondback, such conduct is also a breach of the representation in

22

**App. 080**

Paragraph 9.2(e) of the License, in which Diamondback represented that "it has not granted and will not grant any licenses or other contingent or non-contingent right, title, or interest under or relating to the Licensed Patents."

80.     At all times relevant herein, Repeat Precision has performed all of its obligations under the Amended Patent License Agreement.   As such, the Amended Patent License Agreement remains a valid, binding, and enforceable written agreement.

81.     By reason of Diamondback's breaches of the Amended Patent Agreement, Repeat Precision has suffered damages in an amount to be proven at trial.

82.     As a result of Diamondback's breach of the License, Repeat Precision has been and continues to be irreparably injured and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.   Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

83.     Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further breach of the License.

### Count 3: Illegal Tying of Disposable Setting Tool and Power Charge Products in Violation of Sherman Act §1, Clayton Act §4, and Texas Free Enterprise and Antitrust Act of 1983 §§15.05(a) & 15.21

84.     Repeat Precision incorporates by reference Paragraphs 1 through 83 above.

85.     Diamondback has tied its power charge product (tying product) to the purchase of its disposable setting tool product (tied product) by refusing to sell its power charge product to consumers who purchase a disposable tool setting product from Repeat Precision, the only other producer of disposable setting tools in the market.   This anticompetitive behavior constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 3 of the Clayton Act, 15 U.S.C.

23

§ 14, and Sections 15.05(a) & (c) of the Texas Free Enterprise and Antitrust Act of 1983, Tex.
Bus. & Com. Code § 15.05.

86.     Diamondback is currently the only entity making and selling power charges that
can be used with the disposable setting tool.  There are also significant barriers to entry into the
power charge market that prevent other potential competitors from entering into this market
space for disposable setting tools, including Diamondback's power charge patents and the need
for licenses from the Bureau of Alcohol, Tobacco, and Firearms, which can take over a year to
obtain.   Thus, because Diamondback is the only source for the necessary power charges,
purchasers of disposable setting tools have no choice but to purchase the disposable setting tools
from Diamondback, thereby unlawfully excluding the disposable setting tools of Repeat
Precision.

87.     Disposable setting tools and power charges are commercially separate and distinct
products that are designed to be used together.   There is separate consumer demand for
disposable setting tools and power charges, and, prior to Diamondback's unlawful conduct,
consumers purchased disposable setting tools and power charges from separate sources.

88.     Diamondback possesses monopoly power in the market for power charges for
disposable setting tools because the Diamondback power charge is the only existing power
charge that works with disposable setting tools, including the disposable setting tools that are
marketed by both Diamondback and Repeat Precision.

89.     Diamondback is leveraging its monopoly power in the market for power charges
for disposable setting tools to coerce buyers to purchase its disposable setting tool rather than
Repeat Precision's disposable setting tool.  Diamondback's conduct constitutes a *per se* violation

App. 082

of Section 1 of the Sherman Act and Section 15.05(a) of the Texas Free Enterprise and Antitrust Act.

90. The tying arrangement affects a substantial volume of commerce in the disposable setting tools market, suppresses the sales of disposable setting tools, suppresses consumer choice within the disposable setting tools market, and diminishes Repeat Precision's current and future sales opportunities.

91. The tying arrangement constitutes an unreasonable restraint on trade in violation of 15 U.S.C. § 1 and Tex. Bus. & Com. Code §15.05(a). There are no pro-competitive justifications for Diamondback's behavior. To the contrary, Diamondback's behavior is economically irrational, including because it is foregoing sales of its power charges to consumers in order to harm competition in the disposable setting tools market, and also foregoing royalties under the License on disposable setting tools that it would have received had Repeat Precision made more sales.

92. Diamondback's actions are willful and flagrant, and are in retaliation for Repeat Precision exercising its contractual rights under the License.

93. Diamondback has specifically intended, and continues to intend, through its alleged conduct, to control prices, exclude competitors, and destroy competition in the relevant market for disposable setting tools by leveraging its monopoly power in the market for power charges for disposable setting tools. Thus, even if Diamondback has through some natural or legal advantage (which is specifically denied) gained monopoly power in the market for power charges for disposable setting tools, it has illegally exploited that position in order to control the market for disposable setting tools.

App. 083

94.     Repeat Precision has been directly and proximately damaged by losses of sales and profits resulting from Diamondback's unlawful tying of products.   Repeat Precision seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws.   *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1). Repeat Precision (and the market for disposable setting tools) will be irreparably harmed if Diamondback's unlawful tying of products is not enjoined.

95.     As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.   Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

96.     Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### Count 4: Unlawful Attempt to Monopolize in Violation of Sherman Act §2, Clayton Act §4, and Texas Free Enterprise and Antitrust Act of 1983 §§15.05(b) & 15.21

97.     Repeat Precision incorporates by reference Paragraphs 1 through 96 above.

98.     Diamondback's conduct is an attempt to monopolize the disposable setting tool market in violation of 15 U.S.C. § 2 and Section 15.05(b) of the Texas Free Enterprise and Antitrust Act of 1983.

99.     Defendant has acted with the specific intent to monopolize the relevant market for disposable setting tools and has sufficient market power to create a dangerous probability of success of monopolizing the market.

App. 084

100.    Diamondback's actions are willful and flagrant, and are in retaliation for Repeat Precision electing to exercise its contractual rights under the License.

101.    The relevant geographic market is the United States.  The disposable setting tools market is a separate and distinct product market from the market for conventional (i.e. non-disposable) setting tools.  Disposable setting tools can be easily disposed of without dealing with the substantial risks and costs associated with conventional setting tools.  Disposable setting tools are significantly easier to use because, unlike conventional setting tools, they do not need to be disassembled, cleaned, and reassembled for further use, requiring service by trained personnel.  Disposable setting tools are simply disposed of following a single use, significantly reducing the operational and safety risks associated with conventional setting tools.

102.    There are significant barriers to entry to both the disposable setting tool market and the market for power charges for disposable setting tools.  Both products are the subject of one or more patents related to their design, use, or manufacture.  The power charges are subject to governmental regulation by the Bureau of Alcohol, Tobacco and Firearms.  Manufacture of both products requires specialized equipment and expertise.

103.    Diamondback has foreclosed, or attempted to foreclose, competition in the disposable setting tool market by engaging in predatory and anti-competitive conduct, including, as described above, the tying of disposable setting tools to power charges and refusing to sell power charges to consumers who have purchased disposable setting tools from Repeat Precision.

104.    Diamondback's anti-competitive practices have injured competition and consumers in the relevant market for disposable setting tools, suppressed sales of Repeat Precision's products, and diminished Repeat Precision's current and future sales opportunities.

App. 085

If Diamondback's illegal conduct is not enjoined, the market for disposable setting tools will suffer irreparable harm, through market distortion and coercion of consumer choice.

105.   As a direct and proximate result of Diamondback's anticompetitive conduct alleged herein, Repeat Precision has been injured in its business and property and suffered substantial lost profits.

106.   Repeat Precision seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws. *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1). Repeat Precision (and the market for disposable setting tools) will be irreparably harmed if Diamondback's unlawful tying of products is not enjoined.

107.   As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury. Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

108.   Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### *Count 5: Exclusive Dealing in Violation of Clayton Act §§3 & 4, and Texas Free Enterprise and Antitrust Act of 1983 §§15.05(b) & 15.21*

109.   Repeat Precision incorporates by reference Paragraphs 1 through 108 above.

110.   Diamondback has conditioned the purchase of its power charges for disposable setting tools on consumers entering into exclusive contracts with Diamondback for the purchase of its disposable tools.

**App. 086**

111.    Diamondback's exclusive dealing constitutes a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 15.05(c) of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code §15.05(c).

112.    If allowed to continue, Diamondback's illegal conduct likely will foreclose Repeat Precision from substantial portions of the market for disposable setting tools and will substantially lessen competition in those markets.   Diamondback's behavior will create or maintain its monopoly and/or market power over the disposable setting tool market.

113.    As a direct and proximate result of Diamondback's anticompetitive conduct alleged herein, Repeat Precision has been injured in its business and property and suffered substantial lost profits, and will suffer irreparable harm if Diamondback is not enjoined from continuing its illegal course of conduct.

114.    Repeat Precision seeks damages, treble damages, injunctive relief, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws. *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1).

115.    As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.   Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

116.    Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### *Count 6: Breach of Contract*
### *Refusing to Sell Power Charges to Repeat Precision Customers*

117.    Repeat Precision incorporates by reference Paragraphs 1 through 116 above.

29

118.    Diamondback's refusal to sell power charges to Repeat Precision customers undermines the purposes of the License, is in breach of Paragraph 13.3 of the License, and is in breach of the implied duty to cooperate imposed under Texas law.

119.    In Paragraph 13.3 of the License, Diamondback agreed to "perform such other acts as may be necessary to give full effect to the terms of this Agreement." Ex. B at ¶13.3. The terms of the License include Repeat Precision's ability "to make, have made, use, offer to sell, sell, import or export" disposable setting tools. Ex. B at ¶ 2. By taking action to undermine Repeat Precision's exclusive rights and to prohibit Repeat Precision from receiving the benefit of its rights under the License, Diamondback has breached at least Paragraphs 2 and 13.3.

120.    Moreover, under Texas law, Diamondback has an implied duty to cooperate with Repeat Precision under the License. Texas law does not allow a party, like Diamondback here, to enter into an agreement, but then take actions to interfere with or prevent the other contracting party from exercising its rights under the agreement. By refusing to sell power charges to Repeat Precision customers, Diamondback has breached the implied duty to cooperate.

121.    Repeat Precision has been damaged by Diamondback's breach of the License and breach of the implied duty to cooperate.

122.    Diamondback should be compelled to perform the act of selling power chargers to Repeat Precision and/or its customers so as to give full effect to the term of the License.

123.    Repeat Precision therefore seeks an order compelling specific performance by Diamondback to include, for the Term of the License, selling power charges to Repeat Precision and or customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed.

App. 088

### *Count 7: Breach of Implied Contract*
### *Refusing to Sell Power Charges to Repeat Precision Customers*

124.   Repeat Precision incorporates by reference Paragraphs 1 through 123 above.

125.   Alternatively, if Diamondback's refusal to sell power charges to Repeat Precision customers is not in breach of the License itself, it is in breach of the implied-in-fact contract between Repeat Precision and Diamondback.

126.   When Diamondback began doing business with Repeat Precision, Diamondback knew that it was the only entity that makes and sells power charges that work with the disposable setting tools.   Diamondback conveyed this fact to Repeat Precision on multiple occasions, including early on in the parties' business relationship.   Diamondback was counting on its position as the only supplier of power charges for the disposable setting tool as a way to make money from selling power charges to Repeat Precision's customers.

127.   After entering into the License with Repeat Precision, Diamondback actively encouraged Repeat Precision to produce disposable setting tools and to increase manufacturing capacity.   On many occasions, Diamondback requested Repeat Precision to "ramp up" production of the disposable setting tools.   Not only was Diamondback interested in earning royalties from the sales and selling more power charges, Diamondback had a large backlog of orders from customers who wanted to buy disposable setting tools.   Diamondback needed Repeat Precision to provide the extra manufacturing capacity.

128.   Based on Diamondback's repeated requests to "ramp up" production, Repeat Precision invested millions in manufacturing facilities and personnel to increase the quantity of disposable setting tools available for sale.   Repeat Precision communicated its actions to Diamondback, keeping Diamondback in the loop as Repeat Precision was acquiring a long-term lease for additional manufacturing facilities, purchasing equipment to make the disposable

31

setting tools, and hiring personnel to operate the new facilities.  Diamondback encouraged this activity to occur.

129.    Diamondback knew that, without access to power charges, Repeat Precision's investments and the License would be rendered worthless.  With Diamondback's permission, Repeat Precision actively promoted the Diamondback power charges for use with Repeat Precision's products.  Diamondback even requested and received opportunities to review and approve some of Repeat Precision's promotional materials before they were used.  In short, through its words and its actions, Diamondback provided assurance to Repeat Precision that power charges would be made available to Repeat Precision customers when Repeat Precision increased its production of disposable setting tools.

130.    Diamondback's assurances of a sufficient source of power charges to support Repeat Precision's increased production of disposable setting tools was consideration for, and a key point relied upon, when Repeat Precision invested millions to expand its manufacturing operations.  This course of conduct created an implied-in-fact contract that Diamondback would continue to make its power charges available to Repeat Precision's customers on commercially-reasonable terms.

131.    On Friday, November 30, 2018, Repeat Precision learned that Diamondback was refusing to sell power charges to customers that purchased disposable setting tools from Repeat Precision.  Diamondback's refusal to sell power charges is in breach of the implied-in-fact agreement.

132.    Repeat Precision has been damaged by Diamondback's breach of the implied-in-fact agreement.  Repeat Precision seeks recovery of its actual damages and attorneys' fees arising out of this breach.

App. 090

133.    Diamondback should be compelled to perform the act of selling power charges to repeat Precision and/or its customers in accordance with the implied-in-fact agreement between the parties.

134.    Repeat Precision therefore seeks an order compelling Diamondback to continue, for the Term of the License, to sell power charges to Repeat Precision and/or its customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed.

### Count 8: Tortious Interference with Existing Contractual Relationships

135.    Repeat Precision incorporates by reference Paragraphs 1 through 134 above.

136.    Repeat Precision entered into an actual contract to sell approximately $30,000 worth of standalone disposable setting tools to Customer A in or about late November 2018. Customer A had previously purchased approximately $140,000 worth of standalone disposable setting tools from Repeat Precision in the prior two months.

137.    After Repeat Precision completed the late November sale to Customer A, Diamondback refused to sell the necessary power charges for Customer A to use the tools, stating that it refused to do so because Customer A had purchased the tools from Repeat Precision.  Diamondback's refusal to sell the power charge was directly intended to interfere with Repeat Precision's contracts with Customer A.

138.    As a direct and proximate result of Diamondback's refusal to sell power charges to Customer A, Diamondback caused Customer A to breach its contract with Repeat Precision and return the disposable setting tools it had purchased from Repeat Precision in December 2018.  Repeat Precision was damaged by this interference with its customer contracts because it was forced to return Customer A's money for that sale.  Repeat Precision has also been damaged

33

App. 091

by its lost opportunity for additional sales to Customer A that would have occurred, but for Diamondback's interference.  Repeat Precision has since learned that Diamondback further interfered with Repeat Precision's relationship with Customer A, using its control over the power charge market to enable it to sell disposable setting tools to Customer A that otherwise would have been sold by Repeat Precision.

139.   Upon information and belief, Diamondback has actually interfered with, or at least attempted to interfere with, other Repeat Precision customer relationships.

140.   Diamondback's interference with Repeat Precision's customer relationships was intentional and malicious, and in retaliation for Repeat Precision exercising its contract rights under the License.  At a minimum, Diamondback was grossly negligent when engaging in this interference and retaliatory conduct.  Accordingly, Repeat Precision seeks punitive damages against Diamondback due to its intentional and malicious conduct.

141.   As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

142.   Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### Count 9: Tortious Interference with Prospective Contractual Relationships

143.   Repeat Precision incorporates by reference Paragraphs 1 through 142 above.

144.   Texas law recognizes claims for tortious interference with existing and prospective customer relationships, even when those relationships have not been memorialized in

App. 092

formal contracts. *See El Paso Healthcare Sys. Ltd. v. Murphy,* 518 S.W.3d 412, 421 (Tex. 2017); *Heil-Quaker Corp. v. Mischer Corp.,* 863 S.W.2d 210, 214 (Tex. App.—Houston [14th dist.] 1993), writ granted w.r.m., 877 S.W.2d 300 (Tex. 1994); *Whisenhunt v. Lippincott,* 474 S.W.3d 30, 44 (Tex. App.—Texarkana 2015, no pet.); *see also Astoria Indus. v. SNF, Inc.,* 223 S.W.3d 616, 630 & n.54 (Tex. App.—Fort Worth 2007, pet denied) ("The types of business relationships protected against interference include continuing business relationships."); RESTATEMENT (SECOND) TORTS §766B, cmt. c (recognizing that "[t]he expression, prospective contractual relation, is not used in this Section in a strict, technical sense").

145.   Repeat Precision is the manufacturer and seller of disposable setting tools, which, by design, are low-cost products sold to recurring customers. Repeat Precision has many ongoing customer relationships, which include customers who previously purchased disposable setting tools. Repeat Precision anticipated it would sell additional disposable setting tools to its prior customers, many of whom have expressed an intent to continue purchasing disposable setting tools from Repeat Precision.

146.   Diamondback has acted (a) with a conscious desire to prevent Repeat Precision from being able to continue its existing customer relationships, (b) with knowledge that disruption and interference with Repeat Precision's customer relationships was substantially certain to occur as a result of Diamondback's conduct, and (c) with malice and in retaliation against Repeat Precision due to Repeat Precision's decision to file suit to protect its rights under the License. Indeed, the point of Diamondback's anticompetitive conduct was to intentionally disrupt Repeat Precision's customer relationships to try to pressure Repeat Precision into giving up significant rights Repeat Precision had acquired under the License.

**App. 093**

147.   Diamondback's conduct was independently tortious and unlawful.  Under Texas law, a party acts in a tortious or unlawful manner when it engages in unfair competition, *see Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000), which would include the types of antitrust violations and anticompetitive conduct that Diamondback directed at Repeat Precision and its customers, which is detailed above.  But a tortious interference claim sweeps more broadly than the antitrust claims stated above, focusing on whether the conduct at issue (here, Diamondback's) is unlawful, rather than on whether Repeat Precision, as the plaintiff, could independently recover under the antitrust laws. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).   Accordingly, Diamondback's conduct gives rise to liability for tortious interference, regardless of whether Repeat Precision prevails on the merits of its antitrust claims.

148.   Diamondback's tortious and unlawful conduct has been the direct cause of injury and actual damages to Repeat Precision.  By depriving Repeat Precision customers of access to power charges, Repeat Precision has already lost sales of its disposable setting tools, and will continue to lose sales until Diamondback's conduct is stopped.

149.   Repeat Precision seeks recovery of its actual damages as a result of Diamondback's tortious interference, injunctive relief to prevent further interference with Repeat Precision's customers, and exemplary damages because Diamondback has acted with malice and gross negligence towards Repeat Precision. *See* Tex. Civ. Prac. & Rem. Code §41.003(a).

### Count 10: Breach of Contract
### Breach of the Representation in Paragraph 9.2

150.   Repeat Precision incorporates by reference Paragraphs 1 through 149 above.

151.   In Paragraph 9.2 of the License, Diamondback "represents and warrants" to Repeat Precision that "[t]he patents and patent applications of the Licensed Patent are all the

36

**App. 094**

patents and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful to License to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory." This clause provides assurances to Repeat Precision that Diamondback was not withholding any necessary rights for Repeat Precision to make and sell the disposable setting tools covered by the License.

152.   Because power charges are necessary and useful to the Licensed Products, Diamondback's '382 and '054 Patents for power charges fall squarely within the scope of this clause. Diamondback knew about the '382 Patent and application pending for the '054 Patent at the time the parties entered into the License. Thus, Diamondback's representation and warranty in Paragraph 9.2 was false when made, and Diamondback knew it was false.

153.   Repeat Precision has been damaged by Diamondback's breach. By withholding access to power charges from Repeat Precision's customers (even using its '382 and '054 Patents as a deterrent to having others make power charges for Repeat Precision's disposable setting tools), Diamondback is denying Repeat Precision access to patent rights that are both necessary and useful for Repeat Precision to sell its Licensed Products.

154.   In Paragraph 13.3, Diamondback represented that it would "promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement." Here, the proper remedy for Diamondback's breach of Paragraph 9.2 of the License is to compel Diamondback to execute the necessary documents to expressly grant and confirm that the License also granted Repeat Precision rights under the '382 and '054 Patents and any other patent rights necessary or useful for Repeat Precision to make, have made, use, offer to sell, sell, and import the Repeat Precision disposable setting tool.

App. 095

155.    In view of its breach of warranty, Diamondback is estopped from arguing that Repeat Precision, its customers, and any third party who makes power charges for Repeat Precision and its customers need a license under any of Diamondback's patent rights in connection with the manufacture, use, or sale of disposable setting tools and the power charges to be used within those tools.

### Count 11: Declaratory Judgment
### Repeat Precision's Right to Make and Sell Power Charges

156.    Repeat Precision incorporates by reference Paragraphs 1 through 155 above.

157.    Repeat Precision seeks declaratory relief under 28 U.S.C. §2201, *et seq.*, to resolve disputes that have arisen between the parties regarding their rights under the License, particularly as related to power charges.

158.    Repeat Precision seeks declarations from this Court that:

a.    Repeat Precision has the right and license to make, have made import, use or sell power charges without infringing Diamondback's patents or other legal rights;

b.    the License grants Repeat Precision the right to make, have made, use, offer for sale, sell, or important in the Territory, the power charges that are necessary or useful for making and using disposable setting tools;

c.    the Licensed Patents under the License include the '382 and '054 Patents;

d.    Diamondback does not have the right to exclude Repeat Precision from the market for power charges for disposable setting tools; and

e.    Repeat Precision's rights under the License include the right to have a third-party make and sell the necessary power charges for use by Repeat Precision's customers, free and clear of any claim of infringement by Diamondback that such activities infringe the Licensed Patents, including the '382 and '054 Patents.

### Count 12: Promissory Estoppel

159.    Repeat Precision incorporates by reference Paragraphs 1 through 158 above.

160.    As an alternative ground for recovery, Repeat Precision should be compensated for its reasonable and substantial reliance on Diamondback's promises.

**App. 096**

161.    Diamondback promised it would continuously sell the requisite power charges for the disposable setting tools to Repeat Precision customers.   It was foreseeable that Repeat Precision would rely on Diamondback's promise since the function of the disposable setting tools rely entirely on the power charge sold exclusively by Diamondback.

162.    In reasonable reliance on that promise, Repeat Precision entered into a long-term lease of a large warehouse to serve as the manufacturing facility, spent millions on necessary equipment, and hired employees to operate the manufacturing facility.

163.    Diamondback should be estopped from denying the enforceability of its promise to sell the power charges to Repeat Precision customers.

164.    However, if Diamondback is allowed to cut off the supply of power charges to Repeat Precision customers, Diamondback should be required to pay restitution and damages to Repeat Precision to compensate it for the value of its lost investments and lost profits, which were made in reliance on Diamondback's promises and assurances.

## VI.    REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

165.    Repeat Precision incorporates by reference Paragraphs 1 through 164 above.

## A.    Diamondback's Sale of Power Charges

166.    Repeat Precision seeks preliminary injunctive relief to preserve the status quo in the disposable setting tools market during the pendency of this lawsuit.   Federal courts are authorized to enter restraining orders and preliminary injunctions prohibiting violations of the antitrust laws "as shall be deemed just in the premises."   15 U.S.C. § 4.   Texas law is even more explicit on this point:

> Any person ... whose business or property is threatened with injury by reason of anything declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of this Act may sue any person ... to enjoin the unlawful practice temporarily or permanently. In any such suit, the court shall apply the same principles as those

generally applied by courts of equity in suits for injunctive relief against threatened conduct that would cause injury to business or property.

Tex. Bus. & Com. Code § 15.21. Repeat Precision hereby sues Diamondback for injunctive relief to restrain Diamondback from continuing its actual and threatened unlawful conduct in refusing to sell power charges to those who purchase products from Repeat Precision.

167.   Repeat Precision has a strong likelihood of success on the merits of its claims. As detailed above, Diamondback has (a) actually refused to sell products (*i.e.* power charges) to customers who purchased disposable setting tools from Repeat Precision, (b) informed one or more Repeat Precision customers that the only way to obtain the power charges needed to run the disposable setting tool was to agree to purchase the tools exclusively from Diamondback, and (c) has threatened to continue such anticompetitive conduct. Diamondback has also actually used and has threatened to continue using its market power and/or monopoly power in the power charge market, as the only supplier of power charges useable in disposable setting tools, to monopolize or attempt to monopolize the disposable setting tools markets. All of this conduct is harmful to competition, and disruptive of natural market conditions. Consumers and Repeat Precision have suffered actual injury as a result of this competitive harm, and will continue to do so if Diamondback is not enjoined.

168.   There is a substantial risk that the failure to grant a preliminary injunction will result in irreparable harm. Without an injunction, Diamondback will be allowed to unlawfully manipulate and monopolize the market for disposable setting tools, thereby preventing consumers from choosing where to buy disposable setting tools. Consumers would either be forced to buy products from Diamondback, or exit the market entirely. Diamondback entered into the License because it had capacity issues, and an inability to manufacture disposable setting tools on a full scale basis. Thus, if Diamondback is allowed to become the only competitor in

this market, consumers are likely going to be deprived of access to the disposable setting tools, which are cheaper and less risky than conventional setting tools, because of Diamondback's inability to meet consumer demand. Monetary damages at the end of this lawsuit will be inadequate to remedy these harms to the market and consumers.

169.    The threatened injury to competition, the market, and consumers strongly outweighs any harm that Diamondback would suffer if a preliminary injunction is issued. Indeed, Diamondback would likely have no injury. Under a preliminary injunction, Diamondback would actually sell more power charges than it otherwise would, thereby earning greater profits during this case. The fact that Diamondback is taking economically irrational actions to sell less power charge products is a strong indicator of anticompetitive conduct designed to harm the disposable setting tool market. The only harm Diamondback might suffer as a result of a preliminary injunction is that it would be hindered in its efforts to monopolize the disposable setting tools market. This is not the type of harm that should weigh against an injunction to stop antitrust violations.

170.    Granting injunctive relief will not disserve the public interest. To the contrary, injunctive relief will provide benefits to the public by preventing Diamondback from monopolizing the disposable setting tools market. This will increase public access to an innovative product that is cheaper, and less risky to completion operations than conventional setting tools.

171.    Repeat Precision requests that the Court enjoin Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback from engaging in the following conduct while this lawsuit is pending:

    a.    refusing to sell power charges to customers who purchase disposable setting tools from Repeat Precision or to contractors working for those customers;

41

b.    conditioning the sale of power charges on an agreement only to purchase disposable setting tools from Diamondback;

c.    unlawfully tying the sale of power charges to the purchase of disposable setting tools from Diamondback;

d.    imposing terms on the sale of power charges to Repeat Precision customers and their contractors that are materially different than the commercial terms Diamondback uses for sale to its own disposable setting tool customers; and

e.    retaliating against any customers because they choose to buy products from Repeat Precision.

Repeat Precision further requests that this injunction be incorporated into the Court's final judgment following a trial or judgment on the merits of this case.

**B.    Repeat Precision's Right to Have Power Charges Made Freed and Clear to Any Claims of Infringement by Diamondback**

172.    Repeat Precision seeks preliminary injunctive relief to prevent Diamondback from interfering with Repeat Precision's contractual rights and efforts to have a third party make power charges for customers who purchase disposable setting tools from Repeat Precision.

173.    Repeat Precision has a strong likelihood of success on its contract and patent-based arguments to show that Repeat Precision has the right to make or have made power charges for use with disposable setting tools, free and clear of Diamondback's claims to patent rights on power charge technologies.  The License also allows Repeat Precision to assign or transfer its rights to others.  *See* Par. 13.10.  Diamondback has no justifiable basis under the parties' contracts or the relevant patents to interfere with Repeat Precision's exercise of its rights.

174.    Irreparable harm will occur if Diamondback is allowed to interfere with Repeat Precision's exercise of its rights.  Diamondback's actions have created uncertainty in the market for disposable setting tools, causing customers to question whether power charges will be available if they purchase tools from Repeat Precision.  Repeat Precision seeks to exercise its rights to have a third party make power charges for Repeat Precision customers to remove the

App. 100

uncertainty in the market, and to prohibit Diamondback from unlawfully manipulating or suppressing the market as it has previously done by controlling and withholding access to power charges.

175.    The balance of equities weighs strongly in favor of injunctive relief. Repeat Precision did not want to get involved in the power charge market. Moreover, its original intent was to work with Diamondback to increase the sale of Diamondback's power charges by recommending them for use with Repeat Precision's disposable setting tool. Diamondback unilaterally caused the uncertainty in the market when it engaged in anti-competitive conduct to retaliate against Repeat Precision for filing suit to enforce its License against Diamondback. Thus, Diamondback has no legitimate basis to complain about any alleged harm to its own interests as a result of injunctive relief that protects the market against further harm from Diamondback's anticompetitive conduct.

176.    The public interest will best be served by granting injunctive relief to protect the market against Diamondback's conduct while this case is pending.

177.    Repeat Precision requests that the Court enjoin Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback from engaging in the following conduct while this lawsuit is pending:

  a.     interfering with Repeat Precision's rights to contract with third parties to make and sell power charges that may be used by customers who buy disposable setting tools from Repeat Precision; and

  b.     contacting, threatening, or discouraging any person from making power charges under any agreements with Repeat Precision, including, but not limited to, asserting claims that such activities would infringe Diamondback's patents.

Repeat Precision further requests that this injunction be incorporated into the Court's final judgment following a trial or judgment on the merits of this case.

### C.   Bond

178.   Repeat Precision is willing to post a bond to support its request for injunctive relief.   Repeat Precision submits that $1,000 would be an appropriate bond given that the requested injunction would *increase* Diamondback's sales and profits during the time period while the injunction is in place.

## VII.   PRAYER FOR RELIEF

For the reasons stated, Repeat Precision prays for judgment against Diamondback, including the following relief:

(1)   A judgment that Diamondback has breached the License and its implied contracts with Repeat Precision;

(2)   A judgment and order requiring Diamondback to pay Repeat Precision its actual and compensatory damages resulting from Diamondback's breach, together with Repeat Precision's attorney's fees;

(3)   A judgment that Diamondback has directly and indirectly infringed and is directly and indirectly infringing one or more claims of the '035 Patent under all applicable provisions of Title 35 of the United States Code;

(4)   A judgment and order finding that Diamondback has willfully and is willfully infringing one or more claims of the '035 Patent;

(5)   A judgment and order requiring Diamondback to pay Repeat Precision its damages resulting from Diamondback's infringing activities and treble damages as provided by 35 U.S.C. § 284;

(6)   A judgment and order finding this to be an exceptional case and requiring Diamondback to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285;

(7)   A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, pursuant to 35 U.S.C. § 283, from all future activities directly infringing the '035 Patent, and/or inducing or contributing to the infringement of the '035 Patent;

(8)   A judgment that Diamondback has violated federal and state antitrust laws, including Section 1 of the Sherman Act (15 U.S.C. §1), Section 2 of the Sherman Act (15 U.S.C. §2), Section 3 of the Clayton Act (15 U.S.C. §14), and Tex. Bus. & Com. Code §15.05(b) & (c);

**App. 102**

(9)     A judgment and order requiring Diamondback to pay treble damages as provided for under 15 U.S.C. § 15(a) and Tex. Bus. & Com. Code §15.21(a)(1);

(10)    A judgment that Diamondback has tortiously interfered with Repeat Precision's existing and prospective contracts and business relationships;

(11)    A judgment and order requiring Diamondback to pay Repeat Precision its actual and compensatory damages resulting from Diamondback's tortious interference;

(12)    A judgment and order requiring Diamondback to pay exemplary damages due to Diamondback's tortious interference;

(13)    A preliminary injunction as set forth in paragraphs 165-177 above;

(14)    A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, from (a) refusing to sell power charges to customers who purchased products from Repeat Precision or to contractors working for those customers, (b) conditioning the sale of power charges on an agreement only to purchase disposable setting tools from Diamondback, (c) unlawfully tying the sale of power charges to the purchase of disposable setting tools from Diamondback; (d) imposing terms on the sale of power charges to Repeat Precision customers or their contractors that are materially different than the commercial terms Diamondback uses for sale to its own customers, and (e) retaliating against any customers because they choose to buy products from Repeat Precision;

(15)    A judgment declaring that:

a.      Repeat Precision has the right and license to make, have made, import, use or sell dry-firing power charges without infringing Diamondback's patents or other legal rights;

b.      the License grants Repeat Precision the right to make, have made, use, offer for sale, sell, or important in the Territory, the power charges that are necessary or useful for making and using disposable setting tools;

c.      the Licensed Patents under the License include the '382 and '054 Patents;

d.      Diamondback does not have the right to exclude Repeat Precision from the market for power charges for disposable setting tools; and

e.      Repeat Precision's rights under the License include the right to have a third-party make and sell the necessary power charges for use by Repeat Precision's customers, free and clear of any claim of infringement by Diamondback that such activities infringe the Licensed Patents, including the '382 and '054 Patents;

45

**App. 103**

(16)   An Order compelling Diamondback to continue for the Term of the License to sell power charges to Repeat Precision and or its customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed;

(17)   A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, from (a) interfering with Repeat Precision's rights to contract with third parties to make and sell power charges that may be used by customers who buy disposable setting tools from Repeat Precision; and (b) contacting, threatening, or discouraging any person from making power charges under any agreements with Repeat Precision, including, but not limited to, asserting claims that such activities would infringe Diamondback's patents;

(18)   A judgment and order awarding Repeat Precision recovery of its attorneys' fees under Chapter 38 of the Tex. Civ. Prac. & Rem. Code;

(19)   A judgment and order requiring Diamondback to pay Repeat Precision its costs, prejudgment and post judgment interest; and

(20)   Such other and further relief as the Court deems just and equitable.

Date:  February 4, 2019                    Respectfully submitted,


                                           */s/ W. Scott Hastings*
                                           W. Scott Hastings
                                               Texas State Bar No. 24002241
                                               *shastings@lockelord.com*
                                           Charles E. Phipps
                                               Texas State Bar No. 00794457
                                               *cphipps@lockelord.com*
                                           Susan E. Adams
                                               Texas State Bar No. 24059354
                                               *suadams@lockelord.com*
                                           Anna K. Finger
                                               Texas State Bar No. 24105860
                                               *anna.k.finger@lockelord.com*

                                           LOCKE LORD LLP
                                           2200 Ross Avenue, Suite 2800
                                           Dallas, Texas  75201
                                           (214) 740-8000 Telephone
                                           (214) 740-8800 Facsimile

                                           ATTORNEYS FOR REPEAT PRECISION, LLC

**App. 105**

# EXHIBIT 3

# EXHIBIT 4

## PATENT LICENSE

*[Execution Version]*

# Patent License Agreement

This Patent License Agreement ("**Agreement**"), dated as of March 16, 2018 (the "**Effective Date**"), is by and between Diamondback Industries, Inc., a Texas corporation ("**Licensor**"), and Repeat Precision, LLC, a Texas limited liability company ("**Licensee**").

WHEREAS, Licensor is owns all right, title, and interest in and has the right to license to Licensee the Licensed Patents (as defined below); and

WHEREAS, Licensee wishes to practice the Licensed Patents in the Territory (as defined below) in connection with the Licensed Products (as defined below) and Licensor is willing to grant to Licensee a license to the Licensed Patents on the terms and conditions set out in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

    1.   <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

        "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person through the ownership of voting securities, by contract, or otherwise/direct or indirect ownership of more than 50% of the voting securities of a Person. Affiliates shall not include parties that are controlled by Advent International Corporation other than NCS Multistage Holdings, Inc. and entities within its corporate structure.

        For the avoidance of doubt, any Person that is not an Affiliate as of the Effective Date, but later becomes an Affiliate of Licensee through any transaction or series of related transactions shall be deemed to be an Affiliate of Licensee for purposes of this Agreement.

        "**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in New York, NY are authorized or required by Law to be closed for business.

        "**Confidential Information**" means all non-public, confidential or proprietary information electronic, written or oral, furnished by a Disclosing Party, directly or indirectly, to a Receiving Party, including but not limited to all contracts, financial information, engineering reports, environmental reports, land and lease information, technical and economic data, marketing terms and arrangements, knowledge, trade secrets, know-how and related information such as plans, maps, drawings, field notes, sketches, photographs, computer records or software, specifications, models, pricing quotations or other information which is or may be either applicable to or related in any way to the assets, business or affairs of the Disclosing Party, together with all analyses, compilations, data studies or other documents prepared by the Receiving Party containing or based upon, in whole or in part, information acquired by the Receiving Party. Confidential Information shall not include Nonproprietary Information.

        "**Disclosing Party**" means a party disclosing Confidential Information.

"**Improvement**" means (a) any new or modified product that performs the same function as the Licensed Products but (i) does so in a better or more economical way (including by reason of better quality, ease of use, efficacy, safety, or performance); (ii) has a longer service life; (iii) has additional or broader functions or applicability; (iv) costs less to manufacture, package, distribute, or otherwise commercialize; (v) has a better appearance; or (vi) is more marketable, for any reason, than the Licensed Products; or (b) any enhancement or modification to the technology that is the subject of the Licensed Patents.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, award, decree, other requirement or rule of law of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"**Licensed Patents**" means (a) United States Letters Patent No. 9,810,035 Bl, and all continuations, continuations-in-part, divisions, extensions, substitutions, reissues, re-examinations, and renewals of any of the foregoing, including any foreign counterparts in the Territory, and (b) any patents in the Territory issuing from any applications filed after the Effective Date and that claim priority from any of the patents or patent applications identified in subsection (a) or from which any of the patents or patent applications identified in subsection (a) claim priority.

"**Licensed Products**" means a bridge plug that is coupled with the Company or its Affiliates' isolation tool used for well completions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such a Valid Claim exists.

"**Losses**" means all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers.

"**Net Sales Price**" means Licensee's invoice price less returns, allowances, or credits, rebates, excise, sales, use or value-added taxes, costs of packing, transportation, and insurance, delivery charges, cash and trade discounts allowed, import duty, and commissions to agents.

"**Nonproprietary Information**" means the information with respect to which the Receiving Party is able to establish:

(a)  at the time of disclosure is, or thereafter becomes, generally available to the public, other than directly or indirectly, any violation of this Agreement by the Receiving Party or its Representatives or anyone to whom the Receiving Party or its Representatives disclosed such information;

(b)  at the time of disclosure is, or thereafter becomes, available to the Receiving Party or its Representatives on a non-confidential basis from a third-party source, provided that, such third party is not and was not prohibited from disclosing such Confidential Information to the Receiving Party by a legal, fiduciary, or contractual obligation to the Disclosing Party;

2

(c)     by documentary evidence that it was known by or in the possession of the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to this Agreement, provided that such information is not subject to another confidentiality agreement or other obligation of secrecy; or

(d)     was or is independently prepared by the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to this Agreement, without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information;

provided that, any combination of the information which comprises part of the Confidential Information shall not be deemed to be Nonproprietary Information merely because individual parts of that information were within the above clauses, unless the combination itself was within any of the above clauses.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"**Quarterly Period**" means each three-month period commencing on the 1st of January, 1st of April, 1st of July, and 1st of October, except that the first and last periods may be "short," depending on the Effective Date of this Agreement.

"**Receiving Party**" means a party receiving Confidential Information.

"**Representatives**" means a party's and its Affiliates' employees, officers, directors, consultants, and legal advisors.

"**Territory**" means the United States, Canada, Mexico, Argentina, China, Russia and any other territory that may be agreed upon in writing by Licensor and Licensee from time to time.

"**Valid Claim**" means, on a country-by-country basis, a claim of an unexpired issued or granted Licensed Patent, as long as the claim has not been admitted by Licensor or otherwise caused to be invalid or unenforceable through reissue, disclaimer, or otherwise, or held invalid or unenforceable by a tribunal or governmental agency of competent jurisdiction from whose judgment no appeal is allowed or timely taken.

2.     Grant. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee and its Affiliates during the Term an exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory.

3.     Improvements.

3.1     Notice of Improvements. If Licensor files a patent application anywhere in the Territory for any Improvement, Licensor shall provide written notice (the "**Improvement Notice**") to Licensee within 30 Business Days after the filing date of the patent application, with a copy of the patent application and such other details of the Improvement as Licensee reasonably requires to effectively evaluate the Improvement. If Licensee wishes to include any Improvement patent as a

3

Licensed Patent under this Agreement, Licensee shall provide within 30 Business Days of the Improvement Notice written notice to Licensor specifying the particular Improvement patents Licensee wishes to include as a Licensed Patent. Unless the Licensor object to such request within 7 Business Days of the notice specifying the particular Improvement patents Licensee wishes to include, each Improvement Patent identified by Licensee in the notice will be a Licensed Patent under this Agreement.

    3.2   <u>License to Improvements</u>. Licensee may include any patent application covering Improvements as a Licensed Patent under this Agreement by providing written notice to Licensor within 30 Business Days after the Improvement Notice identifying the Improvement patent applications Licensee chooses to include as a Licensed Patent. Such Improvement patent applications will be deemed to be a Licensed Patent and, for the avoidance of doubt, shall not require any Earned Royalty Payments for the sale of the Licensed Products, unless the sale of a Licensed Product in a Territory would infringe on the then existing Licensed Patent, without taking into account the Improvement patent.

    3.3   <u>No Grant-Backs</u>. All right, title, and interest in an Improvement conceived, made, or reduced to practice by either party during the Term of this Agreement, and all patents and patent applications claiming its Improvements, shall:

        (a)   remain the sole and exclusive property of the party making the Improvement or filing the patent; and

        (b)   not be licensed to the other party, unless the Parties otherwise specifically agree in writing.

4.   <u>Royalties</u>.

    4.1   <u>Upfront Payment</u>. On the Effective Date, Licensee shall pay to Licensor the sum of $55,000.

    4.2   <u>Earned Royalty</u>. Licensee shall pay to Licensor on or before the last Business Day of each Quarterly Period during the Term a royalty of $20 for each Licensed Product sold by Licensee in the Territory during the respective preceding Quarterly Period ("**Earned Royalty**"). For the avoidance of doubt, Licensee shall only pay the Earned Royalty fee for each Licensed Product sold in a Territory with a Licensed Patent that, but for this Agreement, the sale of the Licensed Product in the Territory would infringe on one or more Valid Claims necessary for the sale of the Licensed Product.

    4.3   <u>Taxes</u>. If Licensee is required by Law to withhold taxes in connection with any sums payable to Licensor under this Agreement, Licensee may deduct the amount of the withholding from the payment it otherwise would have made to Licensor under this Agreement and shall include in the Payment Statement the gross amount due, the amount of the sum deducted under this section, and the actual amount paid.

    4.4   <u>Payment Terms and Royalty Statements</u>.

(a)    All Earned Royalties and any other sums payable under this Agreement shall be paid in US dollars within 90 days of the end of each successive Quarterly Period.

(b)    Payments to Licensor may be accompanied by a statement (a "**Payment Statement**").

4.5    <u>Payment Disputes</u>. Licensee may withhold from payment any and all payments and amounts Licensee disputes in good faith, pending resolution of the dispute.

5.    <u>Patent Prosecution and Maintenance</u>.

5.1    <u>Patent Prosecution and Maintenance</u>. For each patent application and patent under the Licensed Patents, Licensor shall:

(a)    prepare, file, and prosecute such patent application:

(b)    maintain such patent;

(c)    pay all fees and expenses associated with such activities;

(d)    keep Licensee currently informed of the filing and progress of all material aspects of the prosecution of such patent application and the issuance of patents from any such patent application;

(e)    consult with Licensee concerning any decisions which could affect the scope or enforcement of any issued claims or the potential abandonment of such patent application or patent; and

(f)    notify Licensee in writing of any additions, deletions, or changes in the status of such patent or patent application.

5.2    <u>Abandonment</u>. If Licensor wishes to abandon any patent application or patent that is a Licensed Patent, it shall give Licensee 60 days prior written notice of the desired abandonment. Licensor shall not abandon any such Licensed Patent except upon the prior written consent of Licensee. On Licensee's request, which may be provided at any time after the notice of desired abandonment, Licensor shall assign to Licensee any such patent application or patent Licensor wishes to abandon. Effective as of the effective date of the assignment, such patent application or patent shall no longer be a Licensed Patent and Licensee shall not have any further royalty or other payment obligation for such patent application or patent.

6.    <u>Third-Party Infringement</u>.

6.1    A party receiving notice of alleged infringement of any Licensed Patent in the Territory, or having a declaratory judgment action alleging invalidity or noninfringement of any Licensed Patent in the Territory brought against it, shall promptly provide written notice to the other party of the alleged infringement or declaratory judgment action, as applicable.

**App. 112**

6.2     Licensor may, at its sole option, choose to bring suit to stop infringement of the Licensed Patent or defend a declaratory judgment action or other proceeding alleging noninfringement, invalidity, or unenforceability of the Licensed Patent.  If Licensor elects not to bring such suit or assert such defense within one month of such notice, then Licensee may bring such suit or assert such defense and may join Licensor in the proceeding as necessary.  The party bringing such suit or asserting such defense may control the conduct of the prosecution or defense of any proceeding under this section, including settlement, and the other party will provide assistance as necessary with reasonable out-of-pocket expenses to be timely reimbursed by the party controlling such proceeding.  Licensee must obtain prior approval from Licensor of any settlement terms for other than monetary damages paid to Licensee.

6.3     In the event that neither Licensor nor Licensee chooses to defend an attack on the validity of any patent claims necessary for the Licensed Product pursuant to Section 6.2, no further compensation shall be due, and Licensee shall immediately have a fully paid license under the Licensed Patent pursuant to the terms of Section 2, including the restrictions on the Licensee set forth in Section 2.

7.     Compliance with Laws.

7.1     Regulatory Clearance. Licensor shall reasonably cooperate with Licensee in obtaining any clearances from governmental agencies to market the Licensed Products.

7.2     Recordation of License. Licensor shall record this Agreement as required by any applicable laws of any jurisdiction as a prerequisite to enforceability of this Agreement or for other reasons and any recordation fees and related costs and expenses shall be at Licensor's expense.

8.     Confidentiality.

8.1     Confidentiality Obligations. The parties acknowledges that in connection with this Agreement it will gain access to Confidential Information of the other party. As a condition to being furnished with Confidential Information, parties agree, during the Term and for 1 years thereafter to:

(a)     not use the Disclosing Party's Confidential Information other than as strictly necessary to exercise its rights and perform its obligations under this Agreement; and

(b)     maintain the Disclosing Party's Confidential Information in strict confidence and, subject to the exceptions below, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent, provided, however, the Receiving Party may disclose the Confidential Information to its Representatives who:

(i)     have a "need to know" for purposes of the Receiving Party's performance, or exercise of its rights with respect to such Confidential Information, under this Agreement;

(ii)     are aware of this restriction; and

6

(iii)    are themselves bound by confidentiality, provided further that the Receiving Party shall be responsible for ensuring its Representatives' compliance with, and shall be liable for any breach by its Representatives of, this section.

The Receiving Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

8.2    Exceptions. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

(a)    provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this section; and

(b)    disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

8.3    Securities Laws. Each Party hereby acknowledges that it is aware, and will ensure that its Representatives to whom any Confidential Information is disclosed are also aware, of the general nature of applicable securities laws, including, without limitation, all applicable securities laws which may prohibit any person, firm or corporation who has material, non-public information concerning the matters which are the subject of this Agreement, from trading in securities of a company which may be party to a transaction of the nature contemplated herein or from communicating such information to other persons under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities.

9.    Representations and Warranties.

9.1    Mutual Representations and Warranties. Each party represents and warrants to the other party that:

(a)    it is duly organized, validly existing, and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b)    it has, and throughout the Term shall retain, the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(c)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary organizational action of the party; and

(d)     when executed and delivered by such party, this Agreement shall constitute the legal, valid, and binding obligation of that party, enforceable against that party in accordance with its terms.

9.2     <u>Licensor's Representations and Warranties</u>. Licensor represents and warrants that:

(a)     The patents and patent applications of the Licensed Patent are all the patents and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful for Licensee to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory;

(b)     it is the legal and beneficial owner of the entire right, title, and interest in and to the Licensed Patents, and is the record owner of all patent applications and issued patents that are Licensed Patents;

(c)     it has, and throughout the Term will retain, the unconditional and irrevocable right, power, and authority to grant the license hereunder;

(d)     neither its grant of the license, nor its performance of any of its obligations, under this Agreement does or will at any time during the Term:

(i)     conflict with or violate any applicable Law;

(ii)     require the consent, approval, or authorization of any governmental or regulatory authority or other third party; or

(iii)     require the provision of any payment or other consideration to any third party.

(e)     it has not granted and will not grant any licenses or other contingent or non-contingent right, title, or interest under or relating to Licensed Patents, and is not or will not be under any obligation, that does or will conflict with or otherwise affect this Agreement, including any of Licensor's representations, warranties, or obligations, or Licensee's rights or licenses hereunder;

(f)     there neither are nor at any time during the Term will be any encumbrances, liens, or security interests involving any Licensed Patent;

(g)     no prior art or other information exists that would adversely affect the validity, enforceability, term, or scope of any Licensed Patent;

(h)     there is no settled, pending, or threatened litigation or reissue application, re-examination, post-grant, *inter partes*, or covered business method patent review, interference, derivation, opposition, claim of invalidity, or other claim or proceeding (including in the form of any offer to obtain a license):

(i)     alleging the unpatentability, invalidity, misuse, unregisterability, unenforceability, or noninfringement of, or error in any Licensed Patent;

(ii)      challenging Licensor's ownership of, or right to practice or license, any Licensed Patent, or alleging any adverse right, title, or interest with respect thereto; or

(iii)      alleging that the practice of any Licensed Patent or the making, using, offering to sell, sale, or importation of any Licensed Product in the Territory does or would infringe, misappropriate, or otherwise violate any patent, trade secret, or other intellectual property of any third party.

(i)      it has no knowledge of any factual, legal, or other reasonable basis for any litigation, claim, or proceeding described in <u>Section 9.2(h)</u>;

(j)      it has not received any written, oral, or other notice of any litigation, claim, or proceeding described in <u>Section 9.2(h)</u>; and

(k)      it has not brought or threatened any claim against any third party alleging infringement of any Licensed Patent, nor is any third party infringing or preparing or threatening to infringe any patent, or practicing any claim of any patent application, included as a Licensed Patent.

10.      <u>Exclusion of Consequential and Other Direct Damages</u>. To the fullest extent permitted by Law, Licensee shall not be liable to Licensor for any injury to or loss of goodwill, reputation, business production, revenues, profits, anticipated profits, contracts, or opportunities (irrespective of how these are classified as damages), or for any consequential, incidental, indirect, exemplary, special, punitive, or enhanced damages, whether arising out of breach of contract, tort (including negligence), or otherwise (including the entry into, performance or breach of this Agreement), regardless of whether such damage was foreseeable and whether or not the other party has been advised of the possibility of such damages.

11.      <u>Indemnification</u>.

11.1      Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents, successors, and assigns (each, an "**Indemnitee**") against all Losses arising out of or resulting from any third party claim, suit, action, or proceeding (each an "**Action**") related to, arising out of, or resulting from Licensor's breach of any representation, warranty, covenant, or obligation under this Agreement.

11.2      Licensor shall indemnify, defend, and hold harmless each of the Indemnitees against all Losses arising out of, resulting from, or relating to any Action involving a claim that any manufacture, use, sale, offer for sale, or importation of any Licensed Product in the Territory, or the exercise of any rights or privileges by Licensee granted to it under this Agreement, infringes any patent or other intellectual property right of any third party.

11.3      <u>Indemnification Procedure</u>. The indemnified party shall promptly notify the indemnifying party in writing of any Action and cooperate with the indemnified party at the indemnifying party's sole cost and expense. The indemnifying party shall immediately take control of the defense and investigation of the Action and shall employ counsel reasonably acceptable to indemnified party to handle and defend the same, at the indemnifying party's sole cost and expense. The indemnified party's failure to perform any obligations under this section shall not relieve the

9

indemnifying party of its obligation under this section except to the extent that the indemnifying party can demonstrate that it has been materially prejudiced as a result of the failure. The indemnified party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

12.   Term and Termination.

12.1   Term. This Agreement shall commence as of the Effective Date and, unless terminated earlier in accordance with Section 12.2, shall remain in force on a Licensed-Product-by-Licensed-Product and country-by-country basis until the expiration of the last Valid Claim to expire of the Licensed Patents covering such Licensed Product in such country (the "Term"). As used in this section, "expiration" and "expire," when referring to a Licensed Patent means any expiration, revocation, invalidation, or other termination of such Licensed Patent.

12.2   Termination by Licensee.

(a)   Licensee may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty, by providing at least 30 Business Days' prior written notice to licensor.

(b)   Either may terminate this Agreement on written notice to  other party if the other party materially breaches this Agreement and such breach:

(i)   is incapable of cure; or

(ii)   being capable of cure, remains uncured 180 days after the breaching party receives written notice thereof.

(c)   Either party may terminate this Agreement by written notice to the other party if the other party:

(i)   becomes insolvent or admits inability to pay its debts generally as they become due;

(ii)   becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within 30 Business Days or is not dismissed or vacated within 30 Business Days after filing;

(iii)   is dissolved or liquidated or takes any corporate action for such purpose;

(iv)   makes a general assignment for the benefit of creditors; or

(v)   has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

12.3   Effect of Termination.

10

(a)     On any expiration or termination of the entirety of this Agreement, upon the request of the Disclosing Party for any reason whatsoever, and within five (5) days of such request, the Receiving Party shall return  all original copies of the Confidential Information to the Disclosing Party and shall destroy any and all copies or other reproductions or extracts thereof (both written and electronic), together with such documents, memoranda, analyses, notes and other writings whatsoever prepared by the Receiving Party and its Representatives based on the Confidential Information.  Upon any such request, a senior officer or manager of the Receiving Party shall certify in writing to the Disclosing Party that all of the documents constituting Confidential Information, including documents constituting Confidential Information held by the Receiving Party and its Representatives, have been returned or destroyed.

(b)     Notwithstanding the foregoing, the Parties acknowledge and agree that the Receiving Party may retain copies of the Confidential Information as may be required to comply with applicable Laws. Any Confidential Information retained pursuant to this section will be held subject to the terms of this Agreement.

12.4     <u>Expiration</u>. At the expiration of the last patent to expire under the Licensed Patents in any country in the Territory with respect to any Licensed Product, provided Licensee is not at that time in breach of this Agreement, Licensee shall have a completely paid-up, royalty-free right and license to subsequently make, have made, use, offer to sell, sell, and import in that country any and all products that were previously Licensed Products and shall have no further obligations to Licensor in that country with respect to such Licensed Patents or such Products.

12.5     <u>Sell-Off Period</u>. On termination of this Agreement for any reason, Licensee shall have the right to dispose of all stocks of Licensed Products in its possession and all Licensed Products in the course of manufacture at the date of termination for a period of 90 days after the date of termination (the **"Sell-Off Period"**), in each case, in accordance with the terms and conditions of this Agreement. Any royalty payable under the provisions of <u>Section 4.2</u> shall be paid to Licensor within 60 days after (a) termination, with respect to royalties accrued prior to the effective date of termination, and (b) the expiration of the Sell-Off Period, with respect to royalties accrued during the Sell-Off Period.

12.6     <u>Survival</u>. The rights and obligations of the parties set forth in this section and <u>Section 1</u> (Definitions), <u>Section 8</u> (Confidentiality), <u>Section 9</u> (Representations and Warranties), <u>Section 11</u> (Indemnification), <u>Section 12.3</u> (Effect of Termination), <u>Section 12.4</u> (Expiration), <u>Section 12.5</u> (Sell-off Period) and <u>Section 13</u> (Miscellaneous), and any right, obligation, or required performance of the parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration.

13.     <u>Miscellaneous</u>.

13.1     <u>Bankruptcy</u>. All rights and licenses granted by Licensor under this Agreement are and shall be deemed to be rights and licenses to "intellectual property'" as such term is used in, and interpreted under, Section 365(n) of the United States Bankruptcy Code (the **"Bankruptcy Code"**) (11 U.S.C. § 365(n)). Licensee shall have all rights, elections, and protections under the Bankruptcy Code and all other bankruptcy, insolvency, and similar laws with respect to the Agreement, and the

11

subject matter hereof. Without limiting the generality of the foregoing, Licensor acknowledges and agrees that, if Licensor or its estate shall become subject to any bankruptcy or similar proceeding:

      (a)     subject to Licensee's rights of election under Section 365(n), all rights, licenses, and privileges granted to Licensee under this Agreement will continue subject to the respective terms and conditions hereof, and will not be affected, even by Licensor's rejection of this Agreement; and

      (b)     Licensee shall be entitled to a complete duplicate of, or complete access to, as appropriate, all such intellectual property and embodiments of intellectual property, which, if not already in Licensee's possession, shall be promptly delivered to Licensee or its designee, unless Licensor elects to and does in fact continue to perform all of its obligations under this Agreement.

    13.2    <u>Force Majeure.</u> Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including any obligation to timely make any payment hereunder, when and to the extent such failure or delay is caused by: (i) acts of nature; (ii) flood, fire, or explosion; (iii) war, terrorism, invasion, riot, or other civil unrest; (iv) embargoes or blockades in effect on or after the date of this Agreement; (v) or national or regional emergency (each of the foregoing, a "**Force Majeure Event**"), in each case, provided that (i) such event is outside the reasonable control of the affected party; (ii) the affected party provides prompt notice to the other party, stating the period of time the occurrence is expected to continue; and (iii) the affected party uses diligent efforts to end the failure or delay and minimize the effects of such Force Majeure Event. Licensee may terminate this Agreement if a Force Majeure Event affecting Licensor continues substantially uninterrupted for a period of 30 days or more. Unless Licensee terminates this Agreement pursuant to the preceding sentence, all dates by which Licensee must perform any act or on which a Licensee obligation is due shall automatically be extended for a period up to the duration of the Force Majeure Event.

    13.3    <u>Further Assurances</u>. Each party shall, upon the reasonable request of the other party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

    13.4    <u>Independent Contractors</u>. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

    13.5    <u>No Public Announcements</u>. Neither party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other party's trademarks, service marks, trade names, logos, domain names, or other indicia of source, association, or sponsorship, in each case, without the prior written consent of the other party.

13.6    Notices. All notices, requests, consents, claims, demands, waivers, and other communications (other than routine communications having no legal effect) shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section).

| | |
|---|---|
| If to Licensor: | Repeat Precision, LLC |
| | 19450 State Hwy 249, STE 200 |
| | Houston, TX  77070 |
| | Attn:  General Counsel |
| If to Licensee: | Diamondback Industries, Inc. |
| | 3824 Williamson Road |
| | Crowley, TX 76036 |

13.7    Interpretation. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

Unless the context otherwise requires, references herein: (x) to Sections and Schedules refer to the Sections of and Schedules attached to this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Any Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

13.8    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

13.9    Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, which includes but is not limited to that certain Mutual Confidentiality and Non-Disclosure Agreement dated as of February 16, 2018 ("**Mutual CA**").  The parties hereto

acknowledge and agree that, effective as of the Effective Date, the Mutual CA is terminated and such termination is deemed to be effective as of February 16, 2018. In addition, the parties hereto acknowledge and agree that the provisions in Section 8 shall govern any disclosure of Confidential Information that occurred between February 16, 2018 through the Effective Date .

13.10    Assignment. Licensee may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without Licensor's consent. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective permitted successors and assigns.

13.11    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever, under, or by reason of this Agreement.

13.12    Amendment; Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the waiving party. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

13.13    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.14    Governing Law; Submission to Jurisdiction.

(a)    This Agreement and all related documents, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas

(b)    Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder shall be instituted  in the federal courts of the United States or the courts of the State of Texas, in each case located in the city of Houston and County of Harris County, and each party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by

mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court.

13.15   <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

13.16   <u>Equitable Relief</u>. Each party acknowledges that a breach by the other party of <u>Section 8</u> may cause the non-breaching party irreparable harm, for which an award of damages would not be adequate compensation, and agrees that, in the event of such a breach or threatened breach, the non-breaching party will be entitled to seek equitable relief, including in the form of orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court. These remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available under this Agreement at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

13.17   <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (to which a signed PDF copy is attached) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

Case 19-19-000304-DAC Document 51-5 Filed 02/03/19 Page 17 18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

**DIAMONDBACK INDUSTRIES, INC.**


By_____
Name:
Title:


**REPEAT PRECISION, LLC**


By_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the
Effective Date by their respective officers thereunto duly authorized.

**DIAMONDBACK INDUSTRIES, INC.**

By_____

Name: *Derrek Drury*

Title: *President*

**REPEAT PRECISION, LLC**

By_____

Name:

Title:

# EXHIBIT 6

# AMENDMENT TO PATENT LICENSE

## Amendment to Patent License Agreement and
## Right of First Refusal Agreement

This Amendment to the Patent License Agreement and Right of First Refusal Agreement ("**Agreement**"), dated as of May 30 , 2018 (the "**Effective Date**"), is by and among Diamondback Industries, Inc., a Texas corporation ("**Licensor**"), the shareholder(s) of Licensor ("**Shareholders**"), and Repeat Precision, LLC, a Texas limited liability company ("**Licensee**").

WHEREAS, Licensor and Licensee entered into a Patent License Agreement dated as of March 16, 2018 ("**Prior Agreement**"), pursuant to which, among other things, Licensor granted to Licensee and its Affiliates the right to use certain patents in connection with the Licensed Products on the terms and conditions set forth in the Prior Agreement; and

WHEREAS, Licensor and Licensee desire to amend the Prior Agreement to, among other things, reflect certain changes to and clarifications of the terms thereof and to grant Licensee and its Affiliates a right of first refusal, all in accordance with the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree to amend the Prior Agreement as follows:

1. <u>Definitions</u>. Capitalized terms used and not defined in this Agreement have the respective meanings assigned to them in the Prior Agreement.

2. <u>Amendments to the Existing Agreement</u>. As of the Effective Date, the Prior Agreement is hereby amended or modified as follows:

   2.1. The definition of "Licensed Products" now appearing in Section 1 of the Prior Agreement is hereby deleted in its entirety and replaced with the following:

   "Licensed Products" means an electric wireline setting tool used for well completions and any other products that may be agreed upon in writing by Licensor and Licensee from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such a Valid Claim exists.

   2.2. Section 13.10 of the Prior Agreement is hereby deleted in its entirety and replaced with the following:

   13.10 <u>Assignment</u>. Neither this Agreement nor any rights set forth or derived herein may be assigned or otherwise transferred (including by operation of law) by the Licensor, in whole or in part, without the prior written consent of the Licensee, which consent may be withheld in Licensee's sole discretion.  In the event of a sale of stock (or its equivalents) or assets, or the merger, conversion, share exchange or consolidation of Licensor, or any other transfer of substantially all its business, the license granted in Section 2 and all other rights conveyed to Licensee shall continue to remain in full force and effect. Licensor further covenants and agrees to make any such sale, assignment or other transfer of this Agreement or any of its rights set forth or derived herein to be subject to the license granted to Licensee in Section 2 and other rights granted to Licensee herein.  In particular, Licensor shall not sell or transfer Licensed Patents unless the purchaser of such Licensed Patent(s)

expressly assumes in writing all obligations under this Agreement. Licensor shall use its best efforts to ensure that Licensee's rights under this Agreement continue for the life of the Licensed Patents, including in the case were substantially all of the assets of the Licensor are sold. Licensee may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement without Licensor's consent. For the avoidance of doubt, this Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including the license granted herein.

Further, the last sentence of Section 3.1 of the Prior Agreement is hereby deleted.

3. Right of First Refusal.

3.1. Licensor and each of the Shareholders hereby grants to Licensee and its Affiliates, including NCS Multistage LLC and its subsidiaries, a right of first refusal ("**ROFR**") to purchase the equity securities and/or assets of Licensor and its subsidiaries upon the Licensor's or the Shareholders' proposed sale to, or receipt of a bona fide third-party offer (each, an "**Offer**") to Transfer in a single transaction, or a series of one or more related transactions, 50% or more of the business of the Licensor and its subsidiaries, whether by merger, conversion, consolidation, sale of stock, share exchange, an acquisition of assets or otherwise; *provided, however*, that in the event that the assets or business of Licensor is transferred to an existing Affiliate, or Licensor is converted into an entity other than a corporation, then the ROFR shall also apply to such Affiliate, successor entity or subsequent transferee, as applicable. For purposes hereof, a "**Transfer**" includes a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, exchange or any other disposition by law or otherwise, whether voluntary or involuntary, and includes any change in ownership of stock or other equity securities that would result in a change in control of a Shareholder.

3.2. Upon receipt of an Offer, Licensor or Shareholders, as applicable, shall notify Licensee within three (3) business days, which notice shall be accompanied by a complete copy of all proposed transaction documents. Licensee shall have forty five (45) days to give written notification (including by email) as to whether or not it is exercising its ROFR. If Licensee declines to exercise its ROFR by the forty fifth (45th) day following receipt of the Offer (such date the "**ROFR Acceptance Deadline**"), the Licensor or the Shareholders may proceed with the proposed sale ("**Approved Sale**") solely upon the same terms and conditions presented to Licensee in the Offer; and in the event any such terms and conditions change, Licensee's ROFR shall remain outstanding and may be exercised based upon the revised terms of the offer and Licensee shall have an additional twenty (20) days to exercise its ROFR based upon the revised terms. In the event an Approved Sale fails to close within ninety (90) days, Licensee's ROFR shall remain outstanding, and Licensor or the Shareholders may not Transfer the stock, assets or other consideration described in the Offer without complying again with the provisions of this Section 3.

3.3. In the event Licensee or any of its Affiliates (a "**Licensee Purchaser**") elect to exercise the ROFR, the Licensee Purchaser may purchase the Licensor and its subsidiaries (or the assets or stock thereof) for the same dollar value of consideration presented in the Offer in either cash, publicly listed securities or a combination thereof. The closing of the

2

RN

purchase and sale pursuant to the exercise of the ROFR granted in this Section 3 shall be at 9:00 a.m. on the ninetieth (90th) day following the ROFR Acceptance Deadline at the Licensor's principal office, or at such other time as Licensor or the Shareholders, on the one hand, and Licensee, on the other hand, may otherwise agree.

4. <u>No Other Amendments; Confirmation of Prior Agreement</u>. Other than as expressly modified pursuant to this Agreement, (a) the Prior Agreement shall remain in full force and effect, and no other provisions of the Prior Agreement shall be amended hereby, and (b) all of the terms, conditions and other provisions of the Prior Agreement are hereby ratified and confirmed and shall continue to be in full force and effect in accordance with their respective terms.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts (each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement) and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. A signed copy of this Amendment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

**DIAMONDBACK INDUSTRIES, INC.**

By _____
Name:  Derrek Drury
Title:  President

**LICENSOR SHAREHOLDER(S) (solely for the purposes of Section 3)**

_____
Name:  Derrek Drury

**REPEAT PRECISION, LLC**

By _____
Name:  Robert Nipper
Title:  CEO

[Signature Page]

4734051.2

# EXHIBIT 4



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAYE SCHOLER LLP

E-FILED: **9/28/10**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

ALFRED E. MANN
FOUNDATION FOR SCIENTIFIC
RESEARCH,

    Plaintiffs,

v.

COCHLEAR CORPORATION and
COCHLEAR LTD.,

    Defendants.

_____

COCHLEAR AMERICAS and
COCHLEAR LTD.,

    Counterclaimants,

v.

ALFRED E. MANN
FOUNDATION FOR SCIENTIFIC
RESEARCH,

    Counterdefendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 07-08108 GHK (CTX)

[~~PROPOSED~~] ORDER GRANTING
UNOPPOSED MOTION TO JOIN
ADVANCED BIONICS, LLC

AMF - Proposed Order re Motion to Join.DOCX      [PROPOSED] ORDER

1      The Court has before it Plaintiff Alfred E. Mann Foundation for Scientific

2  Research's unopposed motion to join Advanced Bionics, LLC, as a party to this

3  action through the filing of a First Amended Complaint and service of that First

4  Amended Complaint and a summons upon Advanced Bionics, LLC.

5      The motion is granted.

6

7

8  **IT IS SO ORDERED**.

9

10  DATED: ___9/28___ , 2010

11

12                                        By: _____

13                                        The Honorable George H. King
                                          United States District Court
                                          Central District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

AMF - Proposed Order re Motion to Join.DOCX          [PROPOSED] ORDER

KAYE SCHOLER LLP

**App. 132**